UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| JOHNSON MEMORIAL CORPORATION, INC., et al.,[1] | : | Jointly Administered under |
| JOHNSON MEMORIAL HOSPITAL, INC. | : | 08-22188 |
| THE JOHNSON EVERGREEN CORPORATION, INC. | : | |
| | : | |
| Debtors. | : | |
| | : | |

FIRST AMENDED DISCLOSURE STATEMENT FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS' FIRST AMENDED PLAN OF LIQUIDATION DATED
FEBRUARY 11, 2010

DATED: February 11, 2010

Zeisler & Zeisler, P. C.
558 Clinton Avenue
P. O. Box 3186
Bridgeport, CT  06605-0186
Craig I. Lifland  (ct00976)
James Berman (ct06027)
(203)  368-4234
Counsel to Official Committee of Unsecured Creditors

---

[1] Johnson Memorial Hospital, Inc., Case No. 08-22187, Johnson Memorial Corporation, Inc., Case No. 08-22188, The Johnson Evergreen Corporation, Inc., Case No. 08-22189

## ARTICLE I.
## INTRODUCTION

On November 4, 2008, Johnson Memorial Hospital, Inc., ("JMH") Johnson Memorial Corporation, Inc., ("JMC") The Johnson Evergreen Corporation, Inc., ("JEC"), (collectively "Debtors"), debtors and debtors-in-possession filed voluntary petitions seeking the relief afforded by Chapter 11 of Title 11, United States Bankruptcy Code, §§ 101 et. seq., in the United States Bankruptcy Court, District of Connecticut, Hartford Division. In accordance with § 1107 and § 1108 of the Bankruptcy Code, the Debtors were authorized to continue in possession of their properties and operate and manage their businesses as debtors-in possession. On November 17, 2008, 2009, the U.S. Trustee appointed the Official Committee of Unsecured Creditor in these Chapter 11 cases (hereafter, the "Committee").

The Committee submits this First Amended Disclosure Statement with respect to its proposed First Amended Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") pursuant to § 1125 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., (the "Bankruptcy Code"). This Disclosure Statement is to be used in connection with the solicitation of acceptances of the proposed First Amended Plan of Liquidation under Chapter 11 of the Bankruptcy Code for the Debtors, submitted by the Committee and dated February    , 2010 (hereafter, the "Plan"), and filed with the Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"). Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed to such terms in the Plan.

## ARTICLE II.
## NOTICE TO HOLDERS OF CLAIMS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired, to make an informed decision in exercising your right to accept or reject the Plan.

2.01    **OVERVIEW**

The proponent of the Plan is the Committee. Prior to the time the Committee filed its Plan, JMH had already filed a proposed Plan of Reorganization[2] with little or no input from the Committee. The JMH Plan filed by the Debtor provides for an internal reorganization without any infusion of outside capital other than a proposed borrowing pursuant to a $6,000,000 line of credit, the bulk of which will be used by JMH in its operations. The proposed line of credit will be secured by the Debtors' receivables which are currently in the approximate amount of 9.5 million dollars

---

[2] Only JMH filed a plan. Subsequently, JEC filed a plan and JMC did not file a Plan. The Committee's Plan is for all three Debtor entities.

and are unencumbered. The Committee's Plan provides for the liquidation of the Debtors through a sale of all of the Debtors' operating assets to an entity or entities to be formed by ECHN, a Connecticut not-for-profit hospital and healthcare network located in Eastern Connecticut. The Asset Purchase Agreement with ECHN excludes, inter alia, the Debtors' cash and cash equivalents, as well as accounts receivable, which will be left to the Debtors' estates for the benefit of creditors to be paid in accordance with the priorities set forth in the Plan and the Bankruptcy Code. In addition, ECHN will pay the Debtors estates $2,000,000 dollars and assume, inter alia, the Debtors' senior secured debt of approximately $32,000,000. The Plan proposed by the Committee contemplates the sale of virtually all the operating assets of the Debtors and eventual liquidation of the Debtors.

### 2.02   NOTICES

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF LIQUIDATION PROPOSED BY THE COMMITTEE. PLEASE READ THIS DOCUMENT WITH CARE.

On or about the ____ day of February   , 2010, after notice and a hearing, the Bankruptcy Court entered an order pursuant to § 1125 of the Bankruptcy Code approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS ARE BASED UPON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER

PURPOSE.   THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, ITS BUSINESSES AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES, HAVE BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND OTHER WRITINGS RELATING TO THE DEBTORS.   THE COMMITTEE AND ITS PROFESSIONALS, OR ANY OTHER PARTY MAKES ANY OTHER REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTORS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSABLE IN ANY NON-BANKRUPTCY PROCEEDING REGARDING THE DEBTORS OR ANY OTHER PARTY-IN-INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE LIQUIDATION AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.

Each Holder of a Claim who is entitled to vote to accept or reject the Plan should read the Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and § 1125 of the Bankruptcy Code.  No person has been authorized to use or promulgate any information concerning the Debtors, its business, or the Plan other than the information contained in this Disclosure Statement or other Bankruptcy Court approved Disclosure Statement.  You should not rely on any information relating to the Debtors, its business or the Plan other than that contained in this Disclosure Statement and the Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the Committee's counsel, at the address set forth on the Ballot, on or before the _____ day of _____, 2010.

If you do not vote to accept the Plan, or if you are the Holder of an unimpaired Claim, you may be bound by the Plan if it is accepted by the requisite Holders of Claims or Interests as

described herein under the caption "Voting Procedures and Requirements - Vote Required for Class Acceptance" and "Confirmation of The Plan - Requirements For Confirmation of the Plan" and "Cramdown".

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED BY COMMITTEE'S COUNSEL NO LATER THAN 5:00 P.M., ON THE _____ DAY OF _____, 2010. Your Claims may be classified in multiple classes. WHEN YOU VOTE AND RETURN YOUR BALLOT, PLEASE INDICATE THE CLASS OR CLASSES IN WHICH YOUR CLAIMS ARE CLASSIFIED AND AGAINST WHICH DEBTOR YOU HOLD A CLAIM AGAINST BY MARKING THE APPROPRIATE SPACE PROVIDED ON YOUR BALLOT FOR SUCH PURPOSES. The Ballot should include each creditor's Tax identification number or social security number, as applicable, to avoid delays in distribution or a tax withholding under the Internal Revenue Code. For detailed voting instructions and the names and addresses of the persons you may contact if you have questions regarding the voting procedures, see "Voting Procedures and Requirements - Parties-In-Interest Entitled to Vote", §§ 14.01 through 14.03, herein.

Pursuant to § 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on the _____ day of _____, 2010 at _____ a../p.m., 450 Main Street, Hartford, Connecticut. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before the _____ day of _____, 2010.

## ARTICLE III.
## HISTORY OF THE DEBTORS

3.01    *Debtors' Business, History and Operations* - On the Petition Date, the Debtors filed Voluntary Petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as Debtors-in-Possession pursuant to Bankruptcy Code Sections §§1107 and 1108. The Debtors are Connecticut not-for-profit corporations located in Statford Springs and Enfield, Connecticut.

JMH owns and operates a 92 bed, acute care hospital located in Statford Springs, Connecticut and a surgery center located in Enfield, CT. The hospital offers a comprehensive array of in-patient and out-patient services, including medical and surgical, obstetrics and gynecology, pediatrics, mental health, intensive/coronary care, oncology, rehabilitation and emergency care. JMH's mission is to provide quality healthcare and to participate in educational activities related to rendering care to the sick and injured. It serves as a community resource for the promotion of health, and attempts to respond to the changing healthcare needs of the community it serves. The Debtors also provide healthcare services to any member of the community needing such care, regardless of the ability to pay.

JEC operates Evergreen Healthcare Center, a 150 bed skilled nursing facility for long term and sub-acute care. JMC is the parent corporation for both JMH and JEC. As of the petition date,

JMH and JEC had approximately 850 combined employees and combined revenue of approximately $90,000,000.

Prior to the Petition Date, due to a variety of factors, including low reimbursement rates, certain operating inefficiencies, and low census, the Debtors sustained significant operating losses for several years.  In addition, the Debtors' gradual accumulation of unsecured debt during this period restricted the Debtors' ability to obtain credit and created substantial cash flow issues.  As a further result of its decline and financial performance, the Debtors were unable to make appropriate capital expenditures and invest in growth strategies.

Prior to the Petition Date, the Debtors retained Focus Management Group to provide various management services after terminating its existing management team when the Debtors' Board of Trustees learned from their auditors that they could not give an unqualified opinion as to the Debtors' continued operation as a going concern.  Further, the auditors were required to make $14,000,000 in audit adjustments to the Debtors' financials, resulting in a consolidated operating loss of over $16,000,000 for year ending September 30, 2007.

In approximately the summer of 2008, the Board of Trustees then made the determination that it should sell JMH, JMC and JEC to an entity or entities to be formed by Eastern Health Network Systems, ("ECHN") and signed a contract with ECHN providing for the sale of virtually all of their operating assets to ECHN.  The Debtors then filed Chapter 11 Petitions and filed pleadings seeking an accelerated process to approve the sale of their assets to ECHN.  The Sale would have excluded the Debtors' accounts receivable and cash on hand, providing a fund for distribution and recovery to unsecured creditors; a result very similar to this Plan, except for less consideration.

3.02    *The Debtors' Assets as of Petition Date* – The assets of  the Debtors, as of the Petition Date, are set forth in detail in their Schedules, as amended, which are on file with the Clerk of the U. S. Bankruptcy Court at 450 Main Street, Hartford, Connecticut and can be inspected during regular business hours.  As of the filing date, the Debtors' major businesses and assets consisted primarily of (i) real estate for the hospital, surgery center and nursing home including other office buildings and vacant land; (ii) cash and cash equivalents; (iii) accounts and accounts receivable; and (iv) personal property associated with the operation of the Debtors' businesses.

3.03    *The Debtors' Liabilities As Of The Petition Date* – A detailed listing of the liabilities of the Debtors can be found in Schedule "D" (creditors holding secured claims), "E" (creditors holding unsecured priority claims), and "F" (creditors holding unsecured non-priority claims), all on file, as amended, with the Clerk of the U. S. Bankruptcy Court, 450 Main Street, Hartford, Connecticut and may be inspected during regular business hours.     Generally, the Debtors' real estate is encumbered by mortgages held by People's United Bank approximately as follows:

(i)      JMH 13.3 million dollars;
(ii)     JEC Nursing Home – 15.2 million dollars; and
(iii)    JMC Office/Surgery Center – 3.5 million dollars

In addition, the PBGC asserts unfunded benefit liability (UBL) claims against the Debtors' estates of approximately $29,000,000 (which sum is disputed based upon methodology of calculation) and a $6,000,000 lien on the Debtors' real estate for unfunded benefit contributions prior to the Petition Date which the Committee asserts to be unsecured.  The aggregate amount of the JMH and JMC trade debt is approximately $11,000,000 to $15,000,000, excluding the PBGC UBL claims, which amounts are in dispute, and the trade payables due from JEC is approximately $1,000,000.

## ARTICLE IV.
## CHAPTER 11 PROCEEDINGS

4.01    *Management* – At the commencement of the Chapter 11 cases, the Debtors sought approval of their pre-petition contract with Focus Management Group.  Pursuant to the Management Contract, Focus, based out of Florida, provided the following executives to be the Debtors' management team: Peter Betts, Chief Executive Officer, Frank Shiffer, Chief Finance Officer (Shiffer replaced Patty Gardes who was a member of Focus for approximately the first sixty days of the Chapter 11 cases), Frank Musso, Controller and Gene Schuller, Chief Operating Officer.  On the Petition Date, an additional staff person was included in the Focus supplied management team.  Currently, Betts, Shiffer and Musso remain as the Debtors' management pursuant to the Focus Contract.  The Focus Contract originally provided monthly compensation (fees and expenses) in the amount of approximately $300,000  The Focus engagement was the subject of much controversy and litigation which resulted in the Bankruptcy Court entering several orders reducing and modifying the compensation and terms and conditions originally proposed by the Debtors and upon which Focus managed the Debtors' operations during the Chapter 11 cases.  As set forth in the Plan, upon confirmation of the Plan, the Focus contract shall be terminated and Debtors' management shall be governed by the Interim Management Agreement with ECHN attached to the Plan as Exhibit "B" and incorporated herein.

4.02    *Operations and Finances* – Prior to the Petition Date, the Debtors incurred significant operating losses.  Since the Petition Date, the Debtors operations have stabilized to the point where patient volumes are relatively constant at the hospital and the organization has seen modest growth in the nursing home and home health units (see the operating metrics below, taken from the Debtors weekly flash report).  During the last 18 months, the Debtor has also eliminated approximately 70 FTEs.

|  | Calender year 2009 | | | |
|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 |
| **Hospital Metrics** | | | | |
| Admissions (excl newborns) | 886 | 823 | 780 | 797 |
| ED Visits | 4,928 | 5,315 | 5,499 | 4,973 |
| Births | 71 | 69 | 66 | 69 |
| IP Surgeries | 79 | 60 | 68 | 67 |
| OP Surgeries - Hospital | 584 | 612 | 607 | 565 |
| OP Surgeries - Enfield | 487 | 577 | 429 | 390 |
|  | | | | |
| **Evergreen Health Care (nursing home)** | | | | |
| SNF Resident Days (150 Bed) | 11,448 | 11,079 | 11,978 | 11,857 |
| MS  Resident Days   (30 Bed) | 2,434 | 2,492 | 2,079 | 2,194 |
| Total Resident Days | 13,882 | 13,571 | 14,057 | 14,051 |
| % Occupancy | 85% | 83% | 86% | 86% |
|  | | | | |
| **Home & Community Health Services (home health)** | | | | |
| ADC Home Health | 3,696 | 4,060 | 4,284 | 4,342 |
| ADC Hospice | 227 | 236 | 272 | 248 |
| Total ADC | 3,923 | 4,296 | 4,556 | 4,590 |

4.03    *Plan and Sale Negotiations* –  Immediately after filing their petitions, the Debtors filed a motion to sell substantially all of their properties, other than accounts receivable and cash, to ECHN.  Following extensive negotiations, ECHN subsequently terminated that agreement.  At the outset of the cases, the Committee retained General Capital Partners as its investment banker to solicit offers higher than the ECHN offer.  The Debtors and Committee subsequently entered into negotiations with another entity regarding a potential sale and investment in the Debtors but those negotiations did not reach a final agreement.  At approximately the same time, ECHN approached the Committee indicating its desire to once again acquire virtually all of the Debtors' operating assets, exclusive of its cash and accounts receivable, and increased the offer it made pre-petition that was accepted by the Debtors, (the "Revised ECHN Offer").  Moreover, the Revised ECHN Offer provides for the assumption of the People's Bank secured debt of approximately $32,000,000, assumes certain other liabilities of the Debtors, and pays the Chapter 11 estates $2,000,000.  In addition, the Revised ECHN Offer eliminates many of the conditions which were in its original offer which would have permitted ECHN to terminate the contract virtually at any time without penalty.

Notwithstanding the material benefits of the Revised ECHN Offer, the Debtors, for a variety of reasons which lack merit, will not file a motion pursuant to Section §363 of the Bankruptcy Code selling to ECHN those assets described in the Asset Purchase Agreement, and notwithstanding their prior desire to sell to ECHN on less favorable terms.  As a consequence, the Committee has filed the Plan and this Disclosure Statement seeking to approve the sale of ECHN while JMH has filed a Plan of Reorganization, not supported by the Committee, and

which provides for minimal contingent distributions to unsecured creditors over extended periods of time.

## ARTICLE V.

## PRESENT FINANCIAL CONDITION, LIQUIDATION ANALYSIS AND ESTIMATE OF RETURN TO UNSECURED CREDITORS

5.01     *Current Financial Condition* - The Debtors' latest Debtor-in-Possession operating reports reflecting monthly results for the period ending December 31, 2009 are annexed hereto as Exhibit "A" and incorporated herein.   For the 12 month period ending September 30, 2009 (Debtor's fiscal year), the Debtor's unaudited consolidated net income and EBITDA were $(5.4M) loss and a positive $3.4M respectively.   Since the filing, and reflected in the cash report as of 12/26/09, the Debtor has accumulated a cash surplus from operations in excess of $2M, resulting in a total cash balance of approximately $4M.  Included in the above financial performance were non recurring bankruptcy related expenses of $2.1M and a premium paid on executive management of approximately $2M.

5.02     *Liquidation Analysis*:  Section 1129(a)(7) of the Bankrutpcy Code, also known as the "best interests test", provides, *inter alia*, that a Plan must provide that the Holder of a Claim must "receive or retain under the plan on account of such claim or interest property of a  value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under Chapter 7 of this title on such date."  The Committee submits that the liquidation and payment of claims pursuant to the Plan, will provide a dividend to general unsecured creditors that is not less than the amount that unsecured creditors would receive under a Chapter 7 liquidation.  In a Chapter 7 liquidation, the estate would incur significantly greater expense by virtue of the appointment of a trustee with attendant cost, delay and commission schedule.

This analysis requires the Bankruptcy Court to determine what the holders of Allowed Claims in each impaired class would receive from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The cash amount that would be available for the satisfaction of unsecured claims of the Debtors would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.  Such cash amount would be reduced by the costs and expenses of the liquidation, and by such additional administrative and priority claims that may result from the use of chapter 7 for the purposes of liquidation.

In a Chapter 7 liquidation, the Debtors would no longer constitute a going concern business.  As a result, experience clearly dictates that the collection of accounts receivable from a business entity which ceases to operate significantly drop off by as much as 40% to 50%.  The cost

of collecting aged receivables becomes increasingly expensive and more difficult to liquidate.  To the contrary, the cost of collecting accounts receivable from a business that continues to operate significantly produce a higher return to creditors.  Under the Asset Purchase Agreement, the Purchaser will undertake the collection of the Debtors' accounts receivable while it operates the Debtors' businesses in the ordinary course at reasonable compensation to the estates.  This recovery is bound to exceed what a Chapter 7 Trustee might recover when there is no operating entity continuing to provide goods and services to the entities that owe money to the Chapter 11 estates.  Furthermore, the values of the Debtors' real estate assets would significantly be reduced in a Chapter 7 liquidation and the time necessary to find a buyer would be significant.  Moreover, there exists the potential for significant deficiency claims for failure to satisfy the People's Secured Claims.  Under the Committee Plan, no such shortfall exists.  A deficiency claim of People's United Bank would significantly dilute the return to unsecured creditors in Class 8.

The costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those payable to attorneys, and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case, such as compensation for attorneys, financial advisors, accountants, and costs and expenses of members of any official committees that are allowed in the chapter 7 cases.  In addition, claims could arise by reason of the breach or rejection of obligations incurred and executory contracts entered into, or assumed by, the Debtors during the pendency of the chapter 11 cases.

The foregoing types of Claims and such other claims which may arise in the liquidation cases or result from the pending chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the chapter 11 cases, including: (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (b) the loss in value of operating assets in a liquidation; and (c) the delays in making distributions to Creditors; the Committee believes that confirmation of the Plan will provide each Holder of an Allowed Claim with more than the amount the Holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

5.03   *Estimate Of Return To Creditors* - The following table reflects the Debtors' current assets and anticipated recoveries under the Plan.  It also reflects the Committee's best estimates of the various Claims including administrative, priority and general unsecured Claims and the resulting recovery ranges in the low and high scenarios depending upon what the ultimate assets and liabilities are determined to be.   THERE ARE SIGNIFICANT ASSUMPTIONS INCLUDED IN THE TABLES BELOW AND THEREFORE THE NUMBERS REFLECT BEST ESTIMATES AND ARE NOT FINAL.

Overview – Based on the following analysis, the Committee expects that it will have sufficient funds on Distribution Date to pay, in full, all Administrative Claims, Priority Tax Claims and Priority Claims. The Liquidating Custodian will satisfy Allowed Secured Claims from the Distributable Funds and then make distributions to unsecured creditors.  The chart below reflects the best estimate prepared by the Committee's professionals reflecting sources and uses and potential high and low recoveries for general unsecured creditors:

| **ESTIMATED ASSETS/SOURCES** | *Low Range* | *High Range* |
|---|---|---|
| | | |
| Cash from Purchase Price[3] | $2,000,000 | $2,000,000 |
| Unrestricted Cash[4] | $4,233,604 | $5,233,604 |
| Restricted Cash[5] | $750,000 | $2,500,000 |
| Accounts Receivable[6] | $7,604,779 | $9,125,735 |
| Other Recoveries[7] | TBD | TBD |
| ***TOTAL CASH SOURCES*** | $14,588,383 | $18,859,339 |

Less

| | | |
|---|---|---|
| Post petition accounts payable[8] | $1,837,418 | $1,837,418 |
| Admin/professional fees/cure costs[9] | $2,050,000 | $2,050,000 |
| Accrued payroll[10] | $1,600,000 | $1,600,000 |
| Potential other liability/unknown[11] | $1,000,000 | 0 |

---

[3] Cash payment from ECHN at closing.
[4] Based on cash balance as of 10/31/09 (low) high reflects $200K cash accumulation times five months, estimated June 2010 closing.
[5] The Debtors identify approximately $6,900,000 on their schedules and approximately $4,000,000 on their monthly operating reports as "restricted assets" which reflect, generally, the Debtors' view that these are charitable donations whose use is restricted.  The Committee believes that significant amounts contained in the "restricted use" category are actually property of the estate and can be used to satisfy the claims of creditors.  Litigation will be pursued in the Bankruptcy Court in furtherance of these recoveries.
[6] Range of net receivables is 75 to 90%, inclusive of collection costs.
[7] The Committee has been investigating potential claims against the Debtors' officers and directors for breach of fiduciary duty and gross mismanagement prior to the filing of the Chapter 11 Petitions.  In addition, the Committee has been investigating potential claims against the Debtors' auditors.  Moreover, the schedules filed with the Bankruptcy Court reflect millions of dollars of potential preference actions which the Liquidating Custodian will analyze, pursue and may provide recoveries.
[8] Based on balance as of 10/31/09.
[9] Represents Debtors' estimates.
[10] Will float up and down/inverse of cash account.
[11] Eg, workers comp.

| | | |
|---|---|---|
| ***TOTAL CASH USES*** | $6,487.418 | $5,487,418 |
| ***NET CASH AVAILABLE FOR UNSECURED CLAIMS*** | $8,100,965 | $13,371,921 |

| | | |
|---|---|---|
| **ESTIMATED GENERAL UNSECURED CLAIMS** | | |
| Unsecured Claims[12] | $11,000,000 to $15,000,000 | $11,000,000 to $15,000,000 |
| - With PBGC UBL Claim | $44,000,000 | $28,500,000 |
| **Total Estimated General Unsecured Claims** | | |
| **Estimated Range of Recovery – Approx.** | **18.4%** | **47%** |

NOTE:  ACTUAL RECOVERIES MAY DIFFER MATERIALLY FROM THE ESTIMATES SHOWN HERE.

### ARTICLE VI.
### ADMINISTRATIVE AND PRIORITY TAX CLAIMS

6.01   *Administrative Claims* - Administrative claims are not classified under the Plan and, under law, have no right to vote to accept or reject the Plan.  Unless assumed by the Purchaser, each entity holding an Allowed Administrative Claim shall be paid (1) in full in Cash on the later of (a) the Distribution Date or the date such Administrative Expense becomes due and owing in the ordinary course of business, and (b) the date of the entry of a Final Order allowing and determining such Allowed Administrative Claim, or (2) on such other less favorable terms as may be agreed to by such entity.

6.02   *Tax Claims* - Allowed Priority Tax Claims are not classified under the Plan and under law have no right to vote to accept or reject the Plan.  The Committee estimates this amount to be approximately $84,000, excluding a secured nursing home provider tax and Medicaid overpayments due the State of Connecticut, see Classes 6 and 7, below.  Each entity holding an Allowed Priority Tax Claim shall be paid at the option of the Liquidating Custodian, either (i) on the later of (a) the Distribution Date and (b) the date of entry of a Final Order allowing and determining such claim, or (ii) holders of Allowed Priority Tax Claims will receive

---

[12] The aggregate amount of general unsecured claims reflected in the Debtors' schedules is approximately $11,000,000 to $15,000,000 with the spread representing primarily one dispute with a large claimant.  In addition, the PBGC has filed a termination liability claim of approximately $29,000,000 calculated using a PBGC regulatory methodology.  The Committee believes this methodology is incorrect and will dispute the PBGC unsecured claims which will be an unsecured claim in Class 5.

on account of such claim installment payments, with interest at the applicable statutory rate, in cash:

a)      of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim;

b)      over a period ending not later than 5 years after the date of the order for relief; and

c)      in a manner not less favorable than the most favored nonpriority unsecured claim provided by the plan (other than cash payments made to a class of creditors under section 1122(b)).

## ARTICLE VII.
## SUMMARY OF PLAN OF REORGANIZATION

7.01    The Plan is based upon the Committee's belief that the Debtors proposed Plan or a conventional liquidation of its remaining assets under Chapter 7 of the Bankruptcy Code will result in a smaller distribution to creditors than that proposed under the Plan, taking into consideration the priority of payments required in a liquidation under the provisions of the Bankruptcy Code.

CREDITORS ARE ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY FOR A DETAILED DESCRIPTION OF THE PROPOSED TREATMENT OF THE VARIOUS CLASSES IN THE PLAN.  CREDITORS ARE FURTHER URGED TO CONSULT WITH THEIR RESPECTIVE LEGAL COUNSEL AND OTHER PROFESSIONAL ADVISORS CONCERNING THE PLAN AND TAX RAMIFICATIONS, SINCE THE PLAN REPRESENTS A LEGAL BINDING OBLIGATION AS TO THE DEBTORS AND ALL OTHER AFFECTED PARTIES, WITH CERTAIN TAX RAMIFICATIONS TO CREDITORS, EQUITY HOLDERS AND PARTIES-IN-INTEREST, AND CANNOT BE PROPERLY EVALUATED WITHOUT THOROUGH REVIEW AND COMPREHENSION.

The Holders of all Claims against the Debtors, of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, including all Claims arising from transactions with the Debtors or rejection of executory contracts or leases, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan.  The Claims are classified and treated in the Plan as follows:

A.  Class 1 – Allowed Priority Claims

Holders of Allowed Class 1 claims will receive the allowed amount of their claims in Cash on the Distribution Date.

B.  Class 2 – People's Secured Claim

At the Sale Closing the Debtors shall execute any and all documents necessary to effectuate and implement the assumption and assignment of their obligations to People's United Bank by and to ECHN, or the Purchaser, as applicable, in the principal of $31,870,615, or the principal amount outstanding on the closing date on terms and conditions set forth in the documentation by and between the Seller and People's United Bank evidencing  such indebtedness in effect as of the Effective Date, unless People's United Bank and Buyer agree to modified terms and conditions. The Debtors' estates shall have no further liability to People's United bank upon closing of the transactions set forth in the Asset Purchase Agreement.

C.  Class 3 - Allowed Secured Claims Other than People's Secured Claim  Allowed Claims of Key Government Finance , PBGC and State of Connecticut, Departments of Revenue and Social Services.

Each holder of an Allowed Secured Claim, other than the Allowed Secured Claim of People's United Bank, Key Government Finance, PBGC, State of Connecticut, Departments of Revenue and Social Services, against any of the Debtors shall receive on the Distribution Date, in full satisfaction of its Allowed Secured Claim, (i) a single cash payment equal to the sum of (A) the Allowed Secured Claim and (B) accrued post petition interest through the Effective Date, at an interest rate agreed to by the parties, or, if no agreement can be reached, as to the amount or interest rate, as determined by the Bankruptcy Court after notice and hearing, or (ii) if such Allowed Secured Claim is subject to a valid right of recoupment or set-off, such claim shall be set-off to the extent of the amount subject to set-off in accordance with Sections §§506(a) and 553 of the Bankruptcy Code.  The holder of Allowed Secured Claims shall release their liens at the Sale Closing if their collateral is transferred pursuant to the Asset Purchase Agreement with said liens to attach to the proceeds of Sale.  To the extent the holder of a Claim is undersecured, the holder shall be entitled to vote its under-secured claim in Class 8.

Notwithstanding any of the foregoing, the Debtors and any holder of an Allowed Secured Claim may agree to any alternate treatment of such Secured Claim, except that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim

D.  Class 4 – Allowed Secured Claim of Key Government Finance

In full satisfaction of its Allowed Secured Claim, Key Government Finance shall receive the Key Cash Amount on the Distribution Date and the collateral securing the loan shall be abandoned and available to be returned to Key Government Finance on the Distribution Date.   Key Government Finance may file a claim for any unsecured deficiency within 30 days of the Effective Date and the Committee and/or Liquidating Custodian reserves the right to object to such claim(s).

14

E.   Class 5 – Allowed Secured Claim of PBGC

In full satisfaction of the Allowed Secured Claim of the PBGC, on the Distribution Date, the PBGC shall receive a cash payment in the amount of $375,000 and the PBGC shall release any liens it holds against property of the estate on the Closing Date.  The balance of the PBGC's unfunded benefit liability claim will be paid its pro-rata share as a Class 8 Creditor in the amount ultimately allowed by the Court in the JMH case.

F.   Class 6 – Allowed Secured Claim of State of Connecticut, Department of Revenue Services, Nursing Home Provider Tax

In full and complete satisfaction of the State of Connecticut, Department of Revenue, Nursing Home Provider Tax, the holder of such claim shall receive, at the option of the Liquidating Custodian, a cash payment of $228,081.84, plus accrued interest from the Petition Date, at the applicable rate, on (i) the Distribution Date, or (ii) no later than 120 days following the Distribution Date.

G.   Class 7 - Allowed Secured Claim of State of Connecticut, Department of Social Services

In full and complete satisfaction of the secured claim of the State of Connecticut, Department of Social Services in the amount of $73,359.56, the holder thereof, commencing on and after the Distribution Date, shall be entitled to exercise its right of recoupment against amounts due JEC for services rendered up to the Closing Date of the sale to ECHN, or Successful Bidder, in full and complete satisfaction of such claim.

H.   Class 8 – Allowed Unsecured Claims

In full and complete satisfaction of the holder of each Unsecured Claim, each entity holding an Allowed Unsecured Claim shall receive their prorata share of Distributable Funds in their applicable Chapter 11 Case.  Such distribution(s) shall be made by the Liquidating Custodian from the Initial Cash and the Remaining Assets in accordance with the terms and provisions of Article VIII below.

**ARTICLE VIII.**
**MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

8.01    **Operations between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

15

8.02    **Sale of Assets**

The sale of assets described in the Asset Purchase Agreement shall be subject to the terms and provisions of the Sale Procedure Order which shall establish ECHN as the Stalking Horse and establish, inter alia, bid qualification terms, deadlines and the conduct of the auction at the time of the Confirmation Hearing.  On the Effective Date, the Debtors shall transfer all assets subject to the Asset Purchase Agreement annexed hereto as Exhibit "B" in accordance with the terms and provisions thereof, to ECHN, or the Successful Highest Bidder, free and clear of all liens, claims, charges and encumbrances, except as otherwise expressly set forth in the Asset Purchase Agreement.  Any additional documents necessary to effectuate the transfers as set forth in the Asset Purchase Agreement as set forth in the Plan Supplement which shall be on file with the Clerk's Office of the Court within fifteen (15) days of the Confirmation Hearing.  The Sale Approval Order and this Plan shall constitute an Order of the Bankruptcy Court directing the Debtors to cooperate with the Purchaser in effectuating the sale and transition of the Debtors' businesses.  Further, the Debtors shall execute such additional documents as will be necessary to transfer pursuant to the Asset Purchase Agreement the assets of any non-debtor entities controlled by the Debtors.  Pursuant to the Asset Purchase Agreement, ECHN will cooperate with the Debtors and make available to the Liquidating Custodian books and records and other documents necessary to the wind up of the affairs of the Debtors.

8.03    **Post Confirmation Management**

Upon entry of the Confirmation Order, the Debtors' contract with Focus shall be deemed terminated.  The Debtors' governing body, Board of Trustees, shall remain in place and the Debtors shall be managed pursuant to the Interim Management Agreement with ECHN or Successful Highest Bidder annexed to the Asset Purchase Agreement which is annexed hereto as Exhibit "A" and incorporated herein.  Focus shall file any final fee applications for administrative expense within thirty (30) days of the entry of the Confirmation Order and all such fees and expenses shall be subject to the applicable provisions of Section §330 of the Bankruptcy Code and in accordance with this Court's prior Order(s) authorizing the Focus engagement.

8.04    **Pension Obligations**

**Termination of Pension Plan**

JMH sponsors the Retirement Plan for Employees of Johnson Memorial Hospital (the "Pension Plan"), which is asserted to be a defined benefit Pension Plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. §§ 1301-1461.

JMH, JEC, JMC and other affiliates, as either the sponsor or member of the sponsor's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)), are jointly and severally liable to contribute to the Pension Plan for the amounts necessary to satisfy ERISA's and the Internal Revenue Code's minimum funding standards ("Minimum Funding Contributions"). *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007); 26 U.S.C. §§ 412, 430 (as to § 430, effective for pension plan years beginning after December 31, 2007). They also are jointly and severally liable for insurance premiums owed to the Pension Benefit Guaranty Corporation ("PBGC"). See 29 U.S.C. §§ 1306, 1307.

PBGC is the federal agency that administers the nation's defined benefit pension plan termination insurance program under Title IV of ERISA. When an underfunded pension plan terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits.

Should a Debtor decide to terminate a Pension Plan, ERISA provides the exclusive means to terminate a pension plan. See 29 U.S.C. § 1341(a)(1). A Debtor may terminate the Pension Plan in a standard termination in accordance with 29 U.S.C. § 1341(b) and corresponding regulations. *See* 29 C.F.R. §§ 4041.21-4043.31. A standard termination requires sufficient assets to pay all of the Pension Plan's promised benefits. *See* 29 U.S.C. § 341(b)(2)(A)(i) (III).

If a standard termination of the Pension Plan is not feasible, a Debtor may seek to terminate the Pension Plan in a distress termination. *See* 29 U.S.C. § 1341(c). If a Debtor fails to meet the statutory requirements for a distress termination, the Pension Plan will remain ongoing, and the Debtor and any other controlled group members remain liable for amounts owed in continuing the Pension Plan. However, the Pension Plan may also be terminated by a PBGC-initiated termination.  *See* 29 U.S.C. § 1342(a).

The PBGC has filed timely proofs of claims against all of the Debtors for (1) the Pension Plan's underfunding on a termination basis ("Unfunded Benefit Liabilities"), (2) unpaid Minimum Funding Contributions – a portion of which PBGC asserts is entitled to priority under 11 U.S.C. §§ 507(a)(2), (5), and (3) unpaid premiums. As of May 31, 2009, PBGC estimated that the Pension Plan's unfunded benefit liability was approximately $29,108,149; this claim is contingent on the Pension Plan terminating, other than through a standard termination, during the bankruptcy and would be withdrawn if no such termination occurs.

If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) or a PBGC-initiated termination under 29 U.S.C. § 1342 while the Debtor is attempting to reorganize in Chapter 11, and the Debtor is ultimately the subject of a confirmed Chapter 11 plan of reorganization, the Debtor will become liable to PBGC – in addition to the flat and variable-rate premiums – for termination premiums in the amount of $1,250 for each Pension Plan participant for three years. The termination premium liability does not exist until

after the Chapter 11 plan is confirmed and the Debtor exits from bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141. However, if the Debtor's chapter 11 proceeding in essence becomes a liquidation, the Committee believes that there is no termination premium liability as the will be no "discharge" in the bankruptcy case. See, 29 U.S.C. § 1306(a)(7)(B) and 11 U.S.C. §1141(d)(3). The PBGC does not agree with this interpretation.

Any termination of the Pension Plan shall be in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service.

Nothing in the Debtor's bankruptcy proceedings, Confirmation Order, Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtor's bankruptcy cases shall in any way be construed to discharge, release, limit, or relieve the Debtor or any other party, in any capacity, from ERISA fiduciary liability with respect to fiduciary breaches that occurred prior to the termination of the Pension Plan or any other defined benefit pension plan under any law, governmental policy, or regulatory provision.

ECHN will not assume the Pension Plan. The Committee Plan requires that the Debtor terminate its Pension Plan in a distress termination under 29 U.S.C. section 1341(c), in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service. Prior to the Chapter 11 filings, the PBGC filed statutory liens against some of the Debtors' real estate in the approximate amount of $6,000,000. In full satisfaction of the asserted secured claim of the PBGC, and as settlement of any dispute with the PBGC regarding whether termination premiums are due when there is no discharge entered in a liquidating plan, the Committee Plan provides that the PBGC will receive the amount of $375,000 on the Distribution Date and the PBGC will not participate as an unsecured creditor in the JEC or JMC estates, but will receive its pro rata distribution on behalf of its allowed unfunded benefit liability claim in the JMH case.

8.05   **Environmental Matters**

Pursuant to the Asset Purchase Agreement, all known environmental liabilities that exist, and remediation thereof, will be assumed by ECHN including those obligations under the Consent Order issued by the Department of Environmental Protection, and approved by the Bankruptcy Court. The Committee and ECHN are seeking the consent of the DEP to allow ECHN's assumption of the Consent Order. ECHN has further agreed under the Asset Purchase Agreement to execute a Form III, Certified by ECHN, under Section 22a-134 et seq. of the Connecticut Property Transfer Act. In addition, ECHN is aware that the Debtor, Johnson Memorial Hospital, historically, had stored its spent x-ray development fixer in an underground storage tank located at the hospital grounds in Stafford Springs. In April 2004, this tank and the piping leading to it where

discovered to have leaked.  JMH promptly removed the underground storage tank and conducted other remedial activities, including soil removal and sampling of soil and groundwater.  JMH provided information on the remedial activities to the Department of Environmental Protection ("DEP"), which is currently reviewing it.  Under the Plan, any additional investigation and remediation required by the DEP will be performed by ECHN.

### 8.06    **The Liquidating Custodian**

A.    **Appointment:** Clifford Zucker, a partner at J.H. Cohn L.P., is appointed Liquidating Custodian as of the Effective Date.  J.H. Cohn LP is currently the Financial Advisor to the Committee.

B.    **Duties:** The Liquidating Custodian shall be authorized and empowered to exercise all of the powers of the Debtors in the place and to the exclusion of the Debtors' board of directors, trustees, officers and managers.  The Liquidating Custodian, on behalf of the Debtor, is empowered to manage, protect and distribute the Cash and Remaining Assets and to perform all actions necessary to implement the terms of the Plan.  Such rights, powers, functions and duties shall include, without limitation, the following:

1.    To the extent not previously accomplished, terminate the Retirement Plan for Employees of Johnson Memorial Hospital.

2.    maintenance and administration of bank accounts and investment accounts in accordance with the Plan;

3.    liquidation of the Remaining Assets;

4.    the right to incur and pay out of Remaining Assets on behalf of the Debtor such expenses as may be reasonable and appropriate in carrying out the Debtor's duties and responsibilities under the Plan;

5.    the exercise of all rights and the performance of all obligations under the Asset Purchase Agreement;

6.    investment of Cash on deposit in accordance with the Plan or the Bankruptcy Code;

7.    investigation, prosecution and resolution of any causes of action (including those under Chapter 5 of the Bankruptcy Code);

8.    execution and filing of all tax returns and any other documents on behalf of the Debtors as necessary to comply with local, state or federal authorities;

9.      calculation and implementation of distributions from Cash and Remaining Assets in accordance with the Plan;

10.      to the extent necessary, completion the wind down of the 401(k) plan(s) and defined benefit plans;

11.      dissolution of the Debtors unless otherwise ordered by the Court;

12.      filing of a final decree; and

13.      performance of such other and necessary tasks as is required by the Plan or permitted by the Court.

C.      **Professionals and Consultants.** The Liquidating Custodian, on behalf of the Debtors, may engage such attorneys, accountants and other professionals or consultants, including former employees of the Debtors, as are reasonably required to effectively and efficiently perform its responsibilities under the Plan. Subject to the Bankruptcy Court's approval, the Liquidating Custodian shall pay the reasonable fees, charges and expenses of such attorneys, accountants and other professionals who provide services after the Effective Date as an expense of the Debtors.  The Liquidating Custodian may retain professionals who were retained by the Debtors or the Committee during the Case.

D.      **Distribution and Reserves.**

(a)      On the later of (i) 30 days after the Distribution Date and (ii) the date any such Claim is allowed, the Liquidating Custodian shall pay Allowed Administrative Claims.  The Liquidating Custodian shall pay Allowed Priority Tax Claims as described in Article III from Distributable Funds in accordance with the Plan.

(b)      The Liquidating Custodian shall cause the Debtors to reserve sufficient funds to pay any such Claims that have not been allowed as of the Effective Date.

(c)      The Liquidating Custodian shall make distributions as often as in his discretion and judgment there is an amount of funds sufficient to make a meaningful distribution to holders of Class 5 Claims. A distribution to Class 5 claims shall not be considered meaningful unless the amount of the distribution would be 3% or more of the allowed amount of such Claims, unless the Liquidating Custodian deems a lesser distribution to be appropriate in his sole discretion. In making such determinations, the Liquidating Custodian shall exclude amounts of cash necessary to meet other obligations of the Debtors, or otherwise needed to pay the present or future expenses, debts, charges, liabilities and obligations of the Debtors in accordance with the terms of the Plan.

E.      **Compensation.** The customary hourly rate of the Liquidating Custodian is $620/hour, however, the Liquidating Custodian has agreed to provide the services described herein

at the lower rate of $500/hour, with the majority of required tasks delegated to other J.H. Cohn personnel to be rendered at their customary rates. J.H. Cohn shall be entitled to reimbursement of reasonable expenses. The Liquidating Custodian and his professionals shall receive compensation for their services monthly payable as follows. Copies of the fee statement shall be mailed to the Office of the United States Trustee. If no objection to the fee statement is received within ten (10) days of the mailing of the fee statement, the fee statement shall be payable within ten (10) days of expiration of the objection period. If the Liquidating Custodian receives an objection to any fee statement, the Liquidating Custodian and professionals shall be entitled and be paid the undisputed portion and the balance of the fee statement will be set for hearing in the Bankruptcy Court as soon as practicable.

F.    **Books and Records.** The Liquidating Custodian or its agent shall maintain books and records containing an accounting of receipts and disbursements and shall prepare and file any required tax returns on behalf of the Debtors. The Liquidating Custodian shall file with the Court quarterly a statement in reasonable detail showing cumulatively and for the preceding calendar quarter, all proceeds and revenues received, and all distributions of any expenditures from the Debtors for such quarter and all prior quarters.

G.    **Resignation: Removal of Liquidating Custodian**.

(a)    The Liquidating Custodian may resign by giving written notice of his resignation to the Office of the United States Trustee and all parties who requested notice in this Case. Unless the Bankruptcy Court orders otherwise, (i) such resignation shall become effective on the date on which the Bankruptcy Court appoints a successor Liquidating Custodian; and (ii) the Liquidating Custodian shall be entitled to compensation up to the date on which the Liquidating Custodian's resignation becomes effective. Unless the Bankruptcy Court orders otherwise, within forty-five days of such resignation becoming effective, the Liquidating Custodian, with the assistance of professionals and consultants he has engaged, shall file a final accounting with the Bankruptcy Court and thereupon being discharged from the performance of any further duties.

(b)    If the Liquidating Custodian at any time resigns or is removed, or dies or becomes incapable of action, or is a debtor under the Bankruptcy Code or is adjudged to be insolvent, a vacancy shall be deemed to exist and a successor Liquidating Custodian shall be appointed pursuant to an order of the Bankruptcy Court as soon as practicable.

H.    **Conflict**. If any claim, cause of action, objection, settlement or other act of, or on behalf of, the Debtors gives rise to a conflict on behalf of the Liquidating Custodian, the Liquidating Custodian shall withdraw from any and all involvement concerning the matter or issue giving rise to the conflict. Any supplemental Liquidating Custodian so appointed shall have the rights, powers, privileges and duties of the Liquidating Custodian hereunder solely in connection with the matters on which it has been appointed and shall be subject to the conditions and limitations of the Plan. Such supplemental Liquidating Custodian shall be answerable to the Liquidating Custodian for all monies, assets and other property which may be received by it in connection with the administration

21

of the Debtor. The Bankruptcy Court may remove such supplemental Liquidating Custodian for cause, upon the motion of the Liquidating Custodian or any holder of an Allowed Claim that has not been paid in full, and such supplemental Liquidating Custodian shall resign upon completion of its duties in connection with the matter on which it was appointed.

I.    **Limitation of Liability; Standard of Care.**

(a)    The Liquidating Custodian and any supplemental Liquidating Custodian and their members, agents, representatives, employees and professionals shall not be liable to the Debtor, the Debtor's Creditors or any other Entity or party in interest for any action, inaction or error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud. The Liquidating Custodian shall not be liable for any action taken or omitted in good faith and believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan. The Liquidating Custodian makes no representation as to the value or condition of the Debtor's assets or any part thereof, or as to the security afforded by the Plan, or as to the validity, execution (except its own execution), enforceability, legality or sufficiency of the Plan, and the Liquidating Custodian shall incur no liability or responsibility with respect to such matters. In performing its duties under the Plan, the Liquidating Custodian may retain and consult with counsel as described above and shall have no liability for any action taken upon the advice of such counsel. The Liquidating Custodian may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.

(b)    None of the provisions of the Plan shall require or be construed as requiring the Liquidating Custodian to expend or risk its own finds or otherwise incur or expose it to personal financial liability in the performance of any of its duties under the Plan or in the exercise of any of its rights and powers.

(c)    The Liquidating Custodian shall be indemnified and receive reimbursement from the Debtors against and from any and all loss, liability or damage, including payment of attorneys' fees and other costs of defending itself, which it may incur or sustain, other than as a result of willful misconduct, gross negligence or fraud in the exercise and performance of its duties hereunder and under the Plan provided, however, any reserves held in respect of Disputed Claims shall in no event be available for such payments. The Liquidating Custodian may purchase with assets of the Debtor such insurance as it reasonably believes, in the exercise of its discretion, adequately insures that it shall be indemnified against any such loss, liability or damage, not to exceed $15,000,000 million of coverage. The Liquidating Custodian may purchase with the assets of the Debtors as soon as practicable after its appointment a fidelity bond payable to the United States of America in the amount of the value of assets in his control.

(d)    The Liquidating Custodian and its agents shall have no liability for any debts, actions, omissions of the Debtors or Debtors-in-Possession which arose before his appointment. In particular, the Liquidating Custodian and its agents shall have no liability whatsoever for any Taxes due for periods prior to his appointment. In establishing any reserves and making any distributions

22

to creditors pursuant to the Plan, the Liquidating Custodian shall be entitled to proceed in accordance with any order of the Court and shall have no liability for acting in accordance with such order;

(e)     The Liquidating Custodian shall not assume the status of trustee, plan administrator or any other position with respect to any employee benefit plan of the Debtors, including the 401(k) plan. However, the Liquidating Custodian in his discretion may cause the Debtors to expend funds to complete the termination of such plans.

J.     **Power to Assert Chapter 5 Claims.**

(a)     The Liquidating Custodian shall retain and may enforce any and all claims, causes of action and rights of the Debtors, the Debtors' estates or the Creditors, including, without limitation, avoidance actions and the right to seek the subordination of Claims under Bankruptcy Code section 510.

(b)     the Debtors, through the Liquidating Custodian, shall also have the power to abandon property pursuant to Section 554.

K.     **Objections.** On the Effective Date, the Liquidating Custodian, shall have the right and responsibility to examine Claims and prosecute or otherwise resolve objections to any Claims, including any objections previously filed by the Debtors.

L.     **Investment.** All Cash held by the Debtors following the payments made on the Effective Date, other than funds needed for payment of operating expenses, shall be invested and reinvested by the Liquidating Custodian in interest-bearing accounts or certificate of deposits of banks and trust companies having an aggregate capital and surplus in excess of $50 million or such other investments as shall be prudent and appropriate under the circumstances, in such amounts and upon such terms as a reasonable and prudent fiduciary would select and with a view towards sufficient liquidity to make the distributions contemplated by the Plan. All interest earned on such investments shall be retained and distributed in accordance with the terms of the Plan. All Cash and all other property held by the Debtors and interest and earnings on such property shall be distributed pro rata to Creditors as provided in the Plan. In the event that the Liquidating Custodian shall at any time in good faith question the amount or propriety of any distribution to be made hereunder, then in that event the Liquidating Custodian shall make a distribution of so much of the funds then available as to which no dispute or controversy exists and shall be protected in holding the amounts as to which a dispute or controversy exists pending a determination by the Bankruptcy Court as to the amount in dispute.

M.     **Discharge**

After all property has been fully administered and distributed pursuant to the terms of the Plan, the Liquidating Custodian shall be discharged of his duties.

8.07   **Plan Funding**

Upon the Effective Date, the Debtors will fund their operation from the Initial Cash and the Remaining Assets.

A.     **Distributions and Reserves**

i.        The Liquidating Custodian shall make all distributions required by the Plan. All costs and expenses in connection with such distributions shall be borne by the Debtors.  At the option of the Liquidating Custodian, distributions may be made in cash, by wire transfer or by a check drawn on a domestic bank. Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.  The Liquidating Custodian shall not be required to make any payment of $10 or less.

ii.       The Liquidating Custodian may, but is not required to, set off against any Claim and the distribution to be made pursuant to the Plan in respect of such Claim any claims of any nature which the Debtors may have against the holder of such Claim. Neither the failure by the Liquidating Custodian to effect such set off nor the allowance of any Claim shall constitute a waiver or a release of any claim which the Debtors may have against the holder of a Claim.

iii.      With respect to any Claim with respect to which a timely objection (which shall expressly be deemed to include any application, motion or complaint seeking subordination of a Claim) is filed (i.e., a Disputed Claim), no distribution shall be made to the holder of any such Disputed Claim until the entry of a Final Order or judgment determining the allowed amount of such Disputed Claim. Except as otherwise provided in the Plan, pending the time of such Final Order or judgment, to the extent that any sum otherwise becomes payable to the holders of Claims of the class to which the Disputed Claim belongs, there shall be reserved by the Debtor an amount equivalent to that amount which would be payable to the holder of the Disputed Claim in the event that such Disputed Claim were allowed in the full amount asserted. Upon final determination of the allowed amount of the Disputed Claim, payment will be made to the holder of the Disputed Claim to the extent necessary to pay the allowed amount of such Claim.

iv.      Except as otherwise provided herein, in the event and at such time as any distribution under the Plan becomes Unclaimed Property, the Entity to which such distribution was to have been made shall forfeit all rights thereto, and to any and all future payments, and thereafter the Claim in respect of which such distribution was to have been made shall be treated as disallowed.  The Liquidating Custodian may redistribute Unclaimed Property at his option or pay such Unclaimed Property into the Bankruptcy Court registry.

B.      **Avoidance and Other Actions**

The Liquidating Custodian, on behalf of the Debtors, shall have the right and duty, to (a) examine all rights of action, including, without limitation, Avoidance Actions and file, litigate to final judgment, settle, or withdraw such rights of action provided, however, that the Liquidating Custodian shall not commence any Avoidance Action unless he concludes, in this sole discretion that such action is likely to improve materially the distribution on account of Allowed Unsecured Claims, after taking into account the cost of such litigation and the merits of any defenses, or there are other factors that make pursuit of the action in the best interests of the estate.

C.      **Objections to Claims**

1.      Examine Claims and file, litigate to final judgment, settle, or withdraw objections to Claims provided, however, that the Liquidating Custodian, in his sole discretion, may without notice and without obtaining an order from the Bankruptcy Court resolve, including acknowledging, Claims that are within $20,000 of the amounts reflected on the Debtor's books and records.  The Liquidating Custodian shall file any objection with the Bankruptcy Court pursuant to Bankruptcy Rule 3007 and on or before the 180th day after the Effective Date. The Liquidating Custodian shall have the right to petition the Bankruptcy Court for an extension of such date if a complete review of all Claims cannot be completed by such date.

2.      With respect to any Claim (other than an Administrative Claim) for which no objection is filed within such time, such Claim shall be deemed an Allowed Claim for the amount specified in a timely filed proof of Claim with respect to such Claim, or, if no timely filed proof of Claim exists, in the amount specified in the Schedules, unless the Claim was specified in the Schedules as being disputed, contingent or unliquidated. If no timely filed proof of Claim exists, and the Claim was specified in the Schedules as being disputed, contingent or unliquidated, the Claim shall be barred and no distribution made thereon pursuant to Bankruptcy Code section 1111(a) and Bankruptcy Rule 3003(c)(2).

8.08    **CORPORATE ACTION**

The passing of the Effective Date shall constitute authorization for the Debtors and their affiliates to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of an to consummate the Plan prior to on and after the Effective Date and also actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation any action required by the board of trustees of the Debtors and their affiliates.  On the Effective Date, the Liquidating Custodian is authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors and the Debtors' affiliates.

# ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.01    Except as otherwise provided in the Asset Purchase Agreement, or pursuant to prior Order of the Bankruptcy Court, any executory contract or unexpired lease not assumed or rejected by the Debtors before the Effective Date is deemed rejected as of the Effective Date. The party to such executory contract shall file a proof of claim within thirty (30) days of the Effective Date or be forever barred from making a claim or receiving a distribution from the Debtors with respect to such claim.

# ARTICLE X.

## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

10.01    **CERTAIN FEDERAL TAX CONSEQUENCES**

The implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences for Creditors. No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan. The tax consequences for any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan. For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below. In addition, the Internal Revenue Code ("IRC"), the Treasury Department's regulations promulgated thereunder, and interpretations of the IRC and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change. Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties. The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan. This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein. This discussion does not address state, local or foreign tax consequences.

**IN THIS SECTION, AND IN THIS DISCLOSURE STATEMENT GENERALLY, THE COMMITTEE AND ITS PROFESSIONALS DO NOT INTEND TO AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS. THE COMMITTEE ONLY PROVIDES THIS GENERAL INFORMATION TO ASSIST THE PARTIES**

**INVOLVED IN EVALUATING HOW THE PLAN AFFECTS THEM FOR TAX PURPOSES. CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES. NO RULING HAS BEEN REQUESTED FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.**

The Debtors are not-for-profit corporations that are exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtors. Accordingly, the Committee does not expect the implementation of the Plan to have any adverse federal income tax consequences to the Debtor, including, without limitation, in connection with (i) the discharge of debt pursuant to the Plan, or (ii) any other transaction contemplated thereunder. The federal income tax treatment of payments received by a Creditor in these Cases will vary depending on a number of factors, including the classification of the Creditor for tax purposes, the Creditor's method of accounting, the Creditor's tax residence, and the origin or genesis of the Creditor's claim. Thus, tax treatment will depend on whether the Creditor is an individual, a partnership or a corporation, whether the Creditor uses the cash method or the accrual method of accounting, and whether the Creditor is a foreign person for income tax purposes.  In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim. The income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or for the sale of goods or merchandise. Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands. The federal income tax consequences of a distribution under the Plan also will depend on the nature of the original transaction pursuant to which the Claim arose. For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent is included in the Creditor's gross income to the extent it was not previously included in income.

The federal income tax consequences of a distribution to a Creditor also will depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount. For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor. On the other hand, if such Creditor had written off the account or note receivable in a prior year, the

Creditor would have to treat the amount of the distribution as income. Section 166 of the IRC permits a deduction for indebtedness that becomes wholly or partially worthless during a taxable year. In order to prove the worthlessness of the debt, the taxpayer must establish the existence of an "identifiable event" indicating worthlessness.

## ARTICLE XI.
## PREFERENCES AND FRAUDULENT CONVEYANCES

11.01   *Preferences* -  A preference is  (a)  a transfer made by the Debtors,  (b)  to or for the benefit of a creditor,  (c)  on behalf of an antecedent debt,  (d)  made within ninety (90) days of the filing, or within one (1) year of the filing if such transfer was to an insider,  (e)  which makes while the Debtors was insolvent, and  (f)  enabling such creditor to receive more than such creditor would receive in liquidation.  The Liquidating Custodian may bring suit to recover such preferences no later than one hundred eighty (180) days following the Effective Date.  The Committee has not yet undertaken an analysis of potential preference claims.

In the ninety (90) days preceding the commencement of its Chapter 11 case, the Debtors made payments to creditors, on account of antecedent debts, of approximately $12,500,000. Pursuant to Bankruptcy Code Section 547, a portion of these transfers may be avoidable as preferential transfers.

11.02   *Fraudulent Conveyance* – Section 548 of the Bankruptcy Code sets forth when a trustee may avoid a transfer of an interest of the Debtors' property as a fraudulent conveyance.  This section provides that a Debtors or trustee may avoid any transfer of an interest of the Debtors in property or any obligation incurred by the Debtors that was made or incurred on more than one (1) year before the date of the filing of the petition, if the Debtors voluntarily or involuntarily:

1)       Made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the Debtors was or became, on or after the date that such transfer was made or such obligation was incurred, indebted, or

2)       A.       Received less than a reasonably equivalent value in exchange for such transfer or obligation; and

B.       (i)       Was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii)       Was engaged in business or a  transaction or was in a business or a transaction for which any property remaining with the Debtors was an unreasonably small capital; or

(iii)       Intended to incur, or believed that the Debtors would incur,  debts that would be beyond the Debtors's ability to pay as such debts matured.

The Committee, along with the Committee's Financial Advisor, are in the process of reviewing the Debtors's books and records to determine if there are any fraudulent conveyance actions to be brought.  At the present time there does not appear to be any fraudulent conveyance claims but the Committee's analysis is not complete and the Liquidating Custodian reserves any and all rights to pursue fraudulent conveyance claims.

## ARTICLE XII.
## EXECUTIVES, OFFICERS AND DIRECTORS

12.01    *Executive Officers And Directors* - As of the Petition Date, and thereafter, the Debtors' Executives and Officers were as follows:

| **Petition Date** | **Currently** |
|---|---|
| Peter Betts, CEO | Peter Betts, CEO |
| Patty Gardes, CFO | Frank Schiffer, CFO |
| Gene Schuller, COO | Frank Musso, Comptroller |
| | David Morgan, COO |

During the Chapter 11 case, the Debtors' management team installed by Focus Management Group was changed so that at the current time Peter Betts remains CEO, Mr. Frank Schiffer is CFO and Frank Musso is Comptroller at current compensation not exceeding $46,000 per week.  Under the Plan, this management team will be terminated and ECHN or Purchaser, as the case may be, will take over interim management between the entry of the Confirmation Order and the Sale Closing with interim management becoming permanent management effective at the Sale Closing.  During the period from the entry of the Confirmation Order to the Sale Closing, the Debtors will continue to be governed by the existing board of trustees.

## ARTICLE XIII.
## CREDITORS' COMMITTEE

13.01   (a)  The Official Committee of Unsecured Creditors appointed by the U. S. Trustee in the  case consists of:

CREDITOR'S COMMITTEE:

| | |
|---|---|
| CARDINAL HEALTH | CONNECTICUT HOSPITAL |
| c/o Tom Gerhart | ASSOCIATION |
| 7000 Cardinal Place | c/o John J. Brady, III |
| FSS-East | 110 Barnes Road |
| Dublin, OH 43017 | P.O. Box 90 |
| Telephone: (614) 553-3124 | Wallingford, CT 06492 |
| | Telephone: (203) 294-7201 |

MEDLINE INDUSTRIES, INC.
c/o Shane Reed
One Medline Place
Mundelein, IL 60060
Telephone: (847) 643-4103

PHARMERICA CORPORATION
c/o Ken Wheat, Jr.
1901 Campus Place
Louisville, KY 40294
Telephone: (502) 627-7436

NORTH CENTRAL COUNSELING
SERVICES, a division of
COMMUNITY HEALTH RESOURCES
c/o Patrick Sidley
995 Day Hill Road
Windsor, CT 06095
Telephone: (860) 731-5522, ext. 202

THE CONNECTICUT LIGHT & POWER
COMPANY
c/o Honor S. Heath, Esq.
107 Selden Street
Berlin, CT 06037
Telephone: (860) 665-4865

The Committee retained the following attorneys and financial advisors to provide advice and counsel:

Counsel for the Committee:

Craig I. Lifland, Esq.
James Berman, Esq.
Zeisler & Zeisler, P. C.
558 Clinton Avenue
P. O. Box 3186
Bridgeport, CT  06605-0186
(203)  368-4234

Financial Advisor to the Committee:

Clifford A. Zucker, CPA, CFF
Harold Emahiser
J. H. Cohn, LLP
333 Thornall Street
Edison, NJ 08837
Phone – (732) 549-0700

Questions regarding the Plan or Disclosure Statement can be directed to counsel for the Committee, Craig I. Lifland or James Berman, or Clifford Zucker or Harold Emahiser, Financial Advisor to the Committee.

## ARTICLE XIV.
## VOTING PROCEDURES AND REQUIREMENTS

14.01   *Ballots And Voting*   -  A ballot to be used for voting whether to accept or reject the Plan is enclosed with a copy of this Disclosure Statement and has been mailed to Creditors and

2

Equity Holders and who are entitled to vote.   BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

14.02   *Deadline for Voting* - The Bankruptcy Court has directed that in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by counsel, Zeisler & Zeisler, P. C., 558 Clinton Avenue, P. O. Box 3186, Bridgeport, Connecticut 06605-0186, Attention:  Craig I. Lifland, Esq. no later than 5:00 p.m. on the _____ day of _____, 2010.  YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER 5:00 P.M. ON THE ____ DAY OF _____, 2010.  Questions regarding the ballot may be referred to Craig I. Lifland, Esq., Zeisler & Zeisler, P. C., 558 Clinton Avenue, P. O. Box 3186, Bridgeport, Connecticut 06605-0186 (203) 368-4234,

14.03   *Parties-In-Interest Entitled To Vote*  -  Any Holder of a Claim against  the Debtors whose Claim  is impaired under the Plan is entitled to vote to accept or reject the Plan if either:  (i) its Claim  has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent or liquidated), or  (ii)  it has filed a proof of claim or proof of interest on or before deadline, the last date set by the Clerk's Office for such filings.  Any Claim as to which an objection has been filed is not entitled to vote, unless the Bankruptcy Court, upon application of the Holder to whose Claim  an objection has been made, temporarily allows such Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before the __ day of _____, 2010.  A vote may be disregarded if the Bankruptcy Court determines after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

14.04   *Definition Of Impairment*  -  As set forth in §1124 of the Bankruptcy Code, a class of Claims is impaired under a Plan of Reorganization unless, with respect to each Claim of such class, the Plan:

1.   Leaves unaltered the legal, equitable, and contractual rights of the holder of such Claim or  Interest; or

2.   Notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default:

(a)   Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in § 365(b)(2) of the Bankruptcy Code;

(b)   Reinstates the maturity of such claim or interest as it existed before such default;

2

       (c)       Compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

       (d)       Does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

       3.       Provides that, on the Effective Date of the Plan, the holder of such Claim or Interest receives, on account of such Claim or Interest, cash equal to:

       (a)       With respect to a claim, the allowed amount of such claim; or

       (b)       With respect to an interest, if applicable, the greater of: (i) any applicable fixed liquidation preference to which the terms of any security representing such interest entitled the holder of such interest; or (ii) any fixed price at which the Debtors, under the terms of the security, may redeem such security from such holder.

## ARTICLE XV.
## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

15.01 *Confirmation Hearing* - Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. By Order of the Bankruptcy Court, the confirmation hearing has been scheduled for the ___ day of ____, 2010, at 10:00 a.m., 450 Main Street, Hartford, Connecticut. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the confirmation hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon Craig I. Lifland, Esq. and James Berman, Esq., Zeisler & Zeisler, P. C., 558 Clinton Avenue, P. O. Box 3186, Bridgeport, Connecticut 06605-0186 (203) 368-4234 by 5:00 p.m. on the ___ day of ___, 2010, counsel for the Committee.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

15.02 *Requirements For Confirmation Of The Plan* - At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of

the Plan have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan.  As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

    1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

    2.    The proponent of the Plan complies with the applicable provisions of the Bankruptcy Code.

    3.    The Plan has been proposed in good faith and not by any means forbidden by law.

    4.    Any payment made or promised by the proponent, by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with the Case, or in connection with the Plan and incident to the Case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

    5.    (a)(i)   The proponent of the Plan has disclosed the identity of affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint Plan with the Debtors, or a successor to the Debtors under the Plan; and

    (ii)  the appointment to, or continuance in such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

    (b) the proponent of the Plan has disclosed the identify of any insider that will be employed or retained by the reorganized Debtors, and the nature of any compensation for such insider.

    6.    Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

    7.    With respect to each impaired class of Claims or Interests:

    (b)    each Holder of a Claim or Interest of such Class has

    (i)    accepted the Plan; or

    (ii)    will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the effective Date of the Plan, that is not less than the amount that such Holder would so

receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code on such date; or

(c)      if § 1111(b)(2) of the Bankruptcy Code applies to the Claims of such Class, the Holder of a Claim of such Class will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the Estate's interest in the property that secures such Claims.

8.      With respect to each Class of Claims or Interests:

(a)      such Class has accepted the Plan; or

(b)      such Class is not impaired under the Plan.

9.      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

(a)      with respect to a Claim of a kind specified in § 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the Holder of such Claim will receive on account of such Claim cash equal to the allowed amount of such Claim;

(b)      with respect to a Class of Claims of a kind specified in § 507(a)(1), 507 (a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each Holder of a Claim of such Class will receive:

(i)      if such Class has accepted the Plan, deferred cash payments of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; or

(ii)      if such Class has not accepted the Plan, cash on the Effective Date of the Plan equal to the allowed amount of such Claim; and

(c)      with respect to a Claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the Holder of a Claim will receive on account of such Claim regular installment payments in cash:

(i)      of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than 5 years after the date of the order for relief under Section 301, 302, or 303; and

(iii)    in a manner not less favorable than the most favored non-priority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under Section §1122(b)).

10.    If a Class of Claims is impaired under the Plan, at least one Class of Claims that is impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider Holding a Claim of such Class.

11.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

12.    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payments of all such fees on the Effective Date of the Plan.

13.    The Plan provides for the continuation after its Effective Date of payment of all retiree benefits, as that term is defined in § 1114 of the Bankruptcy Code, at the level established pursuant to subsection (3)(1)(B) or (g) of § 1114, at any time prior to confirmation of the Plan, for the duration of the period the Debtors has obligated itself to provide such benefits.

The Committee believes that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Committee has complied or will have complied with all the requirements of Chapter 11, and that the Plan is proposed in good faith.  The Committee submits that Holders of all Allowed Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date not less than the amounts likely to be received if the Debtors were liquidated in a case under Chapter 7 of the Bankruptcy Code.  At the Confirmation Hearing, the Bankruptcy Court will determine whether Holders of allowed Claims or allowed Interests would receive greater distributions under the Plan than they would receive in a liquidation under Chapter 7.

15.03  *Cramdown*  -  In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Committee, if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that class.  A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.      With respect to a class of secured claims:

(a)  (i) the Plan provides that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)      that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the estate's interest in such property;

(b)      for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

(c)      the realization by such holders of the "indubitable equivalent" of such Claims.

2.      With respect to a class of unsecured claims:

(a)      the Plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; or

(b)      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.

In the event that one or more classes of impaired Claims or Equity Interests reject the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims or Equity Interests.  For the reasons set forth above, the Debtors believe the Plan does not discriminate unfairly against, and is fair and equitable with respect to each impaired class of Claims or Equity Interests.

15.04 *Additional Conditions To Confirmation Of The Plan*  -  Even if all the other requirements to Confirmation of the Plan are satisfied, the Committee may determine not to proceed

with Confirmation of the Plan if the Allowed Claims materially exceed the Committee's estimates of such Claims.

## XVI.
## CONCLUSION AND RECOMMENDATION

16.01  *Liquidation Alternative* - The Committee has analyzed whether a liquidation of the Debtors' assets without a sale, would be in the best interest of Holders of Class 5 claims.  An analysis of the recovery that would likely result upon liquidation under Chapter 7 of the Bankruptcy Code is set forth in §5.02 and 5.03 herein.  The Committee believes that liquidation in a Chapter 7 will result in substantial diminution in the value to be realized by Holders of claims because of  (i) additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other professionals to assist such trustee (in the case of a Chapter 7 proceeding) who are not already intimately familiar with the Debtors's affairs; (ii) the diminution in values of the Debtors' assets as a result of a liquidation, and; (iii)  the substantial time which would elapse before creditors would receive any distribution with respect of their claims.  Consequently, the Committee believes that the Plan provides a return equal to or greater than Holders would receive from a liquidation under Chapter 7.

16.02  *Recommendation* –The Committee and its professionals have been extensively involved in the Debtors' Chapter 11 cases and have actively negotiated the Asset Purchase Agreement with ECHN and with other potential Purchasers and/or investors in the Debtors' operations.  The Committee's financial advisors have undertaken an extensive analysis of the various options available to unsecured creditors and have determined that this plan by far creates the greatest recovery for unsecured creditors.  The sale to ECHN or the Successful Highest Bidder will produce immediate cash and collection of accounts receivables far in excess of what any internally generated bootstrap plan that the Debtors have on file which does not have an outside infusion of cash.  Moreover, this Plan provides for the continuation and benefits of the Debtors' healthcare facilities to serve the communities in which they are located by another Connecticut community hospital network that has a proven track record providing valuable services to the community without running into financial hardship as these Debtors have experienced.  The Plan which provides for the sale of the assets as a going concern will produce results significantly better for unsecured creditors than they would otherwise receive in a Chapter 7 liquidation or in any competing Plan filed by the Debtors.  Therefore, the Committee strongly requests and urges Class 5 creditors and all creditors and parties in interest to vote in favor of acceptance of this Plan.

Dated this 20th day January, 2010.


**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR:**

JOHNSON MEMORIAL CORPORATION, INC.
JOHNSON MEMORIAL HOSPITAL, INC.
THE JOHNSON EVERGREEN CORPORATION, INC.


By  **/s/Shane Reed**_____
Shane Reed, Committee Chair




 **/s/Craig I. Lifland**_____
CRAIG I. LIFLAND, ESQ.
JAMES BERMAN, ESQ.
Zeisler & Zeisler, P. C.
558 Clinton Avenue
P. O. Box 3186
Bridgeport, CT  06605-0186
(203)  368-4234
Counsel to the Official Committee of Unsecured Creditors