UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

———————————————————————

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| JOHNSON MEMORIAL CORPORATION, | : | Case No. 08-22188 |
| | : | |
| Debtor. | : | |

———————————————————————:


# DISCLOSURE STATEMENT FOR
# DEBTOR'S PLAN OF REORGANIZATION


Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103-2600
P 860.278.1150
F 860.240.1002
Attorneys for the Debtor and
Debtor in Possession

March 11, 2010

UNITED STATES BANKRUPTCY COURT

DISTRICT OF CONNECTICUT

_____
:
In re                           :         Chapter 11
:
JOHNSON MEMORIAL CORPORATION,   :         Case No. 08-22188
:
                   Debtor.    :
_____:

**DISCLOSURE STATEMENT FOR
DEBTOR'S PLAN OF REORGANIZATION**

## I.    INTRODUCTION

**A.    Introduction.** On November 4, 2008 (the "Petition Date"), Johnson Memorial Corporation (the "Debtor") filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court"). On the Petition Date, Johnson Memorial Hospital ("JMH") and The Johnson Evergreen Corporation, Inc. ("JEC"), also filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. On November 14, 2008, the Bankruptcy Court entered an order granting the motion filed by the Debtor, JEC and JMH for joint administration of their cases. On or about November 17, 2008, the Office of the United States Trustee appointed five creditors of JMH as the Official Committee of Unsecured Creditors (the "Committee") in the Debtor's, JEC's and JMH's cases. The Debtor has proposed and filed with the Bankruptcy Court a chapter 11 plan of reorganization. The Debtor's plan is annexed hereto as Exhibit A (the "Plan"). The Debtor is seeking confirmation of the Plan by the Bankruptcy Court.

This Disclosure Statement is provided pursuant to Bankruptcy Code section 1125 to all known Creditors of the Debtor. The purpose of this Disclosure Statement is to provide the holders of

-1-

Claims in these cases with sufficient and adequate information with respect to the Plan to enable such holders to make an informed decision in exercising their right to vote on the Plan. This Disclosure Statement discusses, among other things, voting instructions, classification of Claims against the Debtor, the treatment of such Claims, and the history of the Debtor's business. This Disclosure Statement also contains a summary and analysis of the Plan.

The Plan is a reorganizing plan that contemplates the financial rehabilitation of the Debtor and the continuation of its business. The primary purposes of the Plan are to ensure that the Debtor's stable cash flow can service its senior long-term debt and to satisfy the Debtor's obligations to, among others, holders of Allowed Unsecured Claims. The restructuring proposed in the Plan will enable the Debtor to exit Chapter 11, service its debts, and continue its existing operations. The Debtor will retain its assets and operate its business after confirmation of the Plan. Creditors will receive payment of their Claims against the Debtor, either on the Effective Date of the Plan or over time.

As described herein, the Debtor believes that the any alternatives to the Plan would produce less for Creditors than they will receive under the Plan and would endanger or terminate the operation of the Debtor's business.

**B.      This Disclosure Statement, Voting, and Confirmation Hearing.** This Disclosure Statement has been approved by an order of the Bankruptcy Court as containing "adequate information," as that term is defined in Bankruptcy Code section 1125, to enable the Debtor's Creditors to make an informed judgment about whether to accept or reject the Plan. However, the Bankruptcy Court has not passed upon the merits of the Plan or conducted a detailed inquiry into the contents of this Disclosure Statement, and neither this Disclosure Statement nor the order approving it should be construed as an approval or endorsement of the Plan by the Bankruptcy Court. Creditors

-2-

are encouraged to read and carefully consider the entire Disclosure Statement. In addition, the Plan is an integral part of this Disclosure Statement. Accordingly, all members of voting Classes are urged to study the Plan carefully in conjunction with this Disclosure Statement in order to make an informed judgment about the Plan. Creditors also should consider consulting with their own legal counsel regarding the Plan.

This Disclosure Statement has been prepared in accordance with Bankruptcy Code section 1125 and not in accordance with federal or state securities laws or other nonbankruptcy law. Unless expressly noted, any financial information contained in this Disclosure Statement has not been independently audited. Every effort has been made to ensure that the information contained in this Disclosure Statement is accurate. This Disclosure Statement and the information contained herein should be used solely to assist in deciding whether or not to vote in favor of the Plan.

**Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.** The summary of the Plan contained in this Disclosure Statement are qualified by reference to the Plan itself. If any inconsistency exists between this Disclosure Statement and the Plan, the terms of the Plan are controlling.

In order for the Plan to be confirmed, Bankruptcy Code section 1129(a) requires that each impaired Class of Allowed Claims in the Plan vote to accept that Plan, subject to certain exceptions. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims in that class, but for this purpose considers only those creditors that actually cast ballots for acceptance or rejection of a plan. Creditors that fail to vote are not counted as either accepting or rejecting a plan. Only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan. As set

17469.034/508721.1

forth in Bankruptcy Code section 1124, a Class is "impaired" if the legal, equitable or contractual

rights attaching to the Claims of that Class are modified by a plan.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted

by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation,

(b) at least one impaired class of claims has accepted the plan without taking into account the votes

of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate

unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown"

provisions are set forth in Bankruptcy Code section 1129(b).

The Plan provides that if all of the applicable requirements of Bankruptcy Code section

1129(a), other than section 1129(a)(8) thereof (i.e., acceptance of the Plan by all impaired Classes),

are met with respect to the Plan, then the Debtor requests that the Bankruptcy Court, pursuant to

Bankruptcy section 1129(b), confirm the Plan notwithstanding the requirements of Bankruptcy Code

section 1129(a)(8).  In the event that Class 4 fails to accept the Plan as required by Bankruptcy Code

section 1129(a), the Debtor believes that the Plan may be confirmed in accordance with Bankruptcy

Code section 1129(b) without amendment or modification. **THE DEBTOR WILL SEEK**

**CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS IN THE**

**EVENT THAT THE IMPAIRED CLASS REJECTS THE PLAN.**

After carefully reviewing this disclosure statement, each holder of an Allowed Claim entitled

to vote to accept or reject the Plan should vote on the enclosed ballot and return such ballot so that it

is received by 5:00 p.m., New York time, on April __, 2010.  Any ballot that does not indicate either

an acceptance or a rejection of the Plan will not be counted toward determining acceptance or

rejection of the Plan.  A vote to accept or reject the Plan can only be made by proper submission of a

-4-

duly completed and executed ballot.  Any person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such person holds Claims.

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY 5:00 P.M. NEW YORK TIME ON APRIL __, 2010, UNLESS THIS SOLICITATION IS EXTENDED BY ORDER OF THE BANKRUPTCY COURT.  BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED.  IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN AND THIS DISCLOSURE STATEMENT.**

Ballots are to be sent to counsel for the Debtor at the following address:

Reid and Riege, P.C.
One Financial Plaza
Hartford, Connecticut 06103-2608
Fax No. (860) 240-1002
Attn: Eric Henzy, Esq.

If you wish to change or withdraw your vote after submission of a ballot, Bankruptcy Rule 3018(a) requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on April __, 2010, at 10:00 a.m., at the United States Bankruptcy Court, 450 Main Street, Hartford, CT.  The Bankruptcy Court has directed that objections, if any, to the confirmation of the Plan be served and filed on or before April __, 2010.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of an adjournment date made at the confirmation hearing or at any subsequently adjourned confirmation hearing.

17469.034/508721.1

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon:

> Eric Henzy, Esq.
> Reid and Riege, P.C.
> One Financial Plaza
> Hartford, CT  06103-2608
> Attorneys for the Debtors
>
>          -and-
>
> Craig Lifland, Esq.
> Zeisler & Zeisler, P.C.
> 558 Clinton Avenue
> Bridgeport, CT 06605
> Attorneys for the Committee

on or before April __, 2010, at 5:00 p.m. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met. The Debtor believes that the Plan meets the applicable requirements of Bankruptcy Code section 1129 (other than those pertaining to voting, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

**ALL PROJECTED RECOVERIES ARE MERELY ESTIMATES, BASED ON ASSUMPTIONS WHICH ARE SET FORTH IN THIS DISCLOSURE STATEMENT. TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE ESTIMATES.**

17469.034/508721.1

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS. CREDITORS ARE URGED TO VOTE TO ACCEPT THE PLAN.**

## II. OVERVIEW OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED BY THE PLAN ITSELF. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN A SUMMARY AND THE PLAN.

The Plan is a reorganizing plan. If the Plan is confirmed, on the Effective Date of the Plan the Debtor will pay all allowed Administrative Claims, Allowed Tax Claims and Allowed Priority Non-Tax Claims. The Debtor will make the payments to People's United Bank, holders of Allowed Unsecured Claims and others as provided in the Plan.

The following table summarizes the classification and treatment of Allowed Claims under the Plan. A more detailed discussion is set forth in Part V of this disclosure statement.

| Class and Estimated Amount of Claims in Class | Treatment Under the Plan |
|---|---|
| **Administrative Claims** | Paid in full, in Cash, on the later of the Effective Date of the Plan and the date of the entry of a Final Order allowing and determining such Administrative Claim, or on such other less favorable terms as may be agreed to by such Entity and the Debtor. |
| **Allowed Tax Claims** | (1) Paid in full, in Cash, on the later of (a) the Effective Date and (b) the date of entry of a Final Order allowing and determining such Tax Claim, or (2) quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of such Allowed Tax Claim, over a period ending not later than five years after the Petition Date or (3) paid on such other less favorable terms as may be agreed to by such Entity. |

-7-

| | |
|---|---|
| **Class 1 – People's Secured Claim** | Debtor shall cure any default that occurred before or after the commencement of the Case, the maturity of the People's Secured Claim shall be reinstated as such maturity existed before any default, and the legal, equitable, or contractual rights to which the People's Secured Claim entitles People's United Bank shall not otherwise be altered. |
| **Class 2 - Allowed Priority Non-Tax Claims** | Receive Cash equal to Allowed amount of Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim. |
| **Class 3 – Allowed Unsecured Claims** | Receive Cash equal to Allowed amount of Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim. |
| **Class 4 – Intercompany Claims** | After Class 3 Claims are paid pursuant to the terms of the Plan, receive payment pursuant to terms mutually agreed upon between Reorganized Debtor and holder of Intercompany Claim. |

## III.    BACKGROUND

On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued in possession and management of its business and properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

The Debtor is a Connecticut not-for-profit corporation located at 201 Chestnut Hill Road, Stafford Springs, Connecticut. The Debtor owns certain land and buildings located in Enfield, Connecticut (the "Enfield Property"), and approximately seventy acres of undeveloped land in Stafford Springs, Connecticut. The Debtor leases the Enfield property to JMH and to other health care providers. At the Enfield Property, JMH operates the Johnson Surgery Center of Enfield. Phoenix Community Cancer Center is located at the Enfield Property. In addition to the Enfield Property and the property in Stafford Springs, the Debtor is the parent of JMH and JEC. In addition to operating the surgery center in Enfield, JMH owns and operates a ninety-two bed, acute care hospital located in Stafford Springs. JEC owns and operates Evergreen Health Care Center, a nursing home which consists of a 120 bed long term care unit, a 30 bed subacute rehabilitation unit

-8-

for patients in need of extensive therapy and care before returning home, and a 30 bed memory support unit for residents with Alzheimer's Disease and similar forms of dementia. The Debtor's mission, together with JMH and JEC, is to provide quality health care and to serve as a community resource for the promotion of health in the communities it serves.

As of the Petition Date, the Debtor had annual revenue of approximately $1 million. As of September 30, 2007, the book value of the Debtor's assets on an unaudited basis was approximately $15.8 million.

Prior to the Petition Date, due to a variety of factors, including low reimbursement rates and certain operating inefficiencies, JMH and JEC sustained significant operating losses for several years and accumulated excess trade payables during this period. This restricted JEC's and JMH's ability to obtain trade credit and created substantial cash flow issues. In addition, as described below, the Debtor is jointly and severally liable with JMH and JEC for obligations relating to the JMH Pension Plan.

To address these concerns, prior to the Petition Date, the Debtor, JMH and JEC retained Focus Management Group to provide various management services. The Debtor, JMH and JEC selected Focus after a lengthy interview process involving several candidates. The Debtor, JMH and JEC ultimately retained Focus based on a number of factors, including experience and cost. The following individuals associated with Focus currently serve the Debtor, JMH and JEC in the following capacities: Peter Betts as Chief Executive Officer; Frank Shiffer as Chief Financial Officer; and Frank Musso as controller. Under the supervision of this management team, the Debtor, JMH and JEC have made great strides in improving the operations of their businesses. The Debtor, JMH and JEC filed their cases in order to put their businesses on a sound financial footing, thereby maximizing value to all of their creditors and ensuring that their businesses continue to provide

-9-

services to the community, employment to community members, and business for other community businesses.

As of the Petition Date, People's United Bank held an approximately $3,540,000.00 Claim against the Debtor, secured by the Debtor's real property and certain personal property. In addition, the Debtor estimates that Unsecured Claims will total less than $100,000.

Immediately after filing its petition, the Debtor, along with JMH and JEC, filed a motion to sell certain of its assets, essentially all property other than accounts receivable and cash, to Eastern Connecticut Health Network ("ECHN"). ECHN subsequently terminated that agreement. The Debtor subsequently entered into negotiations with another entity regarding a potential sale, but those negotiations did not come to fruition. The Committee has retained an investment banker, General Capital Partners. A third entity and ECHN have made proposals to the Committee to acquire certain assets of the Debtor. The Debtor has concluded that at present neither of these proposals is feasible. Accordingly, the Debtor is seeking confirmation of the Plan.

## IV.   THE PLAN

**THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE INFORMATION SET FORTH IN THE PLAN, WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.**

The Plan is a reorganizing Plan. Under the Plan, the Debtor will keep all of its property and restructure its debts. Key features of the Plan include reinstatement of the People's Secured Claim and payment to Unsecured Creditors.

**A.    Description, Classification and Treatment of Claims.** Under the Plan, all Allowed Claims are classified and treated as follows:

**1.     Non-Classified Claims.**

-10-

a.     **Administrative Claims.**  Administrative Claims include, <u>inter alia</u>, any Claim for an

expense of the kind described in Bankruptcy Code section 503(b), including, without limitation, any

actual and necessary costs and expenses of preserving the Debtor's estate incurred after the

commencement of the Case and prior to confirmation of the Plan, any actual and necessary costs of

operating the Debtor's business after the commencement of the Case and prior to confirmation of the

Plan, any indebtedness or obligations incurred by the Debtor in connection with the operation of its

business or for the acquisition or lease of property or the rendition of services after the

commencement of the Case and prior to confirmation of the Plan, any fees and expenses allowed

under Bankruptcy Code sections 330 and 331, and any fees due to the Office of the United States

Trustee under 28 U.S.C. § 1930(a)(6).  Administrative Claims are not classified under the Plan and

the holders of Administrative Claims have no right to vote to accept or reject the Plan.  The Debtor

estimates that as of the Confirmation Date the total amount of unpaid Allowed Administrative

Claims will not exceed approximately $50,000.00.  Requests for payment of Administrative Claims

not otherwise allowed must be filed and served on the Debtor by the date set by the Court in the

order setting the Confirmation Hearing. Under the Plan, each Entity holding an Administrative Claim

shall be paid (1) in full in Cash on the later of (a) the Effective Date and (b) the date of the entry of a

Final Order allowing and determining such Administrative Claim, or (2) on such other less favorable

terms as may be agreed to by and among the Debtor and such Entity; <u>provided</u>, <u>however</u>, that

Administrative Claims representing liabilities incurred by the Debtor in the ordinary course of its

business during the Case shall be paid by the Debtor in accordance with the terms and provisions of

the particular transactions and agreements relating thereto.

b.     **Allowed Tax Claims.**  Allowed Tax Claims consist of any tax, charge, fee, levy,

impost or other assessment by any federal, state, local or foreign taxing authority, including, without

limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license,

use, ad valorem, estimated, severance, stamp, occupation and withholding tax, including any interest

or additions attributable to, imposed on or with respect to such assessments, entitled to priority under

Bankruptcy Code section 507(a)(8).  Allowed Tax Claims are not classified under the Plan and have

no right to vote to accept or reject the Plan.  The Debtor estimates that as of the Confirmation Date

the total amount of Allowed Tax Claims will be approximately $20,000.00.  Under the Plan, each

Entity holding an Allowed Tax Claim shall receive, at the option of the Debtor, the following:  (1)

payment in full in Cash on the later of (a) the Effective Date of the Plan and (b) the date of entry of a

Final Order allowing and determining such Tax Claim, (2) quarterly installment payments in Cash of

a total value, as of the Effective Date, equal to the Allowed amount of such Claim (including interest

at the rate determined under applicable nonbankruptcy law as provided in Bankruptcy Code section

511), over a period ending not later than five years after the Petition Date, or (3) payment on such

other less favorable terms as may be agreed to by and among the Debtor and such Entity.

      **2.**      **Classified Claims.**

      **a.**      **Class 1 – People's Secured Claim.**  Class 1 consists of the People's Secured Claim.

This Class is impaired under and is entitled to vote to accept or reject the Plan.  As of the date of this

Plan, the Debtor owed People's approximately $3,540,000.00.  The People's Secured Claim is

secured by the Debtor's real property and certain of the Debtor's personal property.  Under the Plan,

on the Effective Date the Debtor shall cure any default with respect to the People's Secured Claim

that occurred before or after the commencement of the Case, other than a default of a kind specified

in Bankruptcy Code section 365(b)(2); the maturity of the People's Secured Claim shall be reinstated

as such maturity existed before any default; and the legal, equitable, or contractual rights to which

the People's Secured Claim entitles People's United Bank shall not otherwise be altered.

       **b.**      **Class 2 - Allowed Priority Non-Tax Claims.** Class 2 consists of any Claim entitled

to priority under Bankruptcy Code section 507(a)(3), (4), (5), (6), (7) or (9) to the extent it is an

Allowed Claim. The Debtor estimates that as of the Confirmation Date, the aggregate amount of

unpaid Allowed Priority Non-Tax Claims will be zero. This Class is not impaired under, and holders

of Class 2 Claims are conclusively presumed to have accepted, the Plan. Under the Plan, in full and

complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-

Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority

Non-Tax Claim will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim,

except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the

Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable

treatment.

       **c.**      **Class 3 - Allowed Unsecured Claims.** Class 3 consists of all Allowed Unsecured

Claims. The Debtor estimates that these Claims will total less than $100,000.00. This Class is not

impaired under, and holders of Class 3 Claims are conclusively presumed to have accepted, the Plan.

Under the Plan, in full and complete satisfaction of its Claim, on the later of the Effective Date and

the date such Unsecured Claim becomes an Allowed Unsecured Claim, each Entity holding an

Allowed Unsecured Claim will receive Cash equal to the Allowed amount of such Unsecured Claim,

except to the extent that such holder of an Allowed Unsecured Claim has been paid by the Debtor

prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

       **d.**      **Class 4 – Intercompany Claims**. Class 4 consists of any Claim against the Debtor

by JEC, JMH, Johnson Health Care, Inc., and Home and Community Health Services. This Class is

impaired and is entitled to vote on the Plan. The Plan provides that after Class 3 Claims are paid

pursuant to the terms of the Plan, each holder of an Intercompany Claim shall be entitled to receive

-13-

payment from Reorganized Debtor pursuant to terms to be mutually agreed upon between Reorganized Debtor and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

**B.      Means of Implementation of Plan.**  The Debtor's board will remain in place after Confirmation of the Plan.  After confirmation of the Plan, the Debtor will enter into a three-year contract with Peter J. Betts & Associates, Inc. ("PJB"), pursuant to which PJB will provide to the Debtor, JEC and JMH a management team consisting of Peter Betts as president and chief executive officer, Frank Shiffer as chief financial officer and David Morgan as chief operating officer.  PJB will be paid $1,566,786 annually, plus $9,000 per month in expenses, plus certain other housing, travel and related expenses.  The Debtor, JMH and JEC will pay Focus Management a fee of not more than 27.5% of the amount paid to PJB in the first year of the contract allocated to Betts and Shiffer in exchange for Focus releasing Betts and Shiffer from their non-compete agreements with Focus.  The Debtor believes that this payment will equal approximately what the Debtor, JEC and JMH would pay to an executive search firm to find a new management team.

On the Effective Date, the Reorganized Debtor shall be authorized and directed to execute and to deliver all documents and agreements and take all actions contemplated by this Plan.  The Debtor will retain all of its property subject only to Claims as provided in this Plan.  The Debtor will make the distributions provided for in this Plan from the Debtor's cash on hand and operating revenue and from the Post-Confirmation Line of Credit.  The Post-Confirmation Line of Credit will consist of a revolving line of credit entered into by the Debtor, JMH and JEC after Confirmation and prior to the Effective Date for a minimum of $6 million, to be used to fund payments pursuant to the Plan and on an as needed basis for the Reorganized Debtor's, JMH's and JEC's general operating purposes during the post-Confirmation period.  As demonstrated by the Debtor's cash flow

-14-

projections for the period 2010 through 2012, annexed hereto as Exhibit B, the Debtor's cash flow in combination with the Post-Confirmation Line of Credit will be sufficient to allow the Debtor to properly operate its properties and make all payments required under the Plan.

On or prior to the Effective Date, the Debtor will, <u>inter alia</u>, take actions necessary to reinstate the People's Secured Claim as provided in this Plan and enter into the Post-Confirmation Line of Credit.

    **C.**    **Procedures for Resolving and Treating Disputed Claims.**  The Plan provides, <u>inter alia</u>, that notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed.  Under the Plan, the Reorganized Debtor shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims.  The Plan provides that the Reorganized Debtor shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtor), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court.  The Plan further provides that all objections shall be litigated to a Final Order except to the extent that Reorganized Debtor elects to withdraw such objection, or Reorganized Debtor and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

Under the Plan, the Reorganized Debtor shall be required to reserve (but not in a formal, segregated account) sufficient Cash for Disputed Unsecured Claims as set forth in the Plan. The Plan provides that if on or after the Effective Date any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim distribute to the holder of such Allowed Claim an amount that provides such holder with the same percentage recovery, as of such date, as other holders of Claims in the relevant class that were Allowed on the Effective Date.

**D.     Assumption and Rejection.** The Plan provides, <u>inter alia</u>, that pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Entity shall be deemed assumed by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (1) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (2) as to which a motion for approval of the rejection of such executory contract or unexpired lease is pending as of the Effective Date, or (3) that is specifically designated as a contract or lease to be rejected in any schedule to this Plan.

The Plan further provides that entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (1) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to the Plan, (2) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject the unexpired leases specified in the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (3) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory

-16-

contracts and unexpired leases rejected pursuant to the Plan.  Under the Plan, the Reorganized

Debtor shall pay all cure amounts, if any, to the non-Debtor parties to the executory contracts and

unexpired leases assumed pursuant to the Plan by the later to occur of (i) the first Effective Date

Anniversary or (ii) ten (10) days after resolution of the cure amount by Final Order or agreement of

the parties, except as otherwise agreed to by the parties.  Under the Plan, if a non-Debtor party to an

executory contract or unexpired lease assumed pursuant to the Plan timely objects to the assumption

or the proposed cure amount for that agreement, the Debtor and the objecting party may settle,

compromise, or otherwise resolve the proper cure amount without further order of the Court or may

submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.  The

Plan provides that, notwithstanding the above, the Debtor may, in its sole and absolute discretion,

determine to reject any executory contract or unexpired lease at any time prior to the later of (1)

thirty (30) days after the Effective Date and (2) thirty (30) days after the entry of a Final Order

determining the proper cure amount for that contract or lease. The effective date of a rejection

effected pursuant to the preceding sentence shall be the Confirmation Date regardless of the date on

which the Debtor gives notice of such rejection.

Under the Plan, Claims arising out of the rejection of an executory contract or unexpired

lease pursuant to of the Plan must be filed with the Bankruptcy Court and served upon the Debtor or,

on and after the Effective Date, Reorganized Debtor, no later than thirty (30) days after the later of

(1) the date notice of entry of an order is mailed approving the rejection of such executory contract or

unexpired lease, and (2) the date notice of entry of the Confirmation Order is mailed.  All such

Claims not filed within such time will be forever barred from assertion against the Debtor and its

estate or the Reorganized Debtor and its property.

   **E.    Distributions Under the Plan.**  The Plan provides, <u>inter</u> <u>alia</u>, that the Reorganized

Debtor shall make all distributions required by the Plan, and that unless otherwise provided herein,

any distribution to be made by Reorganized Debtor shall be made to the extent and at the time

provided in Article IV and Article V of the Plan.

   **F.    Retention of Jurisdiction.**  The Plan provides that notwithstanding the entry of the

Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain

jurisdiction over the Cases and any of the proceedings arising from, or relating to, the Cases pursuant

to Bankruptcy Code section 1142 and 28 U.S.C. section 1334 to the fullest extent permitted by the

Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is

necessary to ensure that the purposes and intent of the Plan are carried out, including: (1) to hear and

determine any and all objections to the allowance, or requests for estimation, of Claims; (2) to

consider and act on the compromise and settlement of any Claim against, or cause of action on behalf

of, the Reorganized Debtor or the Reorganized Debtor's estate; (3) to determine any and all

applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or

assignment of executory contracts and the allowance of any Claim resulting therefrom; (4) to enter

such orders as may be necessary or appropriate in connection with the recovery of the Reorganized

Debtor's assets wherever located; (5) to hear and determine any and all applications for allowance of

compensation and reimbursement of expenses; (6) to hear and determine any and all controversies,

suits and disputes arising under or in connection with the interpretation, implementation or

enforcement of the Plan and any of the documents intended to implement the provisions of the Plan;

(7) to hear and determine any and all applications, adversary proceedings, contested matters and

other litigated matters pending on the Effective Date or that may be commenced thereafter as

provided in the Plan; (8) to hear and determine any applications to modify any provision of the Plan

-18-

to the full extent permitted by the Bankruptcy Code; (9) to correct any defect, cure any omissions or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan; (10) to effectuate distributions under and performance of the provisions of the Plan; (11) to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to the Reorganized Debtors arising prior to the Effective Date or relating to the administration of the Cases, including, without limitation, matters involving federal, state and local taxes in accordance with Bankruptcy Code sections 346, 505 and 1146; (12) to determine such other matters and for such other purposes as may be provided in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; (13) to enforce all orders, judgments, injunctions, releases and rulings issued or entered in connection with the Cases or the Plan; (14) to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated; (15) to determine any other matter not inconsistent with the Bankruptcy Code; and (16) to enter an order closing the Case.

G.    **Effect of Confirmation.** The Plan provides that as of the Effective Date, the property of the Debtor's estate, including all claims and causes of action against third parties that arose prior to or after the Petition Date, shall vest in the Debtor or such other entity as provided in the Plan; that from and after the Effective Date, the Debtor may dispose of its assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan; and that as of the Effective Date, all assets of the Debtor shall be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

The Plan further provides that, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor and its successors and assigns, whether or not the Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan; and that the rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

Under the Plan, upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor and the Reorganized Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and liabilities that arose prior to the Confirmation Date; and all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against Debtor or the Reorganized Debtor.

The Plan provides that the Debtor, the Committee, and the Released Parties, and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person for any act taken or omission, after the Petition Date, in connection with or related to the Case or the operations of the Debtor's business during the Case, including but not limited to, formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof) or making any distributions made pursuant to the Plan, except for

acts constituting willful misconduct, gross negligence, or bad faith, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

The Plan further provides that, as of the Effective Date, the Released Parties (as defined in the Plan) shall be released by the Debtor and any successors-in-interest of the Debtor from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that the Debtor would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim or other person or entity would have been legally entitled to assert on behalf of the Debtor or its estate, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Case and, in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Under the Plan, all Entities who have held, hold, or may hold Claims against the Debtor and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against the Debtor from (1) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Reorganized Debtor, the Released Parties, or their property, (2) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by

-21-

any manner or means, whether directly or indirectly, any judgment, award, decree, or order against

the Debtor, the Reorganized Debtor, the Released Parties, or their property, (3) creating, perfecting,

or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the

Debtor, the Reorganized Debtor, the Released Parties, or against the property or interests in property

of the foregoing, (4) asserting any right of setoff, directly or indirectly, against any obligation due the

Debtor, the Reorganized Debtor, the Released Parties, or any of their property, except as

contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (5) acting or

proceeding in any manner, in any place whatsoever, that does not conform to or comply with the

provisions of the Plan, (6) commencing, continuing or asserting in any manner any action or other

proceeding of any kind with respect to any Claims and causes of action which are extinguished or

released pursuant to the Plan, and (7) taking any actions to interfere with the implementation or

consummation of the Plan.  All Entities are permanently enjoined by the Plan, on and after the

Effective Date, from asserting any Claim which is released by such Entity under the Plan or for

which the party against whom the Claim is being asserted has received exculpation under the Plan,

including: (1) commencing, conducting, or continuing in any manner, directly or indirectly, any suit,

action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial,

arbitral, administrative or other forum) on account of such Claim, (2) enforcing, levying, attaching

(including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by

any manner or means, whether directly or indirectly, any judgment, award, decree, or order on

account of such Claim, (3) creating, perfecting, or otherwise enforcing in any manner, directly or

indirectly, any encumbrance of any kind on account of such Claim, (4) asserting any right of setoff,

directly or indirectly, against any obligation on account of such claim, (5) acting or proceeding in any

manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan,

17469.034/508721.1

(6) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (7) taking any actions to interfere with the implementation or consummation of the Plan.

The Plan provides that all injunctions or stays provided for in this Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing this Case.

**H.     PBGC Claims.**  JMH sponsors the Retirement Plan for Employees of Johnson Memorial Hospital (the "Pension Plan"), which is asserted to be a defined benefit Pension Plan covered by Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461 ("ERISA").  The Debtor and other affiliates of JMH, as members of the sponsor's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)), are jointly and severally liable to contribute to the Pension Plan for the amounts necessary to satisfy ERISA's and the Internal Revenue Code's minimum funding standards.  *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007); 26 U.S.C. §§ 412, 430 (as to § 430, effective for pension plan years beginning after December 31, 2007).  The PBGC asserts that the underfunding claim will total approximately $29 million upon termination of the Pension Plan.  The Debtor and other affiliates of JMH also will be jointly and severally liable with JMH for insurance premiums that will be owed to the PBGC upon termination of the Pension Plan.  See 29 U.S.C. §§ 1306, 1307.  The PBGC asserts that this termination premium claim will total approximately $3 million.  The PBGC and JMH have reached an agreement in JMH's case providing for the treatment of both the underfunding and the termination premium claims.  The PBGC and the Debtor have agreed that after confirmation of the Debtor's Plan and the plan filed by JMH its case (the "JMH Plan"), the Debtor will have no liability for the underfunding claim and will remain liable for the

termination premium claim, but will be required to make payments on such claim only if JMH fails to make the payments to the PBGC on account of that termination premium claim as provided in the JMH Plan.

## V.    CERTAIN FEDERAL TAX CONSEQUENCES

The implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences for Creditors.  No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan.  The tax consequences for any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan.  For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below.  In addition, the Internal Revenue Code ("IRC"), the Treasury Department's regulations promulgated thereunder, and interpretations of the IRC and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change.  Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties.  The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein.  This discussion does not address state, local or foreign tax consequences.

IN THIS SECTION, AND IN THIS DISCLOSURE STATEMENT GENERALLY, THE DEBTOR AND ITS PROFESSIONALS DO NOT INTEND TO AND ARE NOT

-24-

**GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS.  THE DEBTOR ONLY PROVIDES THIS GENERAL INFORMATION TO ASSIST THE PARTIES INVOLVED IN EVALUATING HOW THE PLAN AFFECTS THEM FOR TAX PURPOSES. CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.  NO RULING HAS BEEN REQUESTED FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.**

The Debtor is a not-for-profit corporation that is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code.  It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtor.  Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences to the Debtor, including, without limitation, in connection with (i) the discharge of debt pursuant to the Plan, or (ii) any other transaction contemplated thereunder.

The federal income tax treatment of payments received by a Creditor in these Cases will vary depending on a number of factors, including the classification of the Creditor for tax purposes, the Creditor's method of accounting, the Creditor's tax residence, and the origin or genesis of the Creditor's claim.  Thus, tax treatment will depend on whether the Creditor is an individual, a partnership or a corporation, whether the Creditor uses the cash method or the accrual method of accounting, and whether the Creditor is a foreign person for income tax purposes.

In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value

-25-

of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim.  The income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands.  The federal income tax consequences of a distribution under the Plan also will depend on the nature of the original transaction pursuant to which the Claim arose.  For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent is included in the Creditor's gross income to the extent it was not previously included in income.

The federal income tax consequences of a distribution to a Creditor also will depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount. For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor.  On the other hand, if such Creditor had written off the account or note receivable in a prior year, the Creditor would have to treat the amount of the distribution as income.

Section 166 of the IRC permits a deduction for indebtedness that becomes wholly or partially worthless during a taxable year.  In order to prove the worthlessness of the debt, the taxpayer must establish the existence of an "identifiable event" indicating worthlessness.

17469.034/508721.1

## VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Creditors the potential for the greatest recovery on their Claims and, therefore, is in the best interests of Creditors.  If the Plan is not confirmed and consummated, the alternatives include (a) dismissal of the Debtor's chapter 11 Case, (b) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code, (c) an alternative chapter 11 plan or (d) continuation of the Debtor's case.  The Debtor believes that the Plan is preferable to the alternatives described below because the Plan provides for payment in full to the Debtor's Creditors and because any alternative to confirmation of the Plan would result in significant delays in and probable diminution of recoveries for Creditors.

**A.    Dismissal of the Debtor's Chapter 11 Case.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Case could be dismissed.  The Debtor believes that dismissal of the Debtor's chapter 11 Case would result in piecemeal litigation and attachment of the Debtor's assets without Bankruptcy Court supervision.  Such litigation would, in the Debtor's opinion, generate substantially less for Creditors than the sums which will be realized under the Plan and result in inequitable recoveries among Creditors.

**B.    Liquidation Under Chapter 7.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor's Case could be converted to cases under chapter 7 of the Bankruptcy Code.  If the Case were converted, a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtor's estate and distribute the proceeds to Creditors in accordance with the priorities established under the Bankruptcy Code.

The Debtor believes that Creditors would receive far less in a liquidation pursuant to chapter 7 than they would under the Plan.  A chapter 7 trustee would receive a substantial commission for

-27-

distributing the Debtor's assets. In addition, and much more significant, a chapter 7 trustee likely would shut down the operations of the Debtor, JMH and JEC, resulting in a massive reduction in the value of the Debtor's assets and a potentially massive increase in the amount of Claims against the Debtor. Among other things, the Debtor's property would lose all going concern value if operations are terminated. People's United Bank likely would be undersecured by millions of dollars, and its deficiency Claim would be added to Unsecured Claims. Administrative Claims against the Debtor, including contract breach claims and costs of winding the Debtor's business down would be enormous, and likely would absorb most if not all liquidation proceeds remaining after payment of Secured Claims. As the Debtor proposes to pay Creditors in full, liquidation under Chapter 7 would serve no good purpose and bring significant risk.

**C.    Alternative Chapter 11 Plan.** If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtor, the Committee, or any other party in interest, could attempt to formulate an alternative chapter 11 plan or plans. The Debtor has explored various alternatives in connection with the formulation and development of the Plan, and believes that an alternative plan is not a realistic option in the facts and circumstances of this Case. As detailed herein, the Debtor sought to sell its assets at the beginning of its Case, but ECHN terminated that process. The Committee has put forth several sale proposals, including a renewed proposal from ECHN, but the Debtor believes that such proposals are not feasible or would result in reduced recoveries for Creditors.

The Debtor believes that failure to confirm the Plan and formulation of a new plan would result in substantial expense and delay to the bankruptcy estate, and negatively impact the time and amount of distributions to Creditors, all for no good purpose in light of the Debtor's proposal to pay Creditors in full. A chapter 11 plan more favorable to Creditors than the Plan could not be

formulated. The Debtor believes that the Plan will enable Creditors to realize greater value under the circumstances than under any available alternative plan.

      **D.**      **Continuation of the Debtor's Case.**  If the Debtor remains in chapter 11, it would remain subject to the operational difficulties and costs associated with a chapter 11 bankruptcy case. Professional fees and other chapter 11 costs have been substantial in this case, the Debtor cannot continue to incur these costs indefinitely, and the Debtor believes that the continuation of these costs will reduce the amount available to Creditors.  The continued payment of these costs would not be of any benefit to Creditors, as the Debtor believes that a confirmation of a plan superior to the Plan is not possible.

## VII.    CONCLUSION AND RECOMMENDATION

      The Debtor believes, for the reasons described herein and in the Plan, that the Plan offers Creditors the most favorable alternative under existing circumstances.  **ACCORDINGLY, THE DEBTOR URGES ALL CREDITORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO ACCEPT THE PLAN.**

      Dated at Stafford and Hartford, Connecticut, this 11th day of March, 2010.

JOHNSON MEMORIAL HOSPITAL, INC.,

By   /s/ Peter J. Betts
        Peter J. Betts, LFACHE
        Interim President & CEO

By   /s/ Eric Henzy
        Eric Henzy
        Federal Bar No. ct12849
        Reid and Riege, P.C.
        One Financial Plaza
        Hartford, CT  06103
        (860) 278-1150
        Fax: (860) 240-1002
        ehenzy@reidandriege.com
        Its Attorneys

17469.034/508721.1