UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

————————————————————————
                                                    :
In re                                               :         Chapter 11
                                                    :
JOHNSON MEMORIAL CORPORATION,                       :         Case No. 08-22188
JOHNSON MEMORIAL HOSPITAL, INC., and                :         Case No. 08-22187
THE JOHNSON EVERGREEN CORPORATION,                  :         Case No. 08-22189
INC.,                                               :
                                                    :
                              Debtors.              :         Jointly Administered
————————————————————————:

**SECOND AMENDED DISCLOSURE STATEMENT FOR
AMENDED JOINT PLAN OF REORGANIZATION**

Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103-2600
P 860.278.1150
F 860.240.1002
Attorneys for the Debtors and
Debtors in Possession

June 18, 2010

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

_____
:
In re                                        :        Chapter 11
:
JOHNSON MEMORIAL CORPORATION,                :        Case No. 08-22188
JOHNSON MEMORIAL HOSPITAL, INC., and         :        Case No. 08-22187
THE JOHNSON EVERGREEN CORPORATION,           :        Case No. 08-22189
INC.,                                        :
:
                                  Debtors.   :        Jointly Administered
_____:

## SECOND AMENDED DISCLOSURE STATEMENT FOR
## AMENDED JOINT PLAN OF REORGANIZATION

## I.    INTRODUCTION

**A.    Introduction.**   On November 4, 2008 (the "Petition Date"), Johnson Memorial

Hospital, Inc. ("JMH"), The Johnson Evergreen Corporation, Inc. ("JEC"), and Johnson Memorial

Corporation ("JMC"; together with JMH and JEC, the "Debtors"), filed voluntary petitions under

Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the

District of Connecticut, Hartford Division (the "Bankruptcy Court").   On November 14, 2008, the

Bankruptcy Court entered an order granting the motion filed by the Debtors for joint administration

of their cases.   On or about November 17, 2008, the Office of the United States Trustee appointed

five creditors of JMH as the Official Committee of Unsecured Creditors (the "Committee") in the

Debtors' cases.   The Debtors have proposed and filed with the Bankruptcy Court a chapter 11 plan of

reorganization.   The Debtors' plan is annexed hereto as Exhibit A (the "Plan").   The Debtors are

seeking confirmation of the Plan by the Bankruptcy Court.

This Disclosure Statement is provided pursuant to Bankruptcy Code section 1125 to all

known Creditors of the Debtors.   The purpose of this Disclosure Statement is to provide the holders

of Claims in these cases with sufficient and adequate information with respect to the Plan to enable

such holders to make an informed decision in exercising their right to vote to accept or reject the

Plan. This Disclosure Statement discusses, among other things, voting instructions, the history of the

Debtors' businesses, classification and treatment of Claims against the Debtors, certain other key

provisions of the Plan, certain federal tax consequences of the Plan, and alternatives to confirmation

and consummation of the Plan.

Although the Debtors' cases have been jointly administered and this is a joint plan, the

Debtors and their estates have not been and are not proposed to be substantively consolidated.

Accordingly, the Plan really is three distinct plans, one for each of the Debtors. However, because

some of the procedural provisions of the Plan are the same for each Debtor, and to save the Debtors'

estates the costs of the duplicative efforts that would be involved in drafting and soliciting approval

of three separate chapter 11 plans and disclosure statements, the Debtors are submitting a single plan

and disclosure statement for all three Debtors. The sections of the Plan generally apply to all of the

Debtors, except where otherwise indicated.

The Plan is the product of extensive negotiation with the Committee, the Pension Benefit

Guaranty Corporation ("PBGC") and People's United Bank, and is supported by those entities. The

Plan is a reorganizing plan that contemplates the financial rehabilitation of the Debtors and the

continuation of their businesses. The primary purposes of the Plan are to ensure that the Debtors'

stable cash flow can service their senior long-term debt and to compromise the Debtors' obligations

to, among others, the PBGC and holders of Allowed Unsecured Claims. The restructuring proposed

in the Plan will enable the Debtors to exit Chapter 11, service their debts, and continue their existing

operations. The Debtors will retain their assets and operate their businesses after confirmation of the

Plan. The Debtors estimate that holders of Allowed Unsecured Claims against JMH will receive

between 20% and 25% on their Claims and that holders of Allowed Unsecured Claims against JEC will receive approximately 50% on their Claims over a period of five years, and possibly more money depending on recoveries on Litigation Claims, the total amount of Allowed Claims, and certain other events.  The Secured Claims of People's United Bank will be reinstated and paid according to their terms.  JMH's Pension Plan will be or has been terminated, and the resulting termination related Allowed PBGC Claims will be paid in a compromised amount over time.

As described herein, the Debtors believe that any alternatives to the Plan would produce less for Creditors than they would receive under the Plan and would endanger or terminate the operation of the Debtors' hospital, nursing home, surgery center and other businesses.

**B.**       **This Disclosure Statement.**  This Disclosure Statement has been approved by an order of the Bankruptcy Court as containing "adequate information," as that term is defined in Bankruptcy Code section 1125, to enable the Debtors' Creditors to make an informed judgment about whether to accept or reject the Plan.  However, the Bankruptcy Court has not passed upon the merits of the Plan or conducted a detailed inquiry into the contents of this Disclosure Statement, and neither this Disclosure Statement nor the order approving it should be construed as an approval or endorsement of the Plan by the Bankruptcy Court.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  The Plan is a legally binding arrangement and should be read in its entirety.  All members of voting Classes are urged to study the Plan carefully in conjunction with this Disclosure Statement in order to make an informed judgment about the Plan.  Creditors also should consider consulting with their own legal counsel

regarding the Plan.  **Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.**

This Disclosure Statement has been prepared in accordance with Bankruptcy Code section 1125 and not in accordance with federal or state securities laws or other nonbankruptcy law.  Unless expressly noted, any financial information contained in this Disclosure Statement has not been independently audited.  The Debtors have prepared the information contained in this Disclosure Statement in good faith, and every effort has been made to ensure that the information contained in this Disclosure Statement is accurate.  The statements made in this Disclosure Statement generally are made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement after that date does not mean that the information set forth in this Disclosure Statement remains unchanged since the date of this Disclosure Statement.  Moreover, certain of the statements contained in this Disclosure Statement are, by their nature, forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward looking-looking statements will turn out to be true.  This Disclosure Statement and the information contained herein should be used solely to assist in deciding whether or not to vote in favor of the Plan.

Attached to this Disclosure Statement are the Plan (Exhibit A), the Debtors' projected financial information for the period through 2015 (Exhibit B), and a liquidation analysis for the Debtors (Exhibit C).  These Exhibits should be attached to the Disclosure Statement that was served on you.  In addition, there are certain other materials identified in the Plan and this Disclosure Statement that are not attached to the Disclosure Statement.  These documents or other materials will be contained in the Plan Supplement.  The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is fifteen days before the hearing on confirmation of the Plan.  The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal

17469.034/498691.8

business hours.  If any of the exhibits identified above were not attached to the Disclosure Statement served on you, or if you want to obtain a copy of the Plan Supplement, once filed, you may do so by sending a written request to the Debtors at the following address:

> Reid and Riege, P.C.
> One Financial Plaza
> Hartford, Connecticut 06103-2608
> Attn: Eric Henzy, Esq.

**C.    Voting and Confirmation Hearing.**    In order for the Plan to be confirmed, Bankruptcy Code section 1129(a) requires that each impaired Class of Allowed Claims in the Plan vote to accept that Plan, subject to certain exceptions.  The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims in that class, but for this purpose considers only those creditors that actually cast ballots for acceptance or rejection of a plan.  Creditors that fail to vote are not counted as either accepting or rejecting a plan.  Only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims of that class are modified by a plan.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into account the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown" provisions are set forth in Bankruptcy Code section 1129(b).

17469.034/498691.8

The Plan provides that if all of the applicable requirements of Bankruptcy Code section 1129(a), other than section 1129(a)(8) thereof (i.e., acceptance of the Plan by all impaired Classes), are met with respect to the Plan, then the Debtors request that the Bankruptcy Court, pursuant to Bankruptcy section 1129(b), confirm the Plan notwithstanding the requirements of Bankruptcy Code section 1129(a)(8). In the event that any one or more of Classes A1, A3a, A3b, A4, A6, A7, A8, B1, B3, B6, B7, C1, C3 and C4 fails to accept the Plan as required by Bankruptcy Code section 1129(a), the Debtors believe that the Plan may be confirmed in accordance with Bankruptcy Code section 1129(b) without amendment or modification. **THE DEBTORS WILL SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS IN THE EVENT THAT ANY IMPAIRED CLASS OR CLASSES OF CLAIMS REJECTS THE PLAN.**

After carefully reviewing this disclosure statement, each holder of an Allowed Claim entitled to vote to accept or reject the Plan should vote on the enclosed ballot and return such ballot so that it is received by 4:00 p.m., New York time, on July 30, 2010. Any ballot that does not indicate either an acceptance or a rejection of the Plan will not be counted toward determining acceptance or rejection of the Plan. A vote to accept or reject the Plan can only be made by proper submission of a duly completed and executed ballot. Any person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such person holds Claims.

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR BY 4:00 P.M. NEW YORK TIME ON JULY 30, 2010, UNLESS THIS SOLICITATION IS EXTENDED BY ORDER OF THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY**

**TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN**

**AND THIS DISCLOSURE STATEMENT.**

Ballots are to be sent to counsel for the Debtors at the following address:

Reid and Riege, P.C.
One Financial Plaza
Hartford, Connecticut 06103-2608
Fax No. (860) 240-1002
Attn: Eric Henzy, Esq.

If you wish to change or withdraw your vote after submission of a ballot, Bankruptcy Rule 3018(a)

requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a

hearing on confirmation of the Plan. The Bankruptcy Court has scheduled a hearing to consider

confirmation of the Plan on August 4, 2010, at 10:00 a.m., at the United States Bankruptcy Court,

450 Main Street, Hartford, CT. The Bankruptcy Court has directed that objections, if any, to the

confirmation of the Plan be served and filed on or before July 30, 2010. The confirmation hearing

may be adjourned from time to time by the Bankruptcy Court without further notice except for an

announcement of an adjournment date made at the confirmation hearing or at any subsequently

adjourned confirmation hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to

confirmation of a plan. Any objection to confirmation of the Plan must be made in writing and filed

with the Bankruptcy Court and served upon:

Eric Henzy, Esq.
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103-2608
Attorneys for the Debtors

-and-

Craig Lifland, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT 06605
Attorneys for the Committee

on or before July 30, 2010, at 5:00 p.m.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  Unless an objection is timely served and filed, it will not be considered by the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met.  The Debtors believe that the Plan meets the applicable requirements of Bankruptcy Code section 1129 (other than those pertaining to voting, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

**ALL PROJECTED RECOVERIES ARE MERELY ESTIMATES, BASED ON ASSUMPTIONS WHICH ARE SET FORTH IN THIS DISCLOSURE STATEMENT.  TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE ESTIMATES.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.  CREDITORS ARE URGED TO VOTE TO ACCEPT THE PLAN.**

## II.   BACKGROUND

On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as a debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

JMH is a Connecticut not-for-profit corporation located at 201 Chestnut Hill Road, Stafford Springs, Connecticut. Among other things, JMH owns and operates a ninety-two bed, acute care hospital located in Stafford Springs, Connecticut, and leases from JMC and operates a surgery center located in Enfield, Connecticut. The hospital offers a comprehensive array of inpatient and outpatient services, including medical and surgical, obstetrics and gynecology, pediatrics, mental health, intensive/coronary care, oncology, rehabilitation, and emergency care. JMH's mission is to provide quality health care and to participate in educational activities related to rendering care to the sick and injured. It serves as a community resource for the promotion of health, and attempts to respond to the changing health care needs of the communities it serves. JMH provides health care services to any member of the community needing such care, regardless of ability to pay. JMH is a major employer in the North Central region of Connecticut. As of the Petition Date, JMH had approximately 620 employees. In addition, through doctors' offices and service providers, JMH indirectly provides employment to many others in surrounding communities.

In 2007, JMH had revenue of approximately $65 million. As of September 30, 2007, the book value of JMH's total assets on an unaudited basis was approximately $50 million. As of the Petition Date, People's United Bank held an approximately $13.4 million Claim against JMH, secured by the JMH's real property and certain personal property. In addition, JMH previously established a pension plan (the "Pension Plan") for its employees. The Pension Plan covers more than 800 participants. Pursuant to both the Internal Revenue Code and the Employee Retirement Income Security Act of 1974, JMH, as administrator and sponsor of the Pension Plan, incurred certain minimum funding obligations on account of the Pension Plan which it did not meet. As a result, prior to the Petition Date, the PBGC filed federal tax liens for more than $5 million against the JMH's property. In an attempt to reduce the burden of its mounting pension obligations, prior to

-9-

the Petition Date JMH froze (ceased benefit accruals under) the Pension Plan for the great majority of participants. JMH has concluded that it will not be able to continue to make required contributions to the Pension Plan. JMH is in the process of terminating the Pension Plan. The PBGC asserts that JMH's liability to the PBGC for, among other things, underfunding of the Pension Plan will be approximately $29 million. The Debtors estimate that Unsecured Claims against JMH will total approximately $47 million, including the Claim held by the PBGC.

JEC is a Connecticut not-for-profit corporation located at 205 Chestnut Hill Road, Stafford Springs, Connecticut. JEC owns and operates Evergreen Health Care Center, a nursing home which consists of a 120 bed long term care unit, a 30 bed subacute rehabilitation unit for patients in need of extensive therapy and care before returning home, and a 30 bed memory support unit for residents with Alzheimer's Disease and similar forms of dementia. The nursing home has been open since 1989. The nursing home provides a comprehensive array of services, including rehabilitation, hospice care, intravenous therapies, wound care, respite care and more. The memory support unit is staffed by experienced nurses and other professionals trained in the latest advances in Alzheimer's care. JEC's mission is to provide quality care and to serve as a community resource for the promotion of health in the communities it serves. JEC is a major employer in the North Central region of Connecticut. As of the Petition Date, JEC had approximately 230 employees. In addition, through service providers, JEC indirectly provides employment to many others in its community.

As of the Petition Date, JEC had annual revenue of approximately $16 million. As of September 30, 2007, the book value of JEC's assets on an unaudited basis was approximately $9 million. As of the Petition Date, People's United Bank held an approximately $15.2 million Claim against JEC, secured by JEC's real property and certain personal property. In addition, the Debtors estimate that Unsecured Claims against JEC will total approximately $850,000.

JMC is a Connecticut not-for-profit corporation located at 201 Chestnut Hill Road, Stafford Springs, Connecticut. JMC owns certain land and buildings located in Enfield, Connecticut (the "Enfield Property"), and approximately seventy acres of undeveloped land in Stafford Springs, Connecticut. JMC leases the Enfield property to JMH and to other health care providers. At the Enfield Property, JMH operates the Johnson Surgery Center of Enfield. Phoenix Community Cancer Center is located at the Enfield Property. In addition to the Enfield Property and the property in Stafford Springs, JMC is the parent of JMH and JEC.

As of the Petition Date, JMC had annual revenue of approximately $1 million. As of September 30, 2007, the book value of JMC's assets on an unaudited basis was approximately $15.8 million. As of the Petition Date, People's United Bank held an approximately $3,540,000.00 Claim against JMC, secured by JMC's real property and certain personal property. In addition, JMC estimates that Unsecured Claims against JMC will total less than $100,000.

Prior to the Petition Date, due to a variety of factors, including low reimbursement rates, certain operating inefficiencies, and low census, the Debtors sustained significant operating losses for several years. In addition, the Debtors' gradual accumulation of unsecured debt during this period restricted the Debtors' ability to obtain trade credit and created substantial cash flow issues. As a further result of their decline in financial performance, the Debtors were unable to make appropriate capital expenditures and invest in physical plant and equipment. As a result, some of the Debtors' physical plant, equipment and computer systems are outdated and in need of upgrades.

To address these concerns, prior to the Petition Date, the Debtors retained Focus Management Group to provide various management services. The Debtors selected Focus after a lengthy interview process involving several candidates. The Debtors ultimately retained Focus based on a number of factors, including experience and cost. The following individuals associated with

Focus currently serve the Debtors in the following capacities:  Peter Betts as interim president and chief executive officer and Frank Musso as interim chief financial officer.  Under the supervision of this management team, the Debtors have made great strides in improving the operations of their businesses.  The Debtors filed their cases in order to put the hospital, the nursing home, the surgery center and the Debtors' other businesses on a sound financial footing, thereby maximizing value to all of the Debtors' creditors and ensuring that the hospital, nursing home and surgery center continue to provide health care services to the community, employment to community members, and business for other community businesses.

Immediately after filing their petitions, the Debtors filed a motion to sell certain of their assets, essentially all property other than accounts receivable and cash, to Eastern Connecticut Health Network ("ECHN").  ECHN subsequently terminated that agreement.  The Debtors subsequently entered into negotiations with another entity regarding a potential sale, but those negotiations did not come to fruition.  The Committee retained an investment banker, General Capital Partners, which sought buyers for the Debtors' assets.  A third entity and ECHN subsequently made proposals to the Committee to acquire certain assets of the Debtors.  The Debtors concluded that neither of those proposals was feasible.  Accordingly, the Debtors formulated the Plan, negotiated the terms of the Plan with the Committee, the PBGC, People's United Bank and other Creditors, and now is seeking confirmation of the Plan.

17469.034/498691.8

III.    **THE PLAN**

**THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS
ENTIRETY BY REFERENCE TO THE INFORMATION SET FORTH IN THE PLAN,
WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.**

The Plan is a reorganizing Plan.  Under the Plan, the Debtors will keep all of their property and restructure their debts.  Key features of the Plan include assumption of the People's Secured Claims, payment to Unsecured Creditors of a substantial dividend over time, and termination of JMH's defined benefit Pension Plan and treatment of the Claims of the PBGC in connection with that termination.

A.    **Description, Classification and Treatment of Claims.**  Under the Plan, all Allowed Claims are classified and treated as follows:

1.    **Non-Classified Claims.**

a.    **Administrative Claims.**  Administrative Claims include, <u>inter alia</u>, any Claim for an expense of the kind described in Bankruptcy Code section 503(b), including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates incurred after the commencement of the Cases and prior to confirmation of the Plan, any actual and necessary costs of operating the Debtors' businesses after the commencement of the Cases and prior to confirmation of the Plan, any indebtedness or obligations incurred by the Debtors in connection with the operation of their businesses or for the acquisition or lease of property or the rendition of services after the commencement of the Cases and prior to confirmation of the Plan, any fees and expenses allowed under Bankruptcy Code sections 330 and 331, and any fees due to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6).  Administrative Claims are not classified under the Plan and the holders of Administrative Claims have no right to vote to accept or reject the Plan.  The Debtors

estimate that as of the Confirmation Date the total amount of unpaid Allowed Administrative Claims

will not exceed approximately $1.6 million.  Requests for payment of Administrative Claims not

otherwise allowed must be filed and served on the Debtors by the date set by the Court in the order

setting the Confirmation Hearing. Under the Plan, each Entity holding an Administrative Claim shall

be paid (1) in full in Cash on the later of (a) the Effective Date and (b) the date of the entry of a Final

Order allowing and determining such Administrative Claim, or (2) on such other less favorable terms

as may be agreed to by and among the Debtors and such Entity; provided, however, that

Administrative Claims representing liabilities incurred by the Debtors in the ordinary course of their

businesses during the Case shall be paid by the Debtors in accordance with the terms and provisions

of the particular transactions and agreements relating thereto.

      **b.**      **Allowed Tax Claims.**  Allowed Tax Claims consist of any tax, charge, fee, levy,

impost or other assessment by any federal, state, local or foreign taxing authority, including, without

limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license,

use, ad valorem, estimated, severance, stamp, occupation and withholding tax, including any interest

or additions attributable to, imposed on or with respect to such assessments, entitled to priority under

Bankruptcy Code section 507(a)(8).  Allowed Tax Claims are not classified under the Plan and have

no right to vote to accept or reject the Plan.  The Debtors estimate that as of the Confirmation Date

the total amount of Allowed Tax Claims will be approximately $325,000.00.  Under the Plan, each

Entity holding an Allowed Tax Claim (1) shall be paid, at the option of the Debtor, (a) in full in Cash

on the later of (i) the Effective Date of the Plan and (ii) the date of entry of a Final Order allowing

and determining such Tax Claim or (b) quarterly installment payments commencing ninety days after

the Effective Date, in Cash, of a total value (including interest at the rate determined by applicable

non-bankruptcy law as provided in Bankruptcy Code section 511), as of the Effective Date, equal to

the amount of such Allowed Tax Claim, over a period ending not later than five years after the

Petition Date, or (2) shall be paid on such other less favorable terms as may be agreed to by and

among the Debtor and such Entity.

  **2.**  **Classified Claims.**

  **a.**  **Claims Against JMH.**

  **i.**  **Class A1 – People's JMH Secured Claim.**  Class A1 consists of the People's JMH

Secured Claim and People's United Bank's Claims against JMH as guarantor on the People's JMC

Secured Claim and the People's JEC Secured Claim.  This Class is impaired under and is entitled to

vote on the Plan.  As of the date of the Plan and this Disclosure Statement, JMH owed People's Bank

approximately $13 million on the People's JMH Secured Claim.  The People's JMH Secured Claim

is secured by JMH's real property and certain of the JMH's personal property.  Under the Plan, the

maturity of the People's JMH Secured Claim shall be reinstated as such maturity existed before any

default, People's United Bank will retain all liens securing such Claim, and such Claim shall be paid

in full in accordance with the terms of the documents creating and evidencing such Claim.  In

addition, JMH will remain obligated as guarantor on the JMC Secured Claim and the JEC Secured

Claim and People's United Bank will retain any liens on JMH's property securing those guaranty

Claims.

  **ii.**  **Class A2 – Allowed Secured Claim of First American Commercial Bancorp**

**(Ultrasound System)**.  Class A2 consists of the Allowed Secured Claim of First American

Commercial Bancorp secured by the JMH's Vivid Pro Cardiovascular Ultrasound System, Lease No.

9108-24.  This Class is not impaired under and is conclusively presumed to have accepted the Plan,

and the Debtor is not required to solicit acceptances from the holder of the Claim in this Class.

Under the Plan, in full and complete satisfaction of its Class A2 Claim, on the later of the Effective

Date and the date such Claim becomes an Allowed Claim, First American Commercial Bancorp will receive Cash equal to the Allowed amount of its Class A2 Claim, approximately $17,000.00, except to the extent that First American Commercial Bancorp has been paid by the Debtor prior to the Effective Date and except to the extent that First American Commercial Bancorp agrees to less favorable treatment.

**iii.    Class A3a – Allowed Secured Claim of First American Commercial Bancorp (Schedule 97108-35)**.  Class A3a consists of the Allowed Secured Claim of First American Commercial Bancorp, if any, secured by certain property listed on schedule 97108-35 (the "Schedule 35 Property") between JMH and First American.  The Schedule 35 Property consists of the HVAC system at Johnson Memorial Hospital.  JMH takes the position that the Schedule 35 Property is fixtures and that JMH owns the Schedule 35 Property; that First American did not make a fixture filing with the Town of Stafford, but only with the Connecticut Secretary of State; that First American's lien on the Schedule 35 Property is subordinate to the liens of People's United Bank and the PBGC on the Schedule 35 Property; and that First American's interest in the Schedule 35 Property has no value, so that First American is an unsecured Creditor.  First American disputes that the Schedule 35 Property is fixtures.  First American takes the position that this obligation is not a financing, but rather a true lease.  JMH has commenced or will commence an adversary proceeding to determine the ownership of the Schedule 35 Property and the nature of First American's Claim.  If the Bankruptcy Court finds that JMH leases the Schedule 35 Property from First American, it will be treated under Article VI of the Plan, governing treatment of executory contracts.  If the Bankruptcy Court finds that First American is an unsecured Creditor with respect to the Schedule 35 Property, First American's Claim related to this property will be treated as a Class A6 Unsecured Claim to the extent Allowed.  The Debtors are creating this Class in case the Court finds that First American

holds a Secured Claim with respect to the Schedule 35 Property.  First American recently made an election to have any Secured Claim related to the Schedule 35 Property treated pursuant to Bankruptcy Code section 1111(b).  Assuming that First American has any Secured Claim with respect to the Schedule 35 Property, the Debtors believe that the value of First American's interest in the Schedule 35 Property is of inconsequential value, so that First American was not eligible to make an election under Bankruptcy Code section 1111(b), and the Debtors have filed or will file an objection to that election.  First American disputes the Debtors' contentions.  If First American has a Secured Claim with respect to the Schedule 35 Property, this Class is impaired under and is entitled to vote on the Plan.  Under the Plan, on account of any Class A3a Allowed Secured Claim, First American shall (1) retain its lien securing such Claim and (2) receive monthly Cash payments of $1,000.00, together with interest of 6.5%, until it has received payments that total the greater of (a) at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of the property securing such Claim and, if the Bankruptcy Court finds that First American was entitled to make an election under Bankruptcy Code section 1111(b), (b) the Allowed amount of such Claim.

**iv.    Class A3b – Allowed Secured Claim of First American Commercial Bancorp (Schedule 97108-38)**.  Class A3b consists of the Allowed Secured Claim of First American Commercial Bancorp, if any, secured by certain property listed on schedule 97108-38 (the "Schedule 38 Property") between JMH and First American.  The Schedule 38 Property consists of the cooling system in the computer room at Johnson Memorial Hospital.  JMH takes the position that the Schedule 38 Property is fixtures and that JMH owns the Schedule 38 Property; that First American did not make a fixture filing with the Town of Stafford, but only with the Connecticut Secretary of State; that First American's lien on the Schedule 38 Property is subordinate to the liens of People's United Bank and the PBGC on the Schedule 38 Property; and that First American's interest in the

Schedule 38 Property has no value, so that First American is an unsecured Creditor.  First American

disputes that the Schedule 38 Property is fixtures.  First American takes the position that this

obligation is not a financing, but rather a true lease.  JMH has commenced or will commence an

adversary proceeding to determine the ownership of the Schedule 38 Property and the nature of First

American's Claim.  If the Bankruptcy Court finds that JMH leases the Schedule 38 Property from

First American, it will be treated under Article VI of the Plan, governing treatment of executory

contracts.  If the Bankruptcy Court finds that First American is an unsecured Creditor with respect to

the Schedule 38 Property, First American's Claim related to this property will be treated as a Class

A6 Unsecured Claim to the extent Allowed.  The Debtors are creating this Class in case the Court

finds that First American holds a Secured Claim with respect to the Schedule 38 Property.  First

American recently made an election to have any Secured Claim related to the Schedule 38 Property

treated pursuant to Bankruptcy Code section 1111(b).  Assuming that First American has any

Secured Claim with respect to the Schedule 38 Property, the Debtors believe that the value of First

American's interest in the Schedule 38 Property is of inconsequential value, so that First American

was not eligible to make an election under Bankruptcy Code section 1111(b), and the Debtors have

filed or will file an objection to that election.  First American disputes the Debtors' contentions.  If

First American has a Secured Claim with respect to the Schedule 38 Property, this Class is impaired

under and is entitled to vote on the Plan.  Under the Plan, on account of any Class A3b Allowed

Secured Claim, First American shall (1) retain its lien securing such Claim and (2) receive monthly

Cash payments of $250.00, together with interest of 6.5%, until it has received payments that total

the greater of (a) at least the Allowed amount of such Claim, of a value, as of the Effective Date, of

at least the value of the property securing such Claim and, if the Bankruptcy Court finds that First

American was entitled to make an election under Bankruptcy Code section 1111(b), (b) the Allowed amount of such Claim.

      **v.**      **Class A4 – Allowed Secured Claim of Key Government Finance**. Class A4 consists of the Allowed Secured Claim of Key Government Finance secured by certain property of JMH (the "Key Collateral") plus the Key Cash Amount (approximately $415,000.00). Key Bank recently made an election to be treated in accordance with Bankruptcy Code section 1111(b). This Class is impaired under and is entitled to vote on the Plan. On the Effective Date, Key Government Finance shall (1) retain its lien on the Key Collateral and (2) receive from JMH the Key Cash Amount. On or before the one year anniversary of the Effective Date, JMH shall transfer the Key Collateral to Key Government Finance. After the Effective Date, JMH shall pay Key Government Finance $3,500.00 per month through the date that JMH transfers the Key Collateral to Key Government Finance. Because under the plan JMH will be transferring the Key Collateral to Key Government Finance, the Debtors believe that Key Government Finance is not eligible to make an election under Bankruptcy Code section 1111(b), and the Debtors have filed or will file an objection to that election. Key Government Finance disputes the Debtors' contention with respect to the 1111(b) election.

      **vi.**      **Class A5 - Allowed Priority Non-Tax Claims Against JMH.** Class A5 consists of any Claim against JMH entitled to priority under Bankruptcy Code section 507(a)(3), (4), (5), (6), (7) or (9) to the extent it is an Allowed Claim. JMH estimates that as of the Confirmation Date, the aggregate amount of unpaid Allowed Priority Non-Tax Claims will be approximately $300,000.00. This Class is not impaired under, and holders of Class 5 Claims are conclusively presumed to have accepted, the Plan. Under the Plan, in full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax

17469.034/498691.8

Claim, each Entity holding an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

      **vii.**    **Class A6 - Allowed Unsecured Claims Against JMH.**  Class A6 consists of all Allowed Unsecured Claims against JMH.  There are more than 1,000 Unsecured Claims, and JMH believes that these Claims will total approximately $16 million to $18 million.  The Debtors believe that holders of Class A6 Allowed Unsecured Claims against JMH will receive between 20% and 25% on their Claims, and possible more depending on recoveries on Litigation Claims and certain other events.  This Class is impaired under and is entitled to vote to accept or reject the Plan.  The Plan provides that holders of Class A6 Allowed Unsecured Claims shall receive their Pro Rata share of:

      (1)    $705,232.50 on the Effective Date;

      (2)    $256,025.00 on the first anniversary of the Effective Date;

      (3)    $488,775.00 on the second anniversary of the Effective Date;

      (4)    $954,275.00 on the third, fourth and fifth anniversaries of the Effective Date;

      (5)    49% of the Litigation Claims Proceeds of JMH;

      (6)    an amount equal to 16.33% of any monies received from the United States government for electronic medical records funding, payable every six months if funds are received monthly or within sixty days of receipt if provided in one or more lump sums; and

      (7)    in addition, if there is a JMH Change Event (as defined in the Plan), 49% of any JMH Net Proceeds (as defined in the Plan) shall be distributed to Class A6 Creditors up to the additional maximum aggregate amount of $1,470,000.00.  In the case of a JEC Change Event (as defined in the

Plan), Class A6 Creditors shall receive their Pro Rata share of 49% of any JEC Net Proceeds (as defined in the Plan) after payment of Class B6 Creditors as provided in Article IV B6, up to the additional maximum aggregate amount of $1,470,000.00.  In the case of a JMC Change Event (as defined in the Plan), Class A6 Creditors shall receive their Pro Rata share of 49% of 95% of JMC Net Proceeds (as defined in the Plan), up to the additional maximum aggregate amount of $1,470,000.00.  In no event shall the total payments to Classes A6, A7 and B6 on account the total JEC Change Events, JMC Change Events and JMH Change Events exceed $3 million, exclusive of the Scheduled Payments and any other payments due pursuant to Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3 of the Plan.  The payments due under this subparagraph (7) are in addition to and not in lieu of any other payments due under the Plan including, without limitation, the Scheduled Payments, which Scheduled Payments shall continue to be due and payable in such amounts and at such times as are set forth in Article IV A6 (1)-(4) and B6 (1)-(4) of the Plan.

The Plan provides that JMH shall pay simple interest at the rate of 8% on account of any payment default until such default is cured, and that all payments for (1) through (4), (6) and (7) above shall be secured by the Unsecured Claims Security Documents and the liens created thereby shall be *pari passu* with the liens arising under the Unsecured Class A7 Security Documents.

**viii.    Class A7 – Allowed PBGC Claim.**  Class A7 consists of the PBGC Claim (as defined in the Plan—for a fuller description of the PBGC Claim, see paragraph F below).  The PBGC Claim shall be Allowed as set forth in Article IV of the Plan.  The Plan provides that the Allowed PBGC Claim shall be paid as follows:

(1)    $734,401.50 on the Effective Date;

(2)    $266,475.00 on the first anniversary of the Effective Date;

(3)    $508,725.00 on the second anniversary of the Effective Date;

17469.034/498691.8

(4)      $993,225.00 on the third, fourth and fifth anniversaries of the Effective Date;

(5)      51% of the Litigation Claims Proceeds of JMH;

(6)      an amount equal to 17% of any monies received from the United States government

for electronic medical records funding payable every six months if funds are received monthly or

within sixty days of receipt if provided in one or more lump sums; and

(7)      in addition, if there is a JMH Change Event, the PBGC shall receive 51% of any JMH

Net Proceeds, up to the additional maximum amount of $1,530,000.00.  In the case of a JEC Change

Event, the PBGC shall receive 51% of any JEC Net Proceeds after payment of Class B6 Creditors as

provided in Article IV B6, up to the additional maximum amount of $1,530,000.00.  In the case of a

JMC Change Event, the PBGC shall receive 51% of 95% of JMC Net Proceeds, up to the additional

maximum amount of $1,530,000.00.  The Plan provides that in no event shall the total payments to

Classes A6, A7 and B6 on account of the total JEC Change Events, JMC Change Events and JMH

Change Events exceed $3 million, exclusive of the Scheduled Payments and any other payments due

pursuant to Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3 of the Plan.  The payments due

under this subparagraph (7) are in addition to and not in lieu of any other payments due under the

Plan including, without limitation, the Scheduled Payments, which Scheduled Payments shall

continue to be due and payable in such amounts and at such times as are set forth in (1)-(6) above.

The Plan provides that JMH shall pay simple interest at the rate of 8% on account of any

payment default until such default is cured.  All payments for (1) through (4), (6) and (7) above shall

be secured by the Unsecured Class A7 Security Documents (as defined in the Plan) and the liens

created thereby shall be *pari passu* with the liens arising under the Unsecured Claims Security

Documents.  The Plan provides that all proofs of Claim filed by the PBGC will be Allowed in the

amounts filed, but that such Claims shall be treated as set forth in the Plan and that the Committee

consents to such treatment.  The Plan also provides that in exchange for the treatment of the Allowed

PBGC Claim provided in the Plan, on or before the Effective Date the PBGC shall file notices of

withdrawal of its federal tax liens against the Debtors' property.

      **ix.**    **Class A8 – Intercompany Claims Against JMH.**  Class A8 consists of any Claim

against JMH by JMC, JEC or any other related entity.  This Class is impaired and is entitled to vote

on the Plan.  The Plan provides that after Class A6 and A7 Claims are paid pursuant to the terms of

the Plan, each holder of an Intercompany Claim shall be entitled to receive payment from the

Reorganized Debtor pursuant to terms to be mutually agreed upon between the Reorganized Debtor

and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of

and in exchange for such Intercompany Claim.

      **x.**    **Class A9 – Convenience Claims Against JMH.**  Class A9 consists of any Allowed

Unsecured Claim against JMH that is $1,000.00 or less.  JMH estimates that Convenience Claims

will total approximately $163,000.00.  This Class is impaired under and is entitled to vote on the

Plan.  The Plan provides that in full and complete satisfaction of its Claim, on the later of the

Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, each

Entity holding an Allowed Convenience Claim will receive Cash equal to fifty percent of the

Allowed amount of such Convenience Claim, except to the extent that such holder of an Allowed

Convenience Claim has been paid by the Debtor prior to the Effective Date and except to the extent

such holder agrees to less favorable treatment.

      **b.**    **Claims Against JEC.**

      **i.**    **Class B1 – People's JEC Secured Claim.**  Class B1 consists of the People's JEC

Secured Claim.  This Class is impaired under and is entitled to vote to accept or reject the Plan.  As

of the Petition Date, JEC owed People's approximately $15.2 million.  The People's Secured Claim

is secured by JEC's real property and certain of the JEC's personal property. Under the Plan, the maturity of the People's JEC Secured Claim shall be reinstated as such maturity existed before any default, People's United Bank will retain all liens securing such Claim, and such Claim shall be paid in full in accordance with the terms of the documents creating and evidencing such Claim.

ii.    **Class B2 – Allowed Secured Claim of VGM Financial Services**. Class B2 consists of the Allowed Secured Claim of VGM Financial Services. This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JEC is not required to solicit acceptances from the holder of the Claim in this Class. Under the Plan, on the Effective Date JEC shall cure any default with respect to the VGM Financial Services Secured Claim that occurred before or after the commencement of the Case, other than a default of a kind specified in Bankruptcy Code section 365(b)(2); the maturity of the VGM Financial Services Secured Claim shall be reinstated as such maturity existed before any default; and the legal, equitable, or contractual rights to which the VGM Financial Services Claim entitles VGM Financial Services shall not otherwise be altered.

iii.    **Class B3 - Allowed Priority Non-Tax Claims Against JEC.** Class B3 consists of any Claim against JEC entitled to priority under Bankruptcy Code section 507(a)(3), (4), (5), (6), (7) or (9) to the extent it is an Allowed Claim. JEC estimates that as of the Confirmation Date, the aggregate amount of unpaid Allowed Priority Non-Tax Claims will be approximately $80,000.00. This Class is not impaired under, and holders of Class B3 Claims are conclusively presumed to have accepted, the Plan. Under the Plan, in full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an

Allowed Priority Non-Tax Claim has been paid by JEC prior to the Effective Date and except to the

extent such holder agrees to less favorable treatment.

  **iv.**  **Class B4 - Allowed Unsecured Claims Against JEC.** Class B4 consists of all

Allowed Unsecured Claims against JEC. The Debtor estimates that these Claims will total

approximately $850,000.00. The Debtors believe that holders of Class B6 Allowed Unsecured

Claims against JEC will receive approximately 50% on their Claims, and possible more depending

on recoveries on Litigation Claims and certain other events. This Class is impaired under and is

entitled to vote to accept or reject the Plan. The Plan provides that holders of Class B6 Allowed

Unsecured Claims shall receive their Pro Rata share of:

  (1)  $75,750.00 on the Effective Date;

  (2)  $27,500.00 on the first anniversary of the Effective Date;

  (3)  $52,500.00 on the second anniversary of the Effective Date;

  (4)  $102,500.00 on the third, fourth and fifth anniversaries of the Effective Date;

  (5)  the Litigation Claims Proceeds of JEC; and

  (6)  in addition, if there is a JEC Change Event, Class B6 Creditors shall receive their Pro

Rata share of any JEC Net Proceeds, distributed as an additional payment up to the Allowed amount

of their Claims. In the case of a JMC Change Event, Class B6 Creditors shall receive their Pro Rata

share of 5% of JMC Net Proceeds, to be distributed as an additional payment up to the Allowed

amount of their Claims. The Plan provides that in no event shall the total payments to Classes A6,

A7 and B6 on account of the total JEC Change Events, JMC Change Events and/or JMH Change

Events exceed $3 million, exclusive of the Scheduled Payments and any other payments due

pursuant to Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3 under the Plan. The Plan provides

that payments due under this subparagraph (6) are in addition to and not in lieu of any other

payments due under the Plan including, without limitation, the Scheduled Payments, which Scheduled Payments shall continue to be due and payable in such amounts and at such times as are set forth in Article IV A6 (1)-(4) and B6 (1)-(4) under the Plan.

The Plan provides that JEC shall pay simple interest at the rate of 8% on account of any payment default hereunder until such default is cured and that all payments for (1) through (6) above shall be secured by the Unsecured Claims Security Documents.

**v.**      **Class B5 – Intercompany Claims Against JEC**.  Class B5 consists of any Claim against the JEC by JMC, JMH or any other related entity.  This Class is impaired and is entitled to vote on the Plan.  The Plan provides that after Class 5 Claims are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim shall be entitled to receive payment from Reorganized Debtor pursuant to terms to be mutually agreed upon between Reorganized Debtor and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

**vi.**     **Class B6 – Convenience Claims Against JEC**.  Class B6 consists of any Allowed Unsecured Claim against JEC that is $1,000.00 or less.  The Debtor estimates that Convenience Claims will total approximately $6,000.  This Class is impaired under and is entitled to vote to accept or reject the Plan.  The Plan provides that in full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, each Entity holding an Allowed Convenience Claim will receive Cash equal to fifty percent of the Allowed amount of such Convenience Claim, except to the extent that such holder of an Allowed Convenience Claim has been paid by the Debtor prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

c.    **Claims Against JMC.**

i.    **Class 1 – People's JMC Secured Claim.**  Class C1 consists of the People's JMC

Secured Claim and People's United Bank's Claims against JMC as co-borrower on the People's

JMH Secured Claim and the People's JEC Secured Claim.  This Class is impaired under and is

entitled to vote to accept or reject the Plan.  As of the date of this Plan, JMC owed People's

approximately $3,480,000.00 on account of the People's JMC Secured Claim.  The People's JMC

Secured Claim is secured by JMC's real property and certain of JMC's personal property.  Under the

Plan, the maturity of the People's JMC Secured Claim shall be reinstated as such maturity existed

before any default, People's United Bank will retain all liens securing such Claim, and such Claim

shall be paid in full in accordance with the terms of the documents creating and evidencing such

Claim.  In addition, JMC will remain obligated as co-borrower on the JMH Secured Claim and the

JEC Secured Claim and People's United Bank will retain any liens on JMC's property securing those

Claims.

ii.    **Class C2 - Allowed Priority Non-Tax Claims Against JMC.**  Class C2 consists of

any Claim against JMC entitled to priority under Bankruptcy Code section 507(a)(3), (4), (5), (6), (7)

or (9) to the extent it is an Allowed Claim.  JMC estimates that as of the Confirmation Date, the

aggregate amount of unpaid Allowed Priority Non-Tax Claims will be zero.  This Class is not

impaired under, and holders of Class C2 Claims are conclusively presumed to have accepted, the

Plan.  Under the Plan, in full and complete satisfaction of its Claim, on the later of the Effective Date

and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity

holding an Allowed Priority Non-Tax Claim will receive Cash equal to the Allowed amount of such

Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim

has been paid by JMC prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

**iii.      Class C3 - Allowed Unsecured Claims Against JMC.**  Class C3 consists of all Allowed Unsecured Claims against JMC.  JMC estimates that these Claims will total less than $100,000.00.  This Class is impaired under and is entitled to vote to accept or reject the Plan.  Under the Plan, on the later of the Effective Date and the date such Unsecured Claim against JMC becomes an Allowed Unsecured Claim, each Entity holding an Allowed Unsecured Claim against JMC shall receive from JMC Cash equal to its Pro Rata share of $35,000.00, except to the extent that such holder of an Allowed Unsecured Claim has been paid by JMC prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

**iv.      Class C4 – Intercompany Claims Against JMC**.  Class C4 consists of any Claim against JMC by JEC, JMH, Johnson Health Care, Inc., and Home and Community Health Services. This Class is impaired and is entitled to vote on the Plan.  The Plan provides that after Class C3 Claims are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim against JMC shall be entitled to receive payment from Reorganized Debtor pursuant to terms to be mutually agreed upon between Reorganized Debtor and that holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

**B.      Means of Implementation of Plan.**  The Debtors' boards will remain in place after Confirmation of the Plan.  After confirmation of the Plan, the Debtors will enter into a three-year contract with Peter J. Betts & Associates, Inc. ("PJB"), pursuant to which PJB will provide to the Debtors a management team consisting of Peter Betts as president and chief executive officer and David Morgan as chief operating officer.  PJB's compensation is being negotiated and will be disclosed prior to Confirmation.  In addition, the Debtors will pay Focus Management a fee of not

-28-

more than 27.5% of the amount paid to PJB in the first year of the contract allocated to Peter Betts in exchange for Focus releasing Peter Betts from his non-compete agreement with Focus.  Approval of that fee will be the subject of a separate motion to be filed with the Court.  The Debtors believe that this payment will be less than what the Debtors would pay to an executive search firm to find a new management team.

The Plan provides that on the Effective Date, the Reorganized Debtors shall be authorized and directed to execute and to deliver all documents and agreements and take all actions contemplated by this Plan; that the Debtors will retain all of their property subject only to Claims as provided in this Plan; and that the Debtors will make the distributions provided for in this Plan from the Debtors' cash on hand and operating revenue and from the Post-Confirmation Line of Credit. The Post-Confirmation Line of Credit will consist of a revolving line of credit entered into by the Debtors after Confirmation and prior to the Effective Date for a minimum of $6 million, to be used to fund payments pursuant to the Plan and on an as needed basis for the Reorganized Debtors' general operating purposes during the post-Confirmation period.  As demonstrated by the Debtors' cash flow projections for the period 2010 through 2015, annexed hereto as Exhibit B, the Debtors' cash flow in combination with the Post-Confirmation Line of Credit will be sufficient to allow the Debtors to properly operate their businesses and make all payments required under the Plan.

The Plan provides that on or prior to the Effective Date, the Debtors will, inter alia, take actions necessary to reinstate the People's Secured Claims as provided in this Plan, deliver the PBGC Premium Note to the PBGC, and enter into the Post-Confirmation Line of Credit.

**C.**      **Plan Custodian, Security For Class A6 and B6 Claims, and Oversight Committee**.  The Plan provides that on the Effective Date the Plan Custodian shall be appointed.  As set forth in the Plan Custodian Agreement, the Plan Custodian shall be authorized and empowered to

(1) monitor the Debtors' compliance with the terms of the Plan; (2) enforce all rights under the

Unsecured Claims Security Documents; (3) exercise all of the powers of the Debtors in connection

with the Litigation Claims; and (4) subject to the oversight of the Oversight Committee, take such

actions as may be necessary and in the best interests of holders of Allowed Unsecured Claims (other

than Class A7 Allowed Claims) in connection with the implementation of the terms of the Plan

including, without limitation, whether to agree to a JEC Change Event, JMH Change Event, or JMC

Change Event that does not otherwise satisfy the criteria set forth herein.  The Unsecured Claims

Security Documents will provide for, among other things, a second priority lien on all of the

Debtors' real property, subordinate only to the People's Secured Claims, and liens on the Debtors'

personal property, subordinate only to any existing liens and the liens granted to the Exit Lender in

connection with the Post-Confirmation Line of Credit.  Under the Plan, the Plan Custodian may

engage such attorneys, accountants and other professionals as are reasonably required to effectively

and efficiently perform its responsibilities under the Plan.  The Plan provides that the Plan Custodian

shall seek Bankruptcy Court approval for the retention of any such professional who was not retained

previously by the Debtors or the Committee pursuant to an order of the Bankruptcy Court.  Subject

to the Bankruptcy Court's approval, the Plan Custodian and any professionals retained by the Plan

Custodian shall be compensated for fees and expenses from (a) an initial fund of $125,000.00 funded

by the Debtors on the Effective Date and (b) Litigation Claims Proceeds.  Other than the initial

$125,000.00 payment, under the Plan the Debtors will have no obligation for the fees and expenses

of the Plan Custodian or the Plan Custodian's professionals, except in the event of a default under

the Plan by Debtors, whereupon the Reorganized Debtors shall be liable for all reasonable costs and

expenses of the Plan Custodian, including, without limitation, all reasonable attorneys' fees, incurred

during the period of the default.  The Plan provides that the Plan Custodian may retain professionals

who were retained by the Debtors or the Committee during the Case.  Under the Plan the Plan

Custodian shall have the right and duty to, on behalf of and in the name of the Debtors, (a) examine

all rights of action, including, without limitation, avoidance actions under Bankruptcy Code sections

544, 547, 548 and 549, and file, litigate to final judgment, settle, or withdraw such rights of action

and (b) examine Claims and file, litigate to final judgment, settle, or withdraw objections to Claims,

subject to Bankruptcy Court approval.  The Plan Custodian or its agent shall maintain books and

records containing an accounting of receipts and disbursements.  The Plan provides that the Plan

Custodian shall periodically, but not less than once every ninety days, inform the Oversight

Committee of any developments that it considers significant during the term of the Plan.  At the

request of the Oversight Committee, the Plan Custodian shall provide the Oversight Committee with

a written report on the status of all active matters affecting the Debtors.  Under the Plan the Plan

Custodian may resign by giving written notice of his resignation to the Oversight Committee, the

twenty largest unsecured Creditors, and all parties who requested notice in these Cases.  Unless the

Bankruptcy Court orders otherwise, (a) such resignation shall become effective on the date on which

the Bankruptcy Court appoints a successor Plan Custodian and (b) the Plan Custodian shall be

entitled to compensation up to the date on which the Plan Custodian's resignation becomes effective.

 Unless the Bankruptcy Court orders otherwise, within forty-five days of such resignation becoming

effective, the Plan Custodian shall serve a final accounting on the Oversight Committee and

thereupon be discharged from the performance of any further duties.  The Oversight Committee may

move the Bankruptcy Court, upon not less than ten days written notice to all parties listed above, for

an order removing the Plan Custodian for cause.  If the Plan Custodian at any time resigns or is

removed, or dies or becomes incapable of action, or is a debtor under the Bankruptcy Code or is

adjudged to be insolvent, a vacancy shall be deemed to exist and a successor Plan Custodian shall be

17469.034/498691.8

appointed pursuant to an order of the Bankruptcy Court as soon as practicable upon motion of the Oversight Committee on not less than ten days written notice to all parties listed above. If any claim, cause of action, objection, settlement or other act of, or on behalf of, the Debtors gives rise to a conflict on behalf of the Plan Custodian, the Plan Custodian shall inform the Oversight Committee of the conflict not later than two (2) Business Days from discovery of the conflict by the Plan Custodian. Immediately upon discovery of the conflict by the Plan Custodian, the Plan Custodian shall withdraw from any and all involvement concerning the matter or issue giving rise to the conflict. Within thirty days of being informed of the conflict, the Oversight Committee shall seek the entry of an order from the Bankruptcy Court, upon not less than ten days written notice, approving the appointment of a supplemental Plan Custodian only to the extent necessary to avoid such a conflict. Any supplemental Plan Custodian so appointed shall have the rights, powers, privileges and duties of the Plan Custodian hereunder solely in connection with the matters on which it has been appointed and shall be subject to the conditions and limitations of the Plan. The Bankruptcy Court may remove such supplemental Plan Custodian for cause, upon the motion of the Oversight Committee on not less than ten days written notice to all parties, and such supplemental Plan Custodian shall resign upon completion of its duties in connection with the matter on which it was appointed. The Plan Custodian and any supplemental Plan Custodian and their members, agents, representatives, employees and professionals shall not be liable to the Debtors, the Debtors' Creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud. The Plan Custodian shall not be liable for any action taken or omitted in good faith and reasonably believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan. In performing its duties under the Plan, the Plan Custodian may retain and consult with counsel selected by it, and shall have no liability for

any reasonable action taken upon the advice of such counsel.  None of the provisions of the Plan shall require or be construed as requiring the Plan Custodian to expend or risk its own funds or otherwise incur or expose it to personal financial liability in the performance of any of its duties under the Plan or in the exercise of any of its rights and powers.  The Plan Custodian may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.  After all of the provisions of the Plan have been fully performed, Plan Custodian shall be discharged of its duties.

The Plan provides that upon the Effective Date, three members of the Committee selected by the Committee shall become the Oversight Committee.  The Oversight Committee shall be representative of all holders of Allowed Unsecured Claims, and shall oversee the post-Effective Date activities of the Plan Custodian in accordance with the Plan.  The powers and duties of the Oversight Committee shall be limited to the following: (a) monitoring the activities of the Plan Custodian in accordance with the terms of the Plan and the Plan Custodian Agreement, (b) participating in the removal of the Plan Custodian for cause and the appointment of any successor Plan Custodian and (c) making such decisions as are in the best interests of holders of Allowed Unsecured Claims in connection with the implementation of the Plan.  The Oversight Committee may retain counsel to represent the Oversight Committee with respect to any claim or action asserted against the Oversight Committee and to advise the Oversight Committee on matters concerning the Debtors, the Plan Custodian and the Oversight Committee's fiduciary duties.  The reasonable and necessary expenses of the Oversight Committee, including attorneys' fees and expenses, that may be incurred in the performance of the Oversight Committee's fiduciary duties, shall be paid from the $125,000.00 initial fund described above and from any Litigation Claims Proceeds provided, however, that in the event of a default by Debtors under the Plan, any and all reasonable fees and expenses of the

Oversight Committee, including, without limitation, reasonable attorneys' fees, incurred during the period of the default shall not be paid from the $125,000 fund or the Litigation Claims Proceeds but shall be the responsibility of Reorganized Debtors.  An Oversight Committee member shall be recused from any discussions or deliberations of the Oversight Committee or the Plan Custodian concerning any claim which directly or indirectly relates to any claim or cause of action which may be considered or brought by the Debtors against such Oversight Committee member.  Those Oversight Committee members that are required to be recused shall not have access to any non-publicly available information that may be the subject of litigation concerning any such claim. Members of the Oversight Committee shall not be liable to the Debtors, the Debtors' Creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud.  Members of the Oversight Committee shall not be liable for any action taken or omitted in good faith and reasonably believed by them to be authorized within the discretion or rights or powers conferred upon them by the Plan.  In performing its duties under the Plan, the Oversight Committee may retain and consult with counsel selected by it, and shall have no liability for any reasonable action taken upon the advice of such counsel.  None of the provisions of the Plan shall require or be construed as requiring the members of the Oversight Committee to expend or risk their own funds or otherwise incur or expose them to personal financial liability in the performance of any of their duties under the Plan or in the exercise of any of their rights and powers.

 The Oversight Committee may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.  The Oversight Committee will terminate upon the payment of Allowed Unsecured Claims pursuant to the Plan.

D.      **Litigation Matters**.  Under the Plan the Debtors shall retain all pre-petition claims, causes of action and rights of the Debtors and the Debtors' estates, including, without limitation, avoidance actions and the right to seek the subordination of Claims under Bankruptcy Code section 510.  On the Effective Date, the Plan Custodian shall become responsible for examining and pursuing the Litigation Claims on behalf of the Debtors.  Any recovery on such claims shall become Litigation Claims Proceeds.  Other than the $125,000.00 initial amount paid by the Debtors on the Effective Date, all fees, expenses, and costs of pursuing the Litigation Claims shall be paid from the Litigation Claims Proceeds, and the Reorganized Debtors shall not be responsible for any such fees, expenses and costs.  The Plan Custodian cannot settle any Litigation Claims unless the Bankruptcy Court enters an order approving such settlement pursuant to Bankruptcy Rule 9019.  To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Claims prior to the Effective Date by the Debtors and/or the Committee, the Plan Custodian shall be substituted for the Debtors and/or the Committee in connection therewith.  Reorganized Debtors, upon reasonable notice, shall be required to provide information, to the extent Reorganized Debtors have such information, to the Plan Custodian sufficient to enable the Plan Custodian to perform its duties hereunder.

E.      **Procedures for Resolving and Treating Disputed Claims.**  The Plan provides, inter alia, that notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed.  Under the Plan, the Reorganized Debtors shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330 and 503 of the Bankruptcy Code) to make, file and prosecute objections to Claims.  The Plan provides that the

-35-

Reorganized Debtors shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtor), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court. The Plan further provides that all objections shall be litigated to a Final Order except to the extent that Reorganized Debtors elect to withdraw such objection, or Reorganized Debtors and the holder of the Disputed Claim compromise, settle or otherwise resolve any such objections, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court.

Under the Plan, the Reorganized Debtors shall be required to reserve (but not in a formal, segregated account) sufficient Cash for Disputed Unsecured Claims as set forth in the Plan. The Plan provides that if on or after the Effective Date any Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim distribute to the holder of such Allowed Claim an amount that provides such holder with the same percentage recovery, as of such date, as other holders of Claims in the relevant class that were Allowed on the Effective Date.

**F.     Termination of Pension Plan and Payment of Termination Premium to PBGC.**

JMH sponsors the Retirement Plan for Employees of Johnson Memorial Hospital (the "Pension Plans"), which is asserted to be a defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. §§ 1301-1461. JMH as sponsor and JEC and JMC as members of the sponsor's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)), are jointly and severally liable to contribute to the Pension Plan for the amounts necessary to satisfy ERISA's and the Internal Revenue Code's minimum funding standards

("Minimum Funding Contributions"). *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007); 26 U.S.C. §§ 412, 430 (as to § 430, effective for pension plan years beginning after December 31, 2007). They also are jointly and severally liable for insurance premiums owed to the Pension Benefit Guaranty Corporation ("PBGC"). See 29 U.S.C. §§ 1306, 1307.

PBGC is the federal agency that administers the nation's defined benefit pension plan termination insurance program under Title IV of ERISA. When an underfunded pension plan terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits.

ERISA provides the exclusive means to terminate a pension plan. See 29 U.S.C. § 1341(a)(1). JMH may terminate the Pension Plan in a standard termination in accordance with 29 U.S.C. § 1341(b) and corresponding regulations. *See* 29 C.F.R. §§ 4041.21-4043.31. A standard termination requires sufficient assets to pay all of the Pension Plan's promised benefits. *See* 29 U.S.C. § 1341(b)(2)(A)(i) (III). Because there are not sufficient plan assets to pay all of the Pension Plan's promised benefits, a standard termination of the Pension Plan is not feasible and JMH is seeking to terminate the Pension Plan in a distress termination. *See* 29 U.S.C. § 1341(c).

PBGC has filed timely proofs of claims against the JMH for (1) the Pension Plan's underfunding on a termination basis ("Unfunded Benefit Liabilities"), (2) unpaid Minimum Funding Contributions – a portion of which PBGC asserts is entitled to priority under 11 U.S.C. §§ 507(a)(2), (5), and (3) unpaid premiums. As of May 31, 2009, PBGC estimated that the Pension Plan's unfunded benefit liability was approximately $29,108,149; this claim is contingent on the Pension Plan terminating, other than through a standard termination, during the bankruptcy and would be withdrawn if no such termination occurs. The Debtors, the Committee and the PBGC have reached

an agreement on the Allowance and treatment of the PBGC's termination related Claims, which is subject to confirmation of this Plan. If this Plan is not confirmed, all parties reserve their rights with respect to the Allowance and treatment of all Claims, including the PBGC's Claims. The Plan provides that the Debtors and the Committee will not object to the amount of this Claim, the proofs of Claim filed by the PBGC will be Allowed in the amounts filed, and the PBGC Claim will be treated as provided in Article IV of the Plan in the amount Allowed.

If the Pension Plan is terminated in a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) or a PBGC-initiated termination under 29 U.S.C. § 1342 while JMH is attempting to reorganize in Chapter 11, and JMH ultimately is the subject of a confirmed Chapter 11 plan of reorganization, JMH will become liable to the PBGC--in addition to the flat- and variable-rate premiums--for termination premiums in the amount of $1,250 per year for three years for each Pension Plan participant. The termination premium liability does not exist until after the Chapter 11 plan is confirmed and JMH exits from bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141. However, if JMH's chapter 11 proceeding in essence becomes a liquidation, and the Pension Plan is terminated in a PBGC-initiated termination, the termination premium may become immediately due, and PBGC typically would assert the termination premium as a administrative priority claim in JMH's liquidating bankruptcy.

Any termination of the Pension Plan shall be in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service.

Nothing in the Debtors' bankruptcy proceedings, Confirmation Order, Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtors' Cases

shall in any way be construed to discharge, release, limit, or relieve the Debtors or any other party, in any capacity, from ERISA fiduciary liability with respect to fiduciary breaches that occurred prior to the termination of the Pension Plan or any other defined benefit pension plan under any law, governmental policy, or regulatory provision.

JMH shall terminate its Pension Plan in a distress termination under 29 U.S.C. section 1341(c), in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service. The Plan provides that in full and complete satisfaction of the annual insurance premiums due to the PBGC with respect to JMH's terminated Pension Plan under 29 U.S.C. sections 1306(a)(3) and 1307(a) and (e), which the PBGC asserts will total approximately $3 million, JMH shall execute and deliver to the PBGC a promissory note for $2,000,000.00. The note will not bear interest, and JMH will make five annual payments of $400,000.00 to the PBGC commencing on the sixth anniversary of the Effective Date. Dollar payments made in excess of the annual payment will reduce the outstanding principal amount by a multiplier of 1.5. The $2,000,000.00 may be paid in full at any time prior to the sixth anniversary of the Effective Date for a payment of $500,000.00. The PBGC shall release its federal tax liens on the Debtors' property upon confirmation of the Plan.

G.    **Assumption and Rejection.** The Plan provides, inter alia, that pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any Entity shall be deemed assumed by the Debtor as of the Effective Date, except for any executory contract or unexpired lease (1) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (2) as to which a motion for approval of the rejection of such executory contract or unexpired lease is pending as of the Effective

Date, or (3) that is specifically designated as a contract or lease to be rejected in any schedule to this Plan.

The Plan further provides that entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (1) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed and assigned pursuant to the Plan, (2) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject the unexpired leases specified in the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired leases, and (3) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.  Under the Plan, the Reorganized Debtor shall pay all cure amounts, if any, to the non-Debtor parties to the executory contracts and unexpired leases assumed pursuant to the Plan by the later to occur of (i) the first Effective Date Anniversary or (ii) ten (10) days after resolution of the cure amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties.  Under the Plan, if a non-Debtor party to an executory contract or unexpired lease assumed pursuant to the Plan timely objects to the assumption or the proposed cure amount for that agreement, the Debtor and the objecting party may settle, compromise, or otherwise resolve the proper cure amount without further order of the Court or may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount.  The Plan provides that, notwithstanding the above, the Debtor may, in its sole and absolute discretion, determine to reject any executory contract or unexpired lease at any time prior to the later of (1) thirty (30) days after the Effective Date and (2) thirty (30) days after the entry of a Final Order determining the proper cure amount for that contract or lease. The effective date of a rejection

effected pursuant to the preceding sentence shall be the Confirmation Date regardless of the date on which the Debtor gives notice of such rejection.

Under the Plan, Claims arising out of the rejection of an executory contract or unexpired lease pursuant to of the Plan must be filed with the Bankruptcy Court and served upon the Debtor or, on and after the Effective Date, Reorganized Debtor, no later than thirty (30) days after the later of (1) the date notice of entry of an order is mailed approving the rejection of such executory contract or unexpired lease, and (2) the date notice of entry of the Confirmation Order is mailed. All such Claims not filed within such time will be forever barred from assertion against the Debtor and its estate or the Reorganized Debtor and its property.

H.      **Distributions Under the Plan.**  The Plan provides, inter alia, that the Reorganized Debtor shall make all distributions required by the Plan other than those to be made by the Litigation Trustee, and that unless otherwise provided herein, any distribution to be made by Reorganized Debtor or the Litigation Trustee shall be made to the extent and at the time provided in Article IV and Article V of the Plan.

I.      **Retention of Jurisdiction.**  The Plan provides that notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings arising from, or relating to, the Cases pursuant to Bankruptcy Code section 1142 and 28 U.S.C. section 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out, including: (1) to hear and determine any and all objections to the allowance, or requests for estimation, of Claims; (2) to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Reorganized Debtors or the Reorganized Debtors' estates; (3) to determine any and all

applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or

assignment of executory contracts and the allowance of any Claim resulting therefrom; (4) to enter

such orders as may be necessary or appropriate in connection with the recovery of the Reorganized

Debtors' assets wherever located; (5) to hear and determine any and all applications for allowance of

compensation and reimbursement of expenses; (6) to hear and determine any and all controversies,

suits and disputes arising under or in connection with the interpretation, implementation or

enforcement of the Plan and any of the documents intended to implement the provisions of the Plan;

(7) to hear and determine any and all applications, adversary proceedings, contested matters and

other litigated matters pending on the Effective Date or that may be commenced thereafter as

provided in the Plan; (8) to hear and determine any applications to modify any provision of the Plan

to the full extent permitted by the Bankruptcy Code; (9) to correct any defect, cure any omissions or

reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the

Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan; (10) to

effectuate distributions under and performance of the provisions of the Plan; (11) to hear and

determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax

benefits and similar and related matters with respect to the Reorganized Debtors arising prior to the

Effective Date or relating to the administration of the Cases, including, without limitation, matters

involving federal, state and local taxes in accordance with Bankruptcy Code sections 346, 505 and

1146; (12) to determine such other matters and for such other purposes as may be provided in the

Confirmation Order or as may from time to time be authorized under the provisions of the

Bankruptcy Code or any other applicable law; (13) to enforce all orders, judgments, injunctions,

releases and rulings issued or entered in connection with the Cases or the Plan; (14) to enter such

orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of

the Plan, including, without limitation, any stay orders as may be appropriate in the event that the

Confirmation Order is for any reason stayed, revoked, modified or vacated; (15) to determine any

other matter not inconsistent with the Bankruptcy Code; and (16) to enter an order closing the Case.

**J.    Effect of Confirmation.**  The Plan provides that as of the Effective Date, the property

of the Debtors' estate, including all claims and causes of action against third parties that arose prior

to or after the Petition Date, shall vest in the Debtors; that from and after the Effective Date, the

Debtors free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the

Plan; and that as of the Effective Date, all assets of the Debtors shall be free and clear of all Claims,

liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation

Order.

The Plan further provides that, except as otherwise provided in section 1141(d)(3) of the

Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any

holder of a Claim against one of the Debtors and its successors and assigns, whether or not the Claim

of such holder is impaired under the Plan and whether or not such holder has accepted the Plan; and

that the rights, benefits and obligations of any entity named or referred to in the Plan whose actions

may be required to effectuate the term of the Plan shall be binding on, and shall inure to the benefit

of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to,

any trustee appointed for one of the Debtors under chapters 7 or 11 of the Bankruptcy Code).

Under the Plan, upon the Effective Date and in consideration of the distributions to be made

hereunder, except as otherwise expressly provided herein, each holder (as well as any trustees and

agents on behalf of each holder) of a Claim and any affiliate of such holder shall be deemed to have

forever waived, released, and discharged the Debtors and the Reorganized Debtors, to the fullest

extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, and

-43-

liabilities that arose prior to the Confirmation Date; and all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against Debtor or the Reorganized Debtors.

The Plan provides that the Debtors, the Committee, and the Exculpation Parties (defined in the Plan as the Debtors, the Committee, and, solely in their capacity as representatives of the Committee and the Debtors, each of the members of the Committee and each of the Debtors' current and former officers, directors and employees), and any property of or professionals retained by such parties, or direct or indirect predecessor in interest to any of the foregoing persons, shall not have or incur any liability to any Person for any act taken or omission, after the Petition Date, in connection with or related to the Cases or the operations of the Debtors' businesses during the Cases, including but not limited to, formulating, preparing, disseminating, implementing, confirming, consummating or administrating the Plan (including soliciting acceptances or rejections thereof) or making any distributions made pursuant to the Plan, except for acts constituting willful misconduct, gross negligence, or bad faith, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

The Plan further provides that, as of the Effective Date, the Released Parties (defined in the Plan as Peter Betts, Patti Gardes, Gene Shuler, Frank Shiffer, Frank Musso and David Morgan, solely in their capacity as representatives of the Debtors) shall be released by the Debtors and any successors-in-interest of the Debtor from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that the Debtors would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim or other person or entity would have been

17469.034/498691.8

legally entitled to assert on behalf of the Debtors or their estates estate, based in whole or in part

upon any act or omission, transaction, agreement, event, or other occurrence taking place before or

on the Effective Date, except for acts constituting willful misconduct, gross negligence, or bad faith

occurring during the Cases and, in all respects such parties shall be entitled to rely upon the advice of

counsel with respect to their duties and responsibilities under the Plan.

Under the Plan, all Entities (other than the Plan Custodian, whose rights are defined by the

Plan) who have held, hold, or may hold Claims against the Debtors and other parties in interest,

along with their respective present or former employees, agents, officers, directors, or principals, are

permanently enjoined, on and after the Effective Date, with respect to all Claims against the Debtors

from (1) commencing, conducting, or continuing in any manner, directly or indirectly, any suit,

action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial,

arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the

Released Parties, or their property, (2) enforcing, levying, attaching (including, without limitation,

any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether

directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized

Debtors, the Released Parties, or their property, (3) creating, perfecting, or otherwise enforcing in

any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized

Debtors, the Released Parties, or against the property or interests in property of the foregoing, (4)

asserting any right of setoff, directly or indirectly, against any obligation due the Debtors, the

Reorganized Debtors, the Released Parties, or any of their property, except as contemplated or

allowed by the Plan, the Bankruptcy Code, or applicable law, (5) acting or proceeding in any manner,

in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (6)

commencing, continuing or asserting in any manner any action or other proceeding of any kind with

-45-

respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (7) taking any actions to interfere with the implementation or consummation of the Plan.  All Entities are permanently enjoined by the Plan, on and after the Effective Date, from asserting any Claim which is released by such Entity under the Plan or for which the party against whom the Claim is being asserted has received exculpation under the Plan, including: (1) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of such Claim, (2) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of such Claim, (3) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of such Claim, (4) asserting any right of setoff, directly or indirectly, against any obligation on account of such claim, (5) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (6) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (7) taking any actions to interfere with the implementation or consummation of the Plan.

The Plan provides that all injunctions or stays provided for in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing the Cases.

**K.    Certain Environmental Matters.**  Historically, JMH had stored its spent x-ray development fluid in an underground storage tank located at the hospital grounds in Stafford Springs.  In April 2004, this tank and the pipe leading to it were discovered to have leaked.  JMH promptly

removed the underground storage tank and conducted other remedial activities, including soil removal and sampling of soil and groundwater.  JMH provided information on the remedial activities to the Connecticut Department of Environmental Protection (the "DEP"), which is currently reviewing it.  Under the Plan, any additional investigation and remediation required by the DEP will be performed by Reorganized JMH.

## IV.    CERTAIN FEDERAL TAX CONSEQUENCES

The implementation of the Plan may have significant and complex federal, state, local and foreign tax consequences for Creditors.  No ruling from the United States Internal Revenue Service or any state, local or foreign taxing authority has been or will be sought or obtained with respect to any federal, state, local or foreign tax consequences of the Plan.  The tax consequences for any particular Creditor may be affected by matters not addressed in this disclosure statement or in the Plan.  For example, certain types of investors (including non-resident aliens, life insurance companies and tax-exempt organizations) may be subject to special rules not discussed below.  In addition, the Internal Revenue Code ("IRC"), the Treasury Department's regulations promulgated thereunder, and interpretations of the IRC and Regulations by the IRS in its rulings and other announced positions and by the courts are continually subject to change.  Thus, the potential tax consequences described below are general in nature, are not intended to be complete or detailed, and are subject to significant exceptions and uncertainties.  The discussion below covers only certain of the federal income tax consequences associated with the implementation of the Plan.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor which may modify or alter the consequences described herein.  This discussion does not address state, local or foreign tax consequences.

**IN THIS SECTION, AND IN THIS DISCLOSURE STATEMENT GENERALLY, THE DEBTORS AND THEIR PROFESSIONALS DO NOT INTEND TO AND ARE NOT GIVING TAX OR OTHER LEGAL ADVICE TO ANY CREDITORS. THE DEBTORS ONLY PROVIDE THIS GENERAL INFORMATION TO ASSIST THE PARTIES INVOLVED IN EVALUATING HOW THE PLAN AFFECTS THEM FOR TAX PURPOSES. CREDITORS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES. NO RULING HAS BEEN REQUESTED FROM THE IRS AS TO TAX CONSEQUENCES OF THE PLAN. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE IRS WOULD AGREE WITH THE FOLLOWING DISCUSSION.**

The Debtors are not-for-profit corporations that are exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. It is intended that nothing in the Plan shall adversely affect, or be interpreted inconsistently with, the tax exempt status of the Debtors. Accordingly, the Debtors do not expect the implementation of the Plan to have any adverse federal income tax consequences to the Debtors, including, without limitation, in connection with (i) the discharge of debt pursuant to the Plan, or (ii) any other transaction contemplated thereunder.

The federal income tax treatment of payments received by a Creditor in these Cases will vary depending on a number of factors, including the classification of the Creditor for tax purposes, the Creditor's method of accounting, the Creditor's tax residence, and the origin or genesis of the Creditor's claim. Thus, tax treatment will depend on whether the Creditor is an individual, a partnership or a corporation, whether the Creditor uses the cash method or the accrual method of accounting, and whether the Creditor is a foreign person for income tax purposes.

In general, a Creditor receiving a distribution under the Plan in satisfaction of a Claim will realize income, gain or loss measured by the difference between (i) the cash and the fair market value of property received under the Plan and (ii) the Creditor's adjusted tax basis in the Claim.   The income, gain or loss realized by the Creditor will be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or for the sale of goods or merchandise.   Generally, the gain or loss will be capital gain or loss if the Claim is a capital asset in the Creditor's hands.   The federal income tax consequences of a distribution under the Plan also will depend on the nature of the original transaction pursuant to which the Claim arose.   For example, distribution on account of the principal amount due on a loan is not included in the Creditor's gross income, whereas distribution on account of interest on the loan or on account of rent is included in the Creditor's gross income to the extent it was not previously included in income.

The federal income tax consequences of a distribution to a Creditor also will depend on whether an amount representing the distribution has previously been included in the Creditor's gross income or whether the Creditor has previously claimed a loss or bad debt deduction for that amount.  For example, if a distribution is made in satisfaction of an account or note receivable acquired in the ordinary course of the Creditor's trade or business for the performance of services or the sale of goods or merchandise, and the Creditor has previously included the amount of the distribution in its gross income under its method of accounting, and has not previously written off the account or note receivable, the receipt of the distribution would not result in additional income to the Creditor.   On the other hand, if such Creditor had written off the account or note receivable in a prior year, the Creditor would have to treat the amount of the distribution as income.

Section 166 of the IRC permits a deduction for indebtedness that becomes wholly or partially worthless during a taxable year. In order to prove the worthlessness of the debt, the taxpayer must establish the existence of an "identifiable event" indicating worthlessness.

## V.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Creditors the potential for the greatest recovery on their Claims and, therefore, is in the best interests of Creditors. If the Plan is not confirmed and consummated, the alternatives include (a) dismissal of the Debtors' chapter 11 Cases, (b) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code, (c) an alternative chapter 11 plan or plans or (d) continuation of the Debtors' Cases. The Debtors believe that the Plan is preferable to the alternatives described below because the Plan provides for an equitable, early distribution to the Debtors' Creditors and because any alternative to confirmation of the Plan would result in significant delays in and probable diminution of recoveries for Creditors.

**A.      Dismissal of the Debtors' Chapter 11 Cases.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtors' Cases could be dismissed. The Debtors believe that dismissal of the Debtors' chapter 11 Cases would result in piecemeal litigation and attachment of the Debtors' assets without Bankruptcy Court supervision. Such litigation would, in the Debtors' opinion, generate substantially less for Creditors than the sums which will be realized under the Plan, result in inequitable recoveries among Creditors, and potentially result in the closure of one or more of the Debtors' businesses.

**B.      Liquidation Under Chapter 7.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtors' Cases could be converted to cases under chapter 7 of the Bankruptcy Code. If the Cases were converted, a chapter 7 trustee would be elected or appointed to liquidate the

17469.034/498691.8

assets of the Debtors' estates and distribute the proceeds to Creditors in accordance with the priorities established under the Bankruptcy Code.

The Debtors believe that Creditors would receive far less in a liquidation pursuant to chapter 7 than they would under the Plan.  A chapter 7 trustee would receive a substantial commission for distributing the Debtors' assets.  In addition, and much more significant, a chapter 7 trustee likely would shut down the operation of the hospital and the nursing home, resulting in a massive reduction in the value of the Debtors' assets and a potentially massive increase in the amount of Claims against the Debtors.  As illustrated on Exhibit C hereto, the Debtors' assets would decline drastically in value in a liquidation.  The hospital and the nursing home would lose all going concern value if operations are terminated, resulting in significant declines in the value of the Debtors' real and personal property.  The Debtors believe that recoveries on accounts receivable would decline significantly, possibly by as much as 50%.  Further, the Claims against the Debtors would increase dramatically in a liquidation.  The Debtors would incur substantial costs for, among other things, terminating employees and contracted services, transferring patients to alternate care providers, managing the wind down process, going through the regulatory process associated with the closure, properly disposing of equipment and supplies, maintaining access to medical and other key records, maintaining security and necessary utilities, and disposing of hazardous materials and normal wastes. These windup or shutdown costs all would be entitled to priority treatment as chapter 7 administrative expenses.  People's United Bank likely would be undersecured by millions of dollars, and its deficiency Claims would be added to Unsecured Claims.  The same likely would be true for Creditors secured by personal property of the Debtors.  The Debtors' believe that Administrative Claims against the Debtors likely would absorb most if not all liquidation proceeds remaining after

17469.034/498691.8

payment of Secured Claims.  The Debtors believe that holders of Allowed Unsecured Claims likely would receive little or no distribution in a chapter 7 case.

After consideration of the effect a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtors' Creditors, including increased costs and expenses of liquidation under chapter 7 and the increased Claims against the Debtors' estates, the Debtors have concluded that Creditors will receive a larger distribution and receive distributions more quickly under the Plan than they would receive in a chapter 7 liquidation.

C.     **Alternative Chapter 11 Plan.**  If the Plan is not confirmed under Bankruptcy Code section 1129, the Debtors, the Committee, or any other party in interest, could attempt to formulate an alternative chapter 11 plan or plans.  The Debtors have explored various alternatives in connection with the formulation and development of the Plan, and believe that an alternative plan is not a realistic option in the facts and circumstances of this Case.  As detailed herein, the Debtors sought to sell their assets at the beginning of the Cases, but ECHN terminated that process.  The Committee has put forth several sale proposals, including a renewed proposal from ECHN, but the Debtors believe that such proposals are not feasible or would result in reduced recoveries for Creditors.  The Plan is the Debtors' good faith effort to balance all of the needs of the hospital, the nursing home and the surgery center, including stable operation and necessary capital expenditures, with the goal of getting the greatest possible return to Creditors.  The Debtors believe that the Plan implements a fair resolution of all claims and that this proposal is in the best interests of Creditors.

The Debtors believe that failure to confirm the Plan and formulation of a new plan would result in substantial expense and delay to the bankruptcy estate, and negatively impact the time and amount of distributions to Creditors, all for no good purpose.  It is highly unlikely that a chapter 11 plan more favorable to Creditors than the Plan would be formulated. The Debtors believe that the

17469.034/498691.8

Plan will enable Creditors to realize greater value under the circumstances than under any available alternative plan.

      **D.**      **Continuation of the Debtors' Cases.**  If the Debtors remain in chapter 11, they would remain subject to the operational difficulties and costs associated with chapter 11 bankruptcy cases.  The Debtors estimate that professional fees and other chapter 11 costs have averaged approximately $300,000.00 per month.  The Debtors cannot continue to incur these costs indefinitely, and the Debtors believe that the continuation of these costs will reduce the amount available to Creditors.  The continued payment of these costs would not be of any benefit to Creditors, as the Debtors believe that confirmation of a plan superior to the Plan is not likely or feasible.

17469.034/498691.8

## VI.    CONCLUSION AND RECOMMENDATION

The Debtors believe, for the reasons described herein and in the Plan, that the Plan offers Creditors the most favorable alternative under existing circumstances because it will provide the greatest recoveries to Creditors.  Alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  **ACCORDINGLY, THE DEBTORS URGE ALL CREDITORS WHO ARE ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THEY WILL BE RECEIVED NO LATER THAN 4:00 P.M., NEW YORK TIME, ON JULY 30, 2010.**

Dated at Stafford and Hartford, Connecticut, this 18th day of June, 2010.

JOHNSON MEMORIAL CORPORATION,
JOHNSON MEMORIAL HOSPITAL, INC.,
and THE JOHNSON EVERGREEN
CORPORATION, INC.


By   /s/ Peter J. Betts
   Peter J. Betts, LFACHE
   Interim President & CEO


By   /s/ Eric Henzy
   Eric Henzy
   Federal Bar No. ct12849
   Reid and Riege, P.C.
   One Financial Plaza
   Hartford, CT  06103
   (860) 278-1150
   Fax: (860) 240-1002
   ehenzy@reidandriege.com
   Their Attorneys

17469.034/498691.8