UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| JOHNSON MEMORIAL CORPORATION, | : | Case No. 08-22188 |
| JOHNSON MEMORIAL HOSPITAL, INC., and | : | Case No. 08-22187 |
| THE JOHNSON EVERGREEN CORPORATION, | : | Case No. 08-22189 |
| INC., | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

## **FIRST AMENDED JOINT PLAN OF REORGANIZATION**

Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103-2600
P 860.278.1150
F 860.240.1002
Attorneys for the Debtors and
Debtors in Possession

August 9, 2010

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| JOHNSON MEMORIAL CORPORATION, | : | Case No. 08-22188 |
| JOHNSON MEMORIAL HOSPITAL, INC., and | : | Case No. 08-22187 |
| THE JOHNSON EVERGREEN CORPORATION, | : | Case No. 08-22189 |
| INC., | : | |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

## FIRST AMENDED JOINT PLAN OF REORGANIZATION

Johnson Memorial Hospital, Inc. (**"JMH"**), The Johnson Evergreen Corporation, Inc. (**"JEC"**), and Johnson Memorial Corporation (**"JMC"**), the above captioned debtors and debtors in possession, propose the following joint plan of reorganization pursuant to Bankruptcy Code section 1121. All capitalized terms used in the Plan are defined in either Bankruptcy Code section 101, Article I below or elsewhere in the Plan.

Briefly stated, but subject to more specific details provided herein, the Plan provides for the reorganization of the Debtors. The Plan also provides for the preservation of the Debtors' mission of providing high quality medical care to the residents of Stafford, Connecticut and surrounding communities. Although the Debtors' cases have been jointly administered and this is a joint plan, the Debtors and their estates have not been substantively consolidated. Accordingly, the Plan really is three distinct plans, one for each of the Debtors. The sections of the Plan generally apply to all of the Debtors, except where otherwise indicated.

# ARTICLE I
## DEFINITIONS

A.      As used in this Plan, the following terms (which appear in this Plan as capitalized terms) shall have the meanings specified below:

1.      **"Administrative Claim"** means any Claim for an administrative expense of the kind described in Bankruptcy Code section 503(b), including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates incurred after the commencement of the Cases and prior to confirmation of this Plan, any actual and necessary costs of operating the Debtors' businesses after the commencement of the Cases and prior to confirmation of this Plan, any indebtedness or obligations incurred by the Debtors in connection with the operation of their businesses or for the acquisition or lease of property or the rendition of services after the commencement of the Cases and prior to confirmation of this Plan, any fees and expenses allowed under Bankruptcy Code sections 330 and 331, and any fees due to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6).

2.      **"Allowed"** means, with reference to any Claim, (a) any Claim to the extent it has not been withdrawn, paid in full or otherwise deemed satisfied in full and proof of which has been filed on or before the date designated by the Bankruptcy Court for filing proofs of claim (or, if not filed by such date, filed by such other date as the Bankruptcy Court orders), or, if no proof of claim is filed,  any Claim that has been or hereafter is listed by one of the Debtors on its Schedules as liquidated in amount, not disputed and not contingent and, in all cases, a Claim as to which no objection has been filed, or as to which an objection has been filed and such Claim has been allowed in whole or in part by a Final Order, but only to the extent allowed by such Final Order, and (b) any Claim allowed pursuant to this Plan.

17469.034/516410.6

3.      **"Bankruptcy Code"** means title 11 of the United States Code, as in effect on the Petition Date.

4.      **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Connecticut, Hartford Division.

5.      **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut, the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Connecticut, and any standing orders of the Bankruptcy Court, each of the foregoing as in effect on the Petition Date.

6.      **"Business Day"** means any day other than a Saturday, a Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

7.      **"Cases"** means the chapter 11 cases commenced by the Debtors on the Petition Date and pending before the Bankruptcy Court.

8.      **"Cash"** means legal tender of the United States of America.

9.      **"Claim"** means (a) any right to payment or return of property from one of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from one of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

10.     **"Class"** means each class of Allowed Claims established pursuant to Article III of this Plan.

17469.034/516410.6

11.    **"Committee"** means the Official Committee of Unsecured Creditors appointed in these Cases.

12.    **"Confirmation Date"** means the date upon which the Confirmation Order is entered by the Bankruptcy Court.

13.    **"Confirmation Order"** means the order of the Bankruptcy Court confirming this Plan pursuant to Bankruptcy Code section 1129.

14.    **"Convenience Claim"** means any Allowed Unsecured Claim that is $1,000.00 or less.

15.    **"Creditor"** means an entity that has a Claim against (a) one of the Debtors that arose at the time of or before the Petition Date or (b) one of the Debtors' estates of a kind specified in Bankruptcy Code section 502(g), (h) or (i).

16.    **"Debtors"** means Johnson Memorial Hospital, Inc., The Johnson Evergreen Corporation, Inc., and Johnson Memorial Corporation, as debtors and debtors in possession under the Bankruptcy Code.

17.    **"Disclosure Statement"** means the Second Amended Disclosure Statement For Amended Joint Plan of Reorganization approved by the Bankruptcy Court in connection with this Plan pursuant to Bankruptcy Code section 1125, and any exhibits or duly authorized amendments thereto.

18.    **"Disputed"** means, with reference to any Claim, a Claim that is not an Allowed Claim.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection unless there is another basis to designate such Claim as a Disputed Claim.

17469.034/516410.6

19.    **"Effective Date"** means (a) the first Business Day after ten days have elapsed following the Confirmation Date provided no stay of the Confirmation Order is in effect or (b) if the Confirmation Order has been stayed by a court of competent jurisdiction, the first Business Day following the date on which such stay is no longer in effect; provided, however, that if on or prior to such date all conditions to the Effective Date set forth in Article VIII of this Plan have not been satisfied or waived in accordance with the terms of Article VIII of this Plan, then the Effective Date shall be the first Business Day following the day on which all such conditions to the Effective Date have been satisfied or waived.

20.    **"Entity"** means a person (as defined in Bankruptcy Code section 101(41)), estate, trust, governmental unit (as defined in Bankruptcy Code section 101(27)), and the United States trustee.

21.    **"Exculpation Parties"** means the Debtors, the Committee, and, solely in their capacity as representatives of the Committee and the Debtors, each of the members of the Committee and each of the Debtors' current and former officers, directors and employees.

22.    **"Exit Lender"** means the Entity that provides the Post-Confirmation Line of Credit.

23.    **"Final Order"** means an order, ruling, judgment or decree of the Bankruptcy Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek certiorari has expired and as to which no appeal or petition for certiorari or rehearing is pending or as to which any right to appeal or to seek certiorari or rehearing has been waived in writing in a manner satisfactory to the Debtors.

24.    **"Intercompany Claim"** means any Claim by one of the Debtors against another of the Debtors or by any affiliate of one of the Debtors against such Debtor.

25.    **"JEC Change Event"** means a JEC Material Asset Disposition or a JEC Change of Control at any time prior to the fifth anniversary of the Effective Date.

26.    **"JEC Change of Control"** means a person or persons other than JMC (the sole current member of JEC) having the right to elect a majority of the members of the board of trustees of JEC.

27.    **"JEC Material Asset Disposition"** means, whether for Cash, the assumption of debt, or otherwise: (a) a transfer of all or substantially all of the assets of JEC as part of a single transaction or series of transactions the purpose of which is the transfer of JEC's business and operations on a going concern basis or (b) the transfer of title or a contribution to a joint venture, partnership, limited liability company or other entity of an asset or group of related assets which is or are used by JEC to conduct a discrete business function of JEC.

28.    **"JEC Net Proceeds"** means any proceeds received by Reorganized JEC from a JEC Change Event in excess of amounts necessary to pay all current liabilities and obligations of Reorganized JEC which must be satisfied prior to consummating a JEC Change Event and the reasonable and customary costs and expenses incurred in said consummation.

29.    **"JMC Change Event"** means a JMC Material Asset Disposition or a JMC Change of Control at any time prior to the fifth anniversary of the Effective Date.  Unless otherwise agreed to in writing by the Plan Custodian, a JMC Change Event will not be permitted unless it will result in a payment to the holders of the Class A6, A7 and B6 Allowed Claims, exclusive of Scheduled Payments and other payments set out in Article IV A6 and A7 (1)-(6), B6 (1)-(5) and C3, of (a) at least $1,000,000 in the case of a JMC Material Asset Disposition, (b) at least $2,000,000 in the case of a JMC Change of Control where the full amount due under (a)

already has been paid, and (c) $3,000,000 in the case of any JMC Change of Control where the full payment under (a) has not previously been made.

30.    **"JMC Change of Control"** means a change in the certificate of incorporation and/or bylaws of JMC resulting in a person or persons other than the persons currently satisfying the definition of "members" of JMC having the right to vote to elect a majority of the members of the board of trustees of JMC.  A JMC Change of Control shall not occur based on the ordinary course turnover in the identity of the members of JMC.

31.    **"JMC Material Asset Disposition"** means, whether for Cash, the assumption of debt or otherwise, the sale, assignment, contribution to a joint venture, partnership, limited liability company or other entity, or other transfer of any of JMC's ownership interest in the Surgery Center.

32.    **"JMC Net Proceeds"** means any proceeds received by Reorganized JMC from a JMC Change Event in excess of amounts necessary to pay all current liabilities and obligations of Reorganized JMC which must be satisfied prior to consummating a JMC Change Event and the reasonable and customary costs and expenses incurred in such consummation.

33.    **"JMH Change Event"** means a JMH Material Asset Disposition or a JMH Change of Control at any time prior to the fifth anniversary of the Effective Date.  Unless otherwise agreed to in writing by the Plan Custodian, a JMH Change Event will not be permitted unless it will result in a payment to the holders of the Class A6, A7 and B6 Allowed Claims, exclusive of Scheduled Payments and other payments set out in Article IV A6 and A7 (1)-(6), B6 (1)-(5) and C3, of (a) at least $1,000,000 where the JMH Change Event involves an entity  or entities that is or are majority controlled by persons or entities other than JMH becoming the lessee or operator of the Surgery Center, (b) at least $2,000,000 in the case of any other JMH

Change Event where the full amount due under (a) already has been paid, and (c) $3,000,000 in the case of any JMH Change Event where the full payment under (a) has not previously been made.

34.     **"JMH Change of Control"** means a person or persons other than JMC (the sole current member of JMH) having the right to elect a majority of the members of the board of trustees of JMH.

35.     **"JMH Material Asset Disposition"** means, whether for Cash, assumption of debt or otherwise, (a) a transfer of all or substantially all of the assets of JMH as part of a single transaction or series of transactions the purpose of which is the transfer of JMH's business and operations on a going concern basis, (b) the transfer of title or a contribution to a joint venture, partnership, limited liability company or other entity of an asset or group of related assets which constitute a discrete business or operation of JMH or are used by JMH to conduct a discrete business function of JMH (but not including any transfer of JMH's leasehold interest in and/or right to operate the Surgery Center to an entity or entities in which JMH has a controlling interest), or (c) JMH ceases to maintain a controlling interest in the entity or entities that leases and/or operates the Surgery Center.

36.     **"JMH Net Proceeds"** means any proceeds received by Reorganized JMH from a JMH Change Event in excess of amounts necessary to pay all current liabilities and obligations of Reorganized JMH which must be satisfied prior to consummation of a JMH Change Event and the reasonable and customary costs and expenses incurred in such consummation.

37.     **"Key Cash Amount"** means $414,222.93 (as of September 30, 2009) of cash collateral of Key Government Finance, Inc., together with any additions thereto up to and including the Effective Date.

17469.034/516410.6

38.   "**Key Financing Agreement**" means the Master Financing Agreement dated July 1, 2006, to which Key Government Finance, Inc. (**"Key"**) and JMH are parties, as modified to provide, among other things: (a) that all indebtedness under the Key Financing Agreement shall be discharged upon payment by JMH of $600,000 (the **"Agreed Amount"**), payable in installments of $10,000 on the first day of each month for 60 months beginning on the first business day of the month following the Effective Date of the Plan; (b) that any payments received after a period of ten (10) days from the date on which the same was due shall bear interest at the default rate of interest provided for in the Key Financing Agreement; (c) that in the event of a default, other than a default by reason of the commencement of bankruptcy proceedings with respect to JMH, Key shall have the right to declare the unpaid balance of the Agreed Amount to be immediately due and payable; (d) that, in the event of a default by reason of the commencement of bankruptcy proceedings with respect to JMH, Key shall have the right to declare the entire unpaid balance under the Key Financing Agreement to be due and payable; (e) that, until the Agreed Amount is paid, Key (i) shall retain its security interest in the equipment described in the Key Financing Agreement and (ii) shall have a security interest in JMH's license to the Paragon Information System licensed by McKesson (as it may be upgraded); (f) that upon completion of its use of the equipment described in the Key Financing Agreement, JMH shall notify Key and, if Key so requests, make the equipment available to Key for disposition by Key; (g) that the proceeds of such disposition shall not reduce the balance of the Agreed Amount but shall be otherwise applied to the balance of the Key Financing Agreement; and (h) provisions necessary to implement the foregoing.

39.   "**Litigation Claims**" means all claims, rights (including rights of setoff and/or recoupment) and causes of action, including claims, rights, or causes of action

arising out of or under chapter 5 of the Bankruptcy Code, that could have been brought or raised by or on behalf of one of the Debtors arising before, on, or after the Commencement Date, whether known or unknown, suspected or unsuspected, in contract or in tort, at law or in equity, under any theory of law.  Litigation Claims shall not include any claims arising out of the ordinary course of the Debtors' businesses, such as claims on account of monies owed to one of the Debtors for services provided by that Debtor.

40.    **"Litigation Claims Proceeds"** means the actual consideration, if any, received by one of the Debtors as a result of any judgment, settlement, or compromise of any of the Litigation Claims, net of all reasonable and customary costs.

41.    **"Oversight Committee"** means the post-Confirmation committee formed under Article V of the Plan, consisting of three members of the Committee, and charged with certain oversight functions pursuant to the Plan.

42.    **"PBGC"** means the Pension Benefit Guaranty Corporation.

43.    **"PBGC Claim"** means all Claims of the PBGC against JMH related to the Pension Plan other than for the termination premium described in Article V of this Plan, including (1) the Pension Plan's underfunding on a termination basis ("Unfunded Benefit Liability"), (2) unpaid minimum funding contributions, and (3) unpaid premiums.  As of May 31, 2009, the PBGC estimated that the Pension Plan's Unfunded Benefit Liability upon termination was approximately $29,108,149.  The PBGC Claim shall be Allowed as set forth in Article IV.

44.    **"PBGC Premium Note"** means the $2 million note given to the PBGC on account of the Pension Plan termination premium pursuant to Article V of this Plan.

45.    **"Pension Plan"** means Retirement Plan for Employees of Johnson Memorial Hospital (the "Pension Plan"), which is asserted to be a defined benefit Pension Plan covered by

17469.034/516410.6

Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461, as amended.

46.    **"People's JEC Secured Claim"** means the Allowed Secured Claim of People's United Bank against JEC in the approximate amount of $15.2 million, secured by JEC's real property and certain of JEC's personal property.

47.    **"People's JMC Secured Claim"** means the Allowed Secured Claim of People's United Bank against JMC in the approximate amount of $3,480,000.00, secured by JMC's real property and certain of JMC's personal property.

48.    **"People's JMH Secured Claim"** means the Allowed Secured Claim of People's United Bank against JMH in the approximate amount of $13 million, secured by JMH's real property and certain of JMH's personal property.

49.    **"Petition Date"** means November 4, 2008.

50.    **"Plan"** means this First Amended Joint Plan of Reorganization and any exhibits, supplements or duly authorized amendments hereto.

51.    **"Plan Custodian"** means Clifford Zucker, a partner of JH Cohn, the Committee's financial advisor, or his designee, and any successor appointed pursuant to the Plan.

52.    **"Plan Custodian Agreement"** means the agreement to be entered into by the Debtors and the Plan Custodian that provides for and defines the Plan Custodian's rights and duties.

53.    **"Plan Supplement"** means a supplement to the Plan containing those documents, including, but not limited to, the Plan Custodian Agreement and the Unsecured Claims Security Documents, in a form reasonably acceptable to the Debtors and the Committee, effectuating the

transactions contemplated by the Plan, to be filed with the Bankruptcy Court within fifteen days of the Confirmation Date.

54.    **"Post-Confirmation Line of Credit"** shall mean a revolving line of credit entered into by the Debtors after Confirmation and prior to the Effective Date, for a minimum of $6 million, to be used to fund payments pursuant to this Plan and on an as needed basis for the Reorganized Debtors' general operating purposes during the post-Confirmation period.

55.    **"Priority Non-Tax Claim"** means any Claim entitled to priority under Bankruptcy Code section 507(a)(3), (4), (5), (6), (7) or (9) to the extent it is an Allowed Claim.

56.    **"Pro Rata"** means the proportion that the amount of any Claim in a particular Class bears to the aggregate amount of all Claims in such Class, including the estimated Allowed amount of any Disputed Claim in such Class.

57.    **"Record Date"** means the date of the order approving the Disclosure Statement.

58.    **"Released Parties"** means, solely in their capacity as representatives of the Debtors, Peter Betts, Patti Gardes, Gene Shuler, Frank Shiffer, Frank Musso and David Morgan.

59.    **"Reorganized Debtors"** means the Debtors on and after the Effective Date.

60.    **"Scheduled Payments"** means the payments provided for in Article IV A6(1)-(4), A7(1)-(4), and B6(1)-(4).

61.    **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs, as may be amended, filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007.

62.    **"Secured Claim"** means that portion of a Claim that is secured by a valid perfected lien on property of one of the Debtors, to the extent of the value of the interest of the holder of such Claim in such property of one of the Debtors, as determined by agreement

between that Debtor and the holder of such Claim or by the Bankruptcy Court by a Final Order under Bankruptcy Code section 506, to the extent that it is an Allowed Claim.

63.    **"Surgery Center"** means that certain real estate known as 148 Hazard Avenue, Enfield, Connecticut together with all improvement thereon, including, without limitation, an ambulatory surgery center located thereon owned by JMC and leased from JMC by JMH.

64.    **"Tax"** means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

65.    **"Tax Claim"** means a Claim for any Tax entitled to priority under Bankruptcy Code section 507(a)(8) to the extent it is an Allowed Claim.

66.    **"Unclaimed Property"** means any Cash (together with any interest earned thereon) that is unclaimed within six months after such Cash is distributed, and shall include: (a) checks (and the funds represented thereby) that have been returned as undeliverable; (b) funds for checks that have not been paid or negotiated; and (c) checks (and the funds represented thereby) that were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same.

67.    **"Unsecured Claim"** means a Claim that is not a Secured Claim, an Administrative Claim, a Tax Claim, the PBGC Claim or a Priority Non-Tax Claim.

68.    **"Unsecured Claims Security Documents"** means such documents, including, but not limited to, mortgages and security agreements, as are necessary to grant the Plan Custodian perfected security interests in and liens on (a) all of the Debtors' real property,

subordinate only to the People's Secured Claims, and (b) all of the Debtors' personal property, subordinate only to any existing liens and the liens granted to the Exit Lender in connection with the Post-Confirmation Line of Credit, all for the benefit of and to secure payments to be made under this Plan to holders of Class A6, B6 and C3 Allowed Claims which shall be *pari passu* with the liens created by the Unsecured Class A7 Security Documents.

69.     **"Unsecured Class A7 Security Documents"** mean such documents including, but not limited to, mortgages and security agreements, as are necessary to grant the PBGC liens on (a) all of the Debtors' real property, subordinate only to the People's Secured Claims, and (b) all of the Debtors' personal property, subordinate only to any existing liens and the liens granted to Exit Lender in connection with the Post Confirmation Line of Credit, all for the benefit of and to secure payments to be made under this Plan to holders of Class A7 Allowed Claims, which liens shall be on a *pari passu* basis with the liens created under the Unsecured Claims Security Documents.

B.      Terms not defined herein which are defined in the Disclosure Statement shall have the meaning assigned to such term in the Disclosure Statement.  A term used in this Plan that is not defined in this Plan or the Disclosure Statement but that is defined in the Bankruptcy Code or Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

## ARTICLE II
## ADMINISTRATIVE CLAIMS AND ALLOWED TAX CLAIMS

A.      **Administrative Claims.**  Administrative Claims are not classified under this Plan and have no right to accept or reject this Plan.  Each Entity holding an Allowed Administrative Claim against one of the Debtors shall be paid by such Debtor (1) in full in Cash on the later of

(a) the Effective Date and (b) the date of the entry of a Final Order allowing and determining such Administrative Claim, or (2) on such other less favorable terms as may be agreed to by and among such Debtor and such Entity; provided, however, that Administrative Claims representing liabilities incurred by one of the Debtors in the ordinary course of its business during the Case shall be paid by such Debtor in accordance with the terms and provisions of the particular transactions and agreements relating thereto.   In accordance with Bankruptcy Code section 1129(a)(12) and 28 U.S.C. Section 1930, all quarterly fees payable to the United States Trustee shall be paid by the Debtors in full on or before their respective due dates and shall continue to be assessed and paid until such time as final decrees closing, converting or dismissing these Cases are entered by the Court.

B.    **Allowed Tax Claims.**  Allowed Tax Claims are not classified under this Plan and have no right to accept or reject this Plan.  Each Entity holding an Allowed Tax Claim against one of the Debtors shall receive (1) at the option of such Debtor, (a) payment in full in Cash from such Debtor on the later of (i) the Effective Date of this Plan and (ii) the date of entry of a Final Order allowing and determining such Tax Claim, or (b) quarterly installment payments commencing ninety days after the Effective Date, in Cash, from such Debtor of a total value (including interest at the rate determined by applicable non-bankruptcy law as provided in Bankruptcy Code section 511), as of the Effective Date, equal to the amount of such Allowed Tax Claim, over a period ending not later than five years after the Petition Date, or (2) payment on such other less favorable terms as may be agreed to by and among such Debtor and such Entity.

17469.034/516410.6

**ARTICLE III**
**DESIGNATION OF CLASSES OF CLAIMS**
**AND SPECIFICATION OF CLASSES OF**
**CLAIMS IMPAIRED UNDER THIS PLAN**

All Allowed Claims against the Debtors, other than Administrative Claims and Allowed Tax Claims, of whatever nature, are classified for all purposes, including voting (unless otherwise specified), confirmation, and distribution, as follows:

A.     **Classification of Claims Against JMH.**

1.     **Class A1 – People's JMH Secured Claim.**  Class A1 consists of the People's JMH Secured Claim and People's United Bank's Claims against JMH as guarantor on the People's JMC Secured Claim and the People's JEC Secured Claim.  This Class is impaired under and is entitled to vote on the Plan.

2.     **Class A2 – Allowed Secured Claim of First American Commercial Bancorp (Ultrasound System)**.  Class A2 consists of the Allowed Secured Claim of First American Commercial Bancorp secured by JMH's Vivid Pro Cardiovascular Ultrasound System, Lease No. 9108-24.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JMH is not required to solicit acceptance from the holder of the Claim in this Class.

3.     **Class A3 – Allowed Secured Claim of First American Commercial Bancorp (Equipment Schedule No. 35)**.  Class A3 consists of the Allowed Secured Claim, if any, of First American and IDB with respect to the Schedule 35 Agreement (as defined below) (such Claim of First American and IDB, the **"Schedule 35 Allowed Secured Claim"**).  The Schedule 35 Allowed Secured Claim, is secured by a lien in and to the equipment (such equipment, the **"Schedule 35 Equipment"**) listed on Equipment Schedule No. 35 Under Master Lease No. 97108 between First American and JMH, dated March 27 and 28, 2006 (such schedule, together

-16-

with that certain Master Lease Number 97108 between First American and JMH, dated July 16, 1997 as it applies to the same, the **"Schedule 35 Agreement"**).  First American and IDB elected to have the Schedule 35 Allowed Secured Claim treated pursuant to Bankruptcy Code section 1111(b).  If First American and IDB have an Allowed Secured Claim, this Class is impaired under and is entitled to vote on the Plan.

4.    **Class A4 – Allowed Secured Claim of Key Government Finance, Inc**.  Class A4 consists of the Allowed Secured Claim of Key Government Finance, Inc., secured by certain property of JMH (the **"Key Collateral"**) plus the Key Cash Amount.  This Class is not impaired under and is not entitled to vote on the Plan.

5.    **Class A5 - Allowed Priority Non-Tax Claims Against JMH.**  Class A5 consists of any and all unpaid Allowed Priority Non-Tax Claims against JMH.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JMH is not required to solicit acceptances from any holders of Claims in this Class.

6.    **Class A6 - Allowed Unsecured Claims Against JMH.**  Class A6 consists of all Allowed Unsecured Claims against JMH.  This class is impaired under and is entitled to vote on the Plan.

7.    **Class A7 – Allowed PBGC Claim.**  Class A7 consists of the PBGC Claim.  This Class is impaired under and is entitled to vote on the Plan.

8.    **Class A8 – Intercompany Claims Against JMH**.  Class A8 consists of Intercompany Claims against JMH.  This Class is impaired under and is entitled to vote on the Plan.

9.      **Class A9 – Convenience Claims Against JMH**.  Class A9 consists of Convenience Claims against JMH.  This Class is impaired under and is entitled to vote on the Plan.

B.      **Classification of Claims Against JEC.**

1.      **Class B1 – People's JEC Secured Claim.**  Class B1 consists of the People's JEC Secured Claim.  This Class is impaired under and is entitled to vote on the Plan.

2.      **Class B2 – Allowed Secured Claim of VGM Financial Services**.  Class B2 consists of the Allowed Secured Claim of VGM Financial Services.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JEC is not required to solicit acceptance from the holder of the Claim in this Class.

3.      **Class B3 – Allowed Secured Claim of State of Connecticut Department of Revenue Services**.  Class B3 consists of the Allowed Secured Claim of the State of Connecticut Department of Revenue Services for nursing home provider tax pursuant to Connecticut General Statutes section 17b-320.  This Class is impaired under and is entitled to vote on the Plan.

4.      **Class B4 – Allowed Secured Claim of State of Connecticut Department of Social Services**.  Class B4 consists of the Allowed Secured Claim of the State of Connecticut Department of Social Services.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JEC is not required to solicit acceptance from the holder of the Claim in this Class.

5.      **Class B5 - Allowed Priority Non-Tax Claims Against JEC.**  Class B5 consists of any and all unpaid Allowed Priority Non-Tax Claims against JEC.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JEC is not required to solicit acceptances from any holders of any Claims in this Class.

6.      **Class B6 - Allowed Unsecured Claims Against JEC.**  Class B6 consists of all Allowed Unsecured Claims against JEC.  This class is impaired under and is entitled to vote on the Plan.

7.      **Class B7 – Intercompany Claims Against JEC**.  Class B7 consists of Intercompany Claims against JEC.  This Class is impaired under and is entitled to vote on the Plan.

8.      **Class B8 – Convenience Claims Against JEC**.  Class B8 consists of Convenience Claims against JEC.  This Class is impaired under and is entitled to vote on the Plan.

C.      **Classification of Claims Against JMC.**

1.      **Class C1 – People's JMC Secured Claim.**  Class C1 consists of the People's JMC Secured Claim and People's United Bank's Claims against JMC as co-borrower on the People's JMH Secured Claim and the People's JEC Secured Claim.  This Class is impaired under and is entitled to vote on the Plan.

2.      **Class C2 - Allowed Priority Non-Tax Claims Against JMC.**  Class C2 consists of any and all unpaid Allowed Priority Non-Tax Claims against JMC.  This Class is not impaired under and is conclusively presumed to have accepted the Plan, and JMC is not required to solicit acceptances from any holders of any Claims in this Class.

3.      **Class C3 - Allowed Unsecured Claims Against JMC.**  Class C3 consists of all Allowed Unsecured Claims against JMC.  This Class is impaired under and is entitled to vote on the Plan.

4.      **Class C4 – Intercompany Claims Against JMC**.   Class C4 consists of Intercompany Claims against JMC.  This Class is impaired under and is entitled to vote on the Plan.

**ARTICLE IV**
**TREATMENT OF CLASSES OF CLAIMS**

A.      **Treatment of Claims Against JMH.**

1.      **Class A1 – People's JMH Secured Claim.**  On the Effective Date, the maturity of the People's JMH Secured Claim shall be reinstated as such maturity existed before any default, People's United Bank will retain all liens securing such Claim, and such Claim shall be paid in full in accordance with the terms of the documents creating and evidencing such Claim. In addition, JMH will remain obligated as guarantor on the JMC Secured Claim and the JEC Secured Claim and People's United Bank will retain any liens on JMH's property securing those guaranty Claims.

2.      **Class A2 – Allowed Secured Claim of First American Commercial Bancorp (Ultrasound System)**.  In full and complete satisfaction of its Class A2 Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, First American Commercial Bancorp will receive from JMH Cash equal to the Allowed amount of its Class A2 Claim, except to the extent that First American Commercial Bancorp has been paid by JMH prior to the Effective Date and except to the extent that First American Commercial Bancorp agrees to less favorable treatment.

3.      **Class A3 – Allowed Secured Claim of First American Commercial Bancorp (Equipment Schedule No. 35)**.  The Schedule 35 Allowed Secured Claim, the treatment thereof and the determination of the Bankruptcy Code section 1111(b) treatment of the Schedule 35

17469.034/516410.6

Allowed Secured Claim shall be in such amount, with such collateral value, with such lien priority and on such terms as are determined by a Final Order or by settlement. The application of any such distributions by JMH on the Schedule 35 Allowed Secured Claim shall be in accordance with the Bankruptcy Code. First American and IDB shall (1) retain their liens against the Schedule 35 Equipment and the extent, validity and priority of such liens shall be unimpaired and (2) retain all rights and remedies under the Schedule 35 Agreement. In the event of a post-confirmation default under the Schedule 35 Agreement (as modified by the treatment in this paragraph), First American and IDB may pursue their rights and remedies without further order of the Court or further relief from stay.

4.      **Class A4 – Allowed Secured Claim of Key Government Finance, Inc**. JMH and Key Government Finance, Inc., shall enter into and reaffirm the Key Financing Agreement pursuant to which, among other things, Key Government Finance, Inc. shall receive payments and security interests under and according to the Key Financing Agreement, including the following payments: (1) on the Effective Date, the Key Cash Amount and (2) monthly payments of $10,000 on the first day of each month for 60 months beginning on the first business day of the month following the Effective Date in accordance with the terms of the Key Financing Agreement. In addition, upon completion of its use of the equipment described in the Key Financing Agreement, JMH shall, if Key so requests, make such equipment available to Key for disposition by Key in accordance with the terms of the Key Financing Agreement. Key shall have no Claim under Class A6 of the Plan.

5.      **Class A5 - Allowed Priority Non-Tax Claims Against JMH.** In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed

Priority Non-Tax Claim against JMH will receive from JMH Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by JMH prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

6.      **Class A6 – Allowed Unsecured Claims Against JMH**.  In full and complete satisfaction of its Claim, each Entity holding an Allowed Unsecured Claim against JMH (each a "Class A6 Creditor" and collectively the "Class A6 Creditors") shall be paid its Pro Rata share of:

(1)      $705,232.50 on the Effective Date;

(2)      $256,025.00 on the first anniversary of the Effective Date;

(3)      $488,775.00 on the second anniversary of the Effective Date;

(4)      $954,275.00 on each of the third, fourth and fifth anniversaries of the Effective Date;

(5)      49% of the Litigation Claims Proceeds of JMH;

(6)      an amount equal to 16.33% of any monies received from the United States government for electronic medical records funding, payable every six months if funds are received monthly or within sixty days of receipt if provided in one or more lump sums; and

(7)      in addition, if there is a JMH Change Event, 49% of any JMH Net Proceeds shall be distributed to Class A6 Creditors up to the additional maximum aggregate amount of $1,470,000.00.  In the case of a JEC Change Event, Class A6 Creditors shall receive their Pro Rata share of 49% of any JEC Net Proceeds after payment of Class B6 Creditors as provided in Article IV B6, up to the additional maximum aggregate amount of $1,470,000.00.  In the case of a JMC Change Event, Class A6 Creditors shall receive their Pro Rata share of 49% of 95% of

JMC Net Proceeds, up to the additional maximum aggregate amount of $1,470,000.00.  In no event shall the total payments to Classes A6, A7 and B6 on account of the total JEC Change Events, JMC Change Events and JMH Change Events exceed $3 million, exclusive of the Scheduled Payments and any other payments due pursuant to Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3.  The payments due under this subparagraph (7) are in addition to and not in lieu of any other payments due hereunder including, without limitation, the Scheduled Payments, which Scheduled Payments shall continue to be due and payable in such amounts and at such times as are set forth in Article IV A6 (1)-(4) and B6 (1)-(4).

JMH shall pay simple interest at the rate of 8% on account of any payment default hereunder until such default is cured.  All payments for (1) through (4), (6) and (7) above shall be secured by the Unsecured Claims Security Documents and the liens created thereby shall be *pari passu* with the liens arising under the Unsecured Class A7 Security Documents.

7.    **Class A7 – Allowed PBGC Claim.**   In full and complete satisfaction of the PBGC Claim, the PBGC shall be paid:

(1)    $730,401.50 on the Effective Date;

(2)    $266,475.00 on the first anniversary of the Effective Date;

(3)    $508,725.00 on the second anniversary of the Effective Date;

(4)    $993,225.00 on each of the third, fourth and fifth anniversaries of the Effective Date;

(5)    51% of the Litigation Claims Proceeds of JMH;

(6)    an amount equal to 17% of any monies received from the United States government for electronic medical records funding payable every six months if funds are received monthly or within sixty days of receipt if provided in one or more lump sums; and

17469.034/516410.6

(7)    in addition, if there is a JMH Change Event, the PBGC shall receive 51% of any JMH Net Proceeds, up to the additional maximum amount of $1,530,000.00.  In the case of a JEC Change Event, the PBGC shall receive 51% of any JEC Net Proceeds after payment of Class B6 Creditors as provided in Article IV B6, up to the additional maximum amount of $1,530,000.00.  In the case of a JMC Change Event, the PBGC shall receive 51% of 95% of JMC Net Proceeds, up to the additional maximum amount of $1,530,000.00.  In no event shall the total payments to Classes A6, A7 and B6 on account of the total JEC Change Events, JMC Change Events and JMH Change Events exceed $3 million, exclusive of the Scheduled Payments and any other payments due pursuant to Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3.  The payments due under this subparagraph (7) are in addition to and not in lieu of any other payments due hereunder including, without limitation, the Scheduled Payments, which Scheduled Payments shall continue to be due and payable in such amounts and at such times as are set forth in (1)-(6) above.

JMH shall pay simple interest at the rate of 8% on account of any payment default hereunder until such default is cured.  All payments for (1) through (4), (6) and (7) above shall be secured by the Unsecured Class A7 Security Documents and the liens created thereby shall be *pari passu* with the liens arising under the Unsecured Claims Security Documents.  All proofs of Claim filed by the PBGC will be allowed in the amounts filed.  However, such Claims shall be treated as set forth herein and the Committee consents to this treatment.  In exchange for the treatment of the PBGC Claim provided herein, on or before the Effective Date the PBGC shall file notices of withdrawal of its federal tax liens against the Debtors' property.

8.    **Class A8 – Intercompany Claims Against JMH**.  After Class A6 and Class A7 Claims are paid pursuant to the terms of the Plan, each holder of an Intercompany against JMH

Claim shall be entitled to receive payment from JMH pursuant to terms to be mutually agreed upon between JMH and the holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

9.      **Class A9 – Convenience Claims Against JMH**.   In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, each Entity holding an Allowed Convenience Claim against JMH will receive from JMH Cash equal to fifty percent (50%) of the Allowed amount of such Convenience Claim, except to the extent that such holder of an Allowed Convenience Claim has been paid by JMH prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

B.      **Treatment of Claims Against JEC.**

1.      **Class B1 – People's JEC Secured Claim.**  On the Effective Date, the maturity of the People's JEC Secured Claim shall be reinstated as such maturity existed before any default, People's United Bank will retain all liens securing such Claim, and such Claim shall be paid in full in accordance with the terms of the documents creating and evidencing such Claim.

2.      **Class B2 – Allowed Secured Claim of VGM Financial Services**.  On the Effective Date, JEC shall cure any default on the Class B2 Allowed Secured Claim of VGM Financial Services that occurred before or after the commencement of the Case, other than a default of a kind specified in Bankruptcy Code § 365(b)(2); the maturity of the Allowed Secured Claim of VGM Financial Services shall be reinstated as such maturity existed before any default; and the legal, equitable, or contractual rights to which the Allowed Secured Claim of VGM Financial Services entitles VGM Financial Services shall not otherwise be altered.

17469.034/516410.6

3.    **Class B3 – Allowed Secured Claim of State of Connecticut Department of Revenue Services**.  The Connecticut Department of Revenue Services shall receive (1) at the option of JEC, (a) payment in full in Cash from JEC on the later of (i) the Effective Date of this Plan and (ii) the date of entry of a Final Order allowing and determining such Claim, or (b) quarterly installment payments commencing ninety days after the Effective Date, in Cash, from JEC of a total value (including interest at the rate determined by applicable non-bankruptcy law as provided in Bankruptcy Code section 511), as of the Petition Date, equal to the amount of such Claim, over a period ending not later than five years after the Petition Date, or (2) payment on such other less favorable terms as may be agreed to by and among JEC and the Connecticut Department of Revenue Services.  The Connecticut Department of Revenue Services shall retain its statutory rights of setoff in the event of a default in payment pursuant to the Plan.

4.    **Class B4 – Allowed Secured Claim of State of Connecticut Department of Social Services**.  In full and complete satisfaction of its Class B4 Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, the Connecticut Department of Social Services will receive from JEC Cash equal to the Allowed amount of its Class B4 Claim, except to the extent that the Connecticut Department of Social Services has been paid by JEC prior to the Effective Date and except to the extent that the Connecticut Department of Social Services agrees to less favorable treatment.

5.    **Class B5 - Allowed Priority Non-Tax Claims Against JEC.**  In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim against JEC becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim against JEC will receive from JEC Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an

Allowed Priority Non-Tax Claim has been paid by JEC prior to the Effective Date and except to

the extent such holder agrees to less favorable treatment.

6.    **Class B6 – Allowed Unsecured Claims Against JEC**.   In full and complete

satisfaction of its Claim, each Entity holding an Allowed Unsecured Claim against JEC shall be

paid its Pro Rata share of:

(1)    $75,750.00 on the Effective Date;

(2)    $27,500.00 on the first anniversary of the Effective Date;

(3)    $52,500.00 on the second anniversary of the Effective Date;

(4)    $102,500.00 on each of the third, fourth and fifth anniversaries of the Effective

Date;

(5)    the Litigation Claims Proceeds of JEC; and

(6)    in addition, if there is a JEC Change Event, Class B6 Creditors shall receive their

Pro Rata share of any JEC Net Proceeds, distributed as an additional payment up to the Allowed

amount of their Claims.   In the case of a JMC Change Event, Class B6 Creditors shall receive

their Pro Rata share of 5% of JMC Net Proceeds, to be distributed as an additional payment up to

the Allowed amount of their Claims.   In no event shall the total payments to Classes A6, A7 and

B6 on account of the total JEC Change Events, JMC Change Events and/or JMH Change Events

exceed $3 million, exclusive of the Scheduled Payments and any other payments due pursuant to

Article IV A6 (1)-(6), A7 (1)-(6), B6 (1)-(5) and C3.   The payments due under this subparagraph

(6) are in addition to and not in lieu of any other payments due hereunder including, without

limitation, the Scheduled Payments, which Scheduled Payments shall continue to be due and

payable in such amounts and at such times as are set forth in Article IV A6 (1)-(4) and B6 (1)-

(4).

17469.034/516410.6

JEC shall pay simple interest at the rate of 8% on account of any payment default hereunder until such default is cured.  All payments for (1) through (6) above shall be secured by the Unsecured Claims Security Documents.

7.    **Class B7 – Intercompany Claims Against JEC**.  After Class B6 Claims are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim against JEC shall be entitled to receive payment from JEC pursuant to terms to be mutually agreed upon between JEC and the holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

8.    **Class B8 – Convenience Claims Against JEC**.  In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Convenience Claim becomes an Allowed Convenience Claim, each Entity holding an Allowed Convenience Claim against JEC will receive Cash equal to fifty percent (50%) of the Allowed amount of such Convenience Claim, except to the extent that such holder of an Allowed Convenience Claim has been paid by JEC prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

C.    **Treatment of Claims Against JMC.**

1.    **Class C1 – People's JMC Secured Claim.**  On the Effective Date, the maturity of the People's JMC Secured Claim shall be reinstated as such maturity existed before any default, People's United Bank will retain all liens securing such Claim, and such Claim shall be paid in full in accordance with the terms of the documents creating and evidencing such Claim. In addition, JMC will remain obligated as co-borrower on the JMH Secured Claim and the JEC Secured Claim and People's United Bank will retain any liens on JMC's property securing those Claims.

2.      **Class C2 - Allowed Priority Non-Tax Claims Against JMC.**   In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Priority Non-Tax Claim against JMC becomes an Allowed Priority Non-Tax Claim, each Entity holding an Allowed Priority Non-Tax Claim against JMC will receive from JMC Cash equal to the Allowed amount of such Priority Non-Tax Claim, except to the extent that such holder of an Allowed Priority Non-Tax Claim has been paid by JMC prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

3.      **Class C3 – Allowed Unsecured Claims Against JMC**.   In full and complete satisfaction of its Claim, on the later of the Effective Date and the date such Unsecured Claim against JMC becomes an Allowed Unsecured Claim, each Entity holding an Allowed Unsecured Claim against JMC shall receive from JMC Cash equal to its Pro Rata share of $35,000.00, except to the extent that such holder of an Allowed Unsecured Claim has been paid by JMC prior to the Effective Date and except to the extent such holder agrees to less favorable treatment.

4.      **Class C4 – Intercompany Claims Against JMC**.   After Class C3 Claims are paid pursuant to the terms of the Plan, each holder of an Intercompany Claim against JMC shall be entitled to receive payment from JMC pursuant to terms to be mutually agreed upon between JMC and the holder of an Intercompany Claim, in full and complete satisfaction, settlement and release of and in exchange for such Intercompany Claim.

### ARTICLE V
### MEANS FOR PLAN'S IMPLEMENTATION

A.      **Debtors' Actions.**   On the Effective Date, title to all property of each of the Debtors' estates will vest in the applicable Debtor, the Debtors shall be authorized and directed to execute and to deliver all documents and agreements and take all actions contemplated by this

Plan, and the Debtors will make the Effective Date distributions provided for in this Plan from

the Debtors' cash on hand and operating revenue and from the Post-Confirmation Line of Credit.

On or prior to the Effective Date, the Debtors will, inter alia, take actions necessary to reinstate

the People's Secured Claims as provided in this Plan and enter into the Post-Confirmation Line

of Credit.

B.    **Plan Custodian and Security For Class A6 and B6 Claims**.  On the Effective

Date, the Plan Custodian shall be appointed.  As set forth in the Plan Custodian Agreement, the

Plan Custodian shall be authorized and empowered to (1) monitor the Debtors' compliance with

the terms of the Plan; (2) enforce all rights under the Unsecured Claims Security Documents; (3)

exercise all of the powers of the Debtors in connection with the Litigation Claims; and (4)

subject to the oversight of the Oversight Committee, take such actions as may be necessary and

in the best interests of holders of Allowed Unsecured Claims (other than Class A7 Allowed

Claims) in connection with the implementation of the terms of the Plan including, without

limitation, whether to agree to a JEC Change Event, JMH Change Event, or JMC Change Event

that does not otherwise satisfy the criteria set forth herein.

1.    The Unsecured Claims Security Documents will provide for, among other things,

a second priority lien on all of the Debtors' real property, subordinate only to the People's

Secured Claims, and liens on the Debtors' personal property, subordinate only to any existing

liens and the liens granted to the Exit Lender in connection with the Post-Confirmation Line of

Credit.

2.    The Plan Custodian may engage such attorneys, accountants and other

professionals as are reasonably required to effectively and efficiently perform its responsibilities

under the Plan.  The Plan Custodian shall seek Bankruptcy Court approval for the retention of

any such professional who was not retained previously by the Debtors or the Committee pursuant to an order of the Bankruptcy Court.   Subject to the Bankruptcy Court's approval, the Plan Custodian and any professionals retained by the Plan Custodian shall be compensated for fees and expenses from (a) an initial fund of $125,000.00 funded by the Debtors on the Effective Date and (b) Litigation Claims Proceeds.  Other than the initial $125,000.00 payment, the Debtors will have no obligation for the fees and expenses of the Plan Custodian or the Plan Custodian's professionals, except in the event of a default under the Plan by Debtors, whereupon the Reorganized Debtors shall be liable for all reasonable costs and expenses of the Plan Custodian, including, without limitation, all reasonable attorneys' and professional fees, incurred during the period of the default or as a result of said default.  The Plan Custodian may retain professionals who were retained by the Debtors or the Committee during the Case.

3.      The Plan Custodian shall have the right and duty to, on behalf of and in the name of the Debtors, (a) examine all Litigation Claims, including, without limitation, avoidance actions under Bankruptcy Code sections 544, 547, 548 and 549, and file, litigate to final judgment, settle, or withdraw such Litigation Claims and (b) examine Claims and file, litigate to final judgment, settle, or withdraw objections to Claims, subject to Bankruptcy Court approval.

4.      The Plan Custodian or its agent shall maintain books and records containing an accounting of receipts and disbursements.  The Plan Custodian shall periodically, but not less than once every ninety days, inform the Oversight Committee of any developments that it considers significant during the term of the Plan.  At the request of the Oversight Committee, the Plan Custodian shall provide the Oversight Committee with a written report on the status of all active matters affecting the Debtors.

17469.034/516410.6

5.      The Plan Custodian may resign by giving written notice of his resignation to the Oversight Committee, the twenty largest unsecured Creditors, the United States Trustee for Connecticut, and all parties who requested notice in these Cases.  Unless the Bankruptcy Court orders otherwise, (a) such resignation shall become effective on the date on which the Bankruptcy Court appoints a successor Plan Custodian and (b) the Plan Custodian shall be entitled to compensation up to the date on which the Plan Custodian's resignation becomes effective.  Unless the Bankruptcy Court orders otherwise, within forty-five days of such resignation becoming effective, the Plan Custodian shall serve a final accounting on the Oversight Committee and thereupon be discharged from the performance of any further duties. The Oversight Committee may move the Bankruptcy Court, upon not less than ten days written notice to all parties listed above, for an order removing the Plan Custodian for cause.  If the Plan Custodian at any time resigns or is removed, or dies or becomes incapable of action, or is a debtor under the Bankruptcy Code or is adjudged to be insolvent, a vacancy shall be deemed to exist and a successor Plan Custodian shall be appointed pursuant to an order of the Bankruptcy Court as soon as practicable upon motion of the Oversight Committee on not less than ten days written notice to all parties listed above.

6.      If any claim, cause of action, objection, settlement or other act of, or on behalf of, the Debtors gives rise to a conflict on behalf of the Plan Custodian, the Plan Custodian shall inform the Oversight Committee of the conflict not later than two (2) Business Days from discovery of the conflict by the Plan Custodian.  Immediately upon discovery of the conflict by the Plan Custodian, the Plan Custodian shall withdraw from any and all involvement concerning the matter or issue giving rise to the conflict.  Within thirty days of being informed of the conflict, the Oversight Committee shall seek the entry of an order from the Bankruptcy Court,

upon not less than ten days written notice, approving the appointment of a supplemental Plan Custodian only to the extent necessary to avoid such a conflict. Any supplemental Plan Custodian so appointed shall have the rights, powers, privileges and duties of the Plan Custodian hereunder solely in connection with the matters on which it has been appointed and shall be subject to the conditions and limitations of the Plan. The Bankruptcy Court may remove such supplemental Plan Custodian for cause, upon the motion of the Oversight Committee on not less than ten days written notice to all parties, and such supplemental Plan Custodian shall resign upon completion of its duties in connection with the matter on which it was appointed.

7.       The Plan Custodian and any supplemental Plan Custodian and their members, agents, representatives, employees and professionals shall not be liable to the Debtors, the Debtors' Creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud. The Plan Custodian shall not be liable for any action taken or omitted in good faith and reasonably believed by it to be authorized within the discretion or rights or powers conferred upon it by the Plan. In performing its duties under the Plan, the Plan Custodian may retain and consult with counsel selected by it, and shall have no liability for any reasonable action taken upon the advice of such counsel. None of the provisions of the Plan shall require or be construed as requiring the Plan Custodian to expend or risk its own funds or otherwise incur or expose it to personal financial liability in the performance of any of its duties under the Plan or in the exercise of any of its rights and powers. The Plan Custodian may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.

17469.034/516410.6

8.    After all of the provisions of the Plan have been fully performed, Plan Custodian shall be discharged of its duties.

9.    Should the Plan Custodian recover and hold any funds pending disbursement (either to the Allowed Unsecured Creditors directly or to the Debtors for distribution to the Allowed Unsecured Creditors, and excluding  the Reimbursement Fund or any portion of the Litigation Claims Proceeds to be used for compensation or reimbursement as set forth herein or in the Plan), the Plan Custodian shall obtain and maintain a bond of equal value thereto, payable to the United States of America, for the period of time during which such funds are being held by the Plan Custodian.

C.    **The Oversight Committee.**    Upon the Effective Date, three members of the Committee selected by the Committee shall become the Oversight Committee.  The Oversight Committee shall be representative of all holders of Allowed Unsecured Claims, and shall oversee the post-Effective Date activities of the Plan Custodian in accordance with the Plan.

1.    The powers and duties of the Oversight Committee shall be limited to the following: (a) monitoring the activities of the Plan Custodian in accordance with the terms of the Plan and the Plan Custodian Agreement, (b) participating in the removal of the Plan Custodian for cause and the appointment of any successor Plan Custodian and (c) making such decisions as are in the best interests of holders of Allowed Unsecured Claims in connection with the implementation of the Plan.

2.    The Oversight Committee may retain counsel to represent the Oversight Committee with respect to any claim or action asserted against the Oversight Committee and to advise the Oversight Committee on matters concerning the Debtors, the Plan Custodian and the Oversight Committee's fiduciary duties.  The reasonable and necessary expenses of the Oversight

17469.034/516410.6

Committee, including attorneys' fees and expenses, that may be incurred in the performance of the Oversight Committee's fiduciary duties, shall be paid from the $125,000.00 initial fund described above and from any Litigation Claims Proceeds provided, however, that in the event of a default by Debtors under the Plan, any and all reasonable fees and expenses of the Oversight Committee, including, without limitation, reasonable attorneys' and other professional fees, incurred during the period of the default or as a result of said default shall not be paid from the $125,000 fund or the Litigation Claims Proceeds but shall be the responsibility of Reorganized Debtors.

3.      An Oversight Committee member shall be recused from any discussions or deliberations of the Oversight Committee or the Plan Custodian concerning any claim which directly or indirectly relates to any claim or cause of action which may be considered or brought by the Debtors against such Oversight Committee member.   Those Oversight Committee members that are required to be recused shall not have access to any non-publicly available information that may be the subject of litigation concerning any such claim.

4.      Members of the Oversight Committee shall not be liable to the Debtors, the Debtors' Creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud.   Members of the Oversight Committee shall not be liable for any action taken or omitted in good faith and reasonably believed by them to be authorized within the discretion or rights or powers conferred upon them by the Plan.   In performing its duties under the Plan, the Oversight Committee may retain and consult with counsel selected by it, and shall have no liability for any reasonable action taken upon the advice of such counsel.   None of the provisions of the Plan shall require or be construed as requiring the members of the Oversight Committee to expend or risk their own funds or

otherwise incur or expose them to personal financial liability in the performance of any of their duties under the Plan or in the exercise of any of their rights and powers. The Oversight Committee may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.

5.      The Oversight Committee will terminate upon the payment of Allowed Unsecured Claims pursuant to the Plan.

D.      **Litigation Matters**. The Debtors shall retain all pre-petition claims, causes of action and rights of the Debtors and the Debtors' estates, including, without limitation, avoidance actions and the right to seek the subordination of Claims under Bankruptcy Code section 510. On the Effective Date, the Plan Custodian shall become responsible for examining and pursuing on behalf of the Debtors the Litigation Claims. Any recovery on the Litigation Claims shall become Litigation Claims Proceeds. Other than the $125,000.00 initial amount paid by the Debtors on the Effective Date, all fees, expenses, and costs of pursuing the Litigation Claims shall be paid from the Litigation Claims Proceeds, and the Reorganized Debtors shall not be responsible for any such fees, expenses and costs of pursuing the Litigation Claims. The Plan Custodian cannot settle any Litigation Claims unless the Bankruptcy Court enters an order approving such settlement pursuant to Bankruptcy Rule 9019. To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Claims prior to the Effective Date by the Debtors and/or the Committee, the Plan Custodian shall be substituted for the Debtors and/or the Committee in connection therewith. Reorganized Debtors, upon reasonable notice, shall be required to provide information, to the extent Reorganized Debtors have such information, to the Plan Custodian sufficient to enable the Plan Custodian to perform its duties hereunder.

E.      **Procedures for Resolving and Treating Disputed Claims.**

1.     **No Distributions Pending Allowance**.  Notwithstanding any other provision herein, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on any portion of that Claim unless and until and only to the extent such Claim becomes Allowed.

2.     **Resolution of Disputed Claims**.

a.     Reorganized Debtors, the Committee and the Plan Custodian shall have the right to make, file and prosecute objections to Claims.  A copy of each objection shall be served upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event shall the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court. All objections shall be litigated to a Final Order except to the extent such objection is withdrawn, or such objection is compromised, settled or otherwise resolved.

b.     **Reserve Accounts for Disputed Claims**.  Reorganized Debtors shall be required to reserve (but not in a formal, segregated account) sufficient Cash for Disputed Claims.

c.     **Estimation of Claims**.  One of the Debtors may, at any time, request the Bankruptcy Court to estimate any Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether that Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, a

-37-

Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

d.    **Allowance of Disputed Claims**.  If, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Reorganized Debtor the Claim is against shall, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided herein, distribute to the holder of such Allowed Claim an amount that provides such holder with the same percentage recovery, as of such date, as other holders of Claims in the relevant Class that were Allowed on the Effective Date.

e.    **No Distribution in Respect of Disallowed Claims**.  To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed but rather such distribution amount shall be paid to the other Unsecured Creditors on a Pro Rata basis.

F.    **Termination of JMH Pension Plan and Payment of Termination Premium to PBGC.**  JMH sponsors the Pension Plan, which is asserted to be a defined benefit Pension Plan covered by Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301-1461.  JMH is terminating the Pension Plan in a distress termination under 29 U.S.C. section 1341(c), in conformity with statutory and regulatory requirements as well as the rules and requirements of the PBGC and the U.S. Internal Revenue Service.  JMH will be liable for the amount by which the Pension Plan's liabilities exceed the Pension Plan's assets upon termination.  *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007); 26 U.S.C. §§ 412, 430 (as to § 430, effective for pension plan years beginning after December 31, 2007).  JEC, JMC and other affiliates of JMH, as

members of JMH's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)), will be jointly and severally liable with JMH for this underfunding claim. The PBGC asserts that upon termination the Pension Plan will be underfunded by, and the PBGC will have a Claim against JMH for, approximately $29 million. The Debtors, the Committee and the PBGC have reached an agreement on the Allowance and treatment of the PBGC's termination related Claims, which is subject to confirmation of this Plan. If this Plan is not confirmed, all parties reserve their rights with respect to the Allowance and treatment of all Claims, including the PBGC's Claims. JMH and the Committee will not object to the amount of this Claim, the proofs of Claim filed by the PBGC will be allowed in the amounts filed, and the PBGC Claim will be treated as provided in Article IV of this Plan in the amount Allowed.

If the Pension Plan is terminated in a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) or a PBGC-initiated termination under 29 U.S.C. § 1342 while JMH is attempting to reorganize in Chapter 11, and JMH ultimately is the subject of a confirmed Chapter 11 plan of reorganization, JMH will become liable to the PBGC--in addition to the flat- and variable-rate premiums--for termination premiums in the amount of $1,250 per year for three years for each Pension Plan participant. The termination premium liability does not exist until after the Chapter 11 plan is confirmed and JMH exits from bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141. However, if JMH's chapter 11 proceeding in essence becomes a liquidation, and the Pension Plan is terminated in a PBGC-initiated termination, the termination premium may become immediately due, and PBGC typically would assert the termination premium as a administrative priority claim in JMH's liquidating bankruptcy.

JEC, JMC and other affiliates of JMH also will be jointly and severally liable with JMH for insurance premiums that JMH will owe to the PBGC upon termination of the Pension Plan. See 29 U.S.C. §§ 1306, 1307.  The PBGC asserts that this termination premium claim will total approximately $3 million.  The PBGC and JMH have reached an agreement providing for the treatment of this termination premium claim, and the Committee consents to this treatment.  In full and complete satisfaction of the annual insurance premiums due to the PBGC with respect to the Pension Plan under 29 U.S.C. sections 1306(a)(3) and 1307(a) and (e), JMH shall execute and deliver to the PBGC the PBGC Premium Note for $2,000,000.00.  The PBGC Premium Note will not bear interest, and JMH will make five annual payments of $400,000.00 to the PBGC on account of the PBGC Premium Note commencing on the sixth anniversary of the Effective Date. Dollar payments made in excess of the annual payment will reduce the outstanding principal amount by a multiplier of 1.5.  The $2,000,000.00 may be paid in full at any time prior to the sixth anniversary of the Effective Date for a payment of $500,000.00.  The PBGC and the Debtors have agreed that after confirmation of the Plan, JEC and JMC will have no liability for the PBGC Claim and will remain liable for the termination premium claim, but will be required to make payments on such termination premium claim only if JMH fails to make the payments to the PBGC on account of that termination premium claim as provided herein.  JMH's obligation to make payments on account of the termination premium shall be secured by the lien granted to the PBGC pursuant to the Unsecured Class A7 Security Documents, provided, however, that such payments shall be subordinated to JMH's obligation to make payments on account of Class A6, Class A7 and Class B6 Allowed Claims.

Nothing in the Debtors' bankruptcy proceedings, the Confirmation Order, the Plan, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtors' Cases

17469.034/516410.6

shall in any way be construed to discharge, release, limit, or relieve the Debtors or any other party, in any capacity, from ERISA fiduciary liability with respect to fiduciary breaches that occurred prior to the termination of the Pension Plan or any other defined benefit pension plan under any law, governmental policy, or regulatory provision.

G.      **Certain Environmental Matters.**  Historically, JMH had stored its spent x-ray development fluid in an underground storage tank located at the hospital grounds in Stafford Springs.  In April 2004, this tank and the pipe leading to it were discovered to have leaked. JMH promptly removed the underground storage tank and conducted other remedial activities, including soil removal and sampling of soil and groundwater.  JMH provided information on the remedial activities to the Connecticut Department of Environmental Protection (the "DEP"), which is currently reviewing it.  Under the Plan, any additional investigation and remediation required by the DEP will be performed by Reorganized JMH.

17469.034/516410.6

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Assumption.**   Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy

Code, all executory contracts and unexpired leases that exist between one of the Debtors and

any Entity shall be deemed assumed by such Debtors, as of the Effective Date, except for any

executory contract or unexpired lease (1) that has been rejected pursuant to an order of the

Bankruptcy Court entered prior to the Effective Date, (2) as to which a motion for approval of

the rejection of such executory contract or unexpired lease is pending as of the Effective Date,

or (3) that is specifically designated as a contract or lease to be rejected in any schedule to this

Plan.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the

Effective Date, constitute (1) the approval, pursuant to sections 365(a) and 1123(b)(2) of the

Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed

and assigned pursuant to the Plan, (2) the extension of time, pursuant to section 365(d)(4) of the

Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the

unexpired leases specified in the Plan through the date of entry of an order approving the

assumption, assumption and assignment, or rejection of such unexpired leases, and (3) the

approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of

the executory contracts and unexpired leases rejected pursuant to the Plan.

B.      **Cure of Defaults**.   The Reorganized Debtors shall pay all cure amounts, if any,

to the non-debtor parties to the non-intercompany executory contracts and unexpired leases

assumed pursuant to the Plan by the later to occur of (1) the first Effective Date Anniversary or

(2) ten (10) days after resolution of the cure amount by Final Order or agreement of the parties,

except as otherwise agreed to by the parties.  If a non-debtor party to an executory contract or unexpired lease assumed pursuant to the Plan timely objects to the assumption or the proposed cure amount for that agreement, the Debtors and the objecting party may settle, compromise, or otherwise resolve the proper cure amount without further order of the Court or may submit the dispute to the Bankruptcy Court for a determination as to the proper cure amount. Notwithstanding the above, the Debtors may, in its sole and absolute discretion, determine to reject any executory contract or unexpired lease at any time prior to the later of (1) thirty (30) days after the Effective Date and (2) thirty (30) days after the entry of a Final Order determining the proper cure amount for that contract or lease.  The effective date of a rejection effected pursuant to the preceding sentence shall be the Confirmation Date regardless of the date on which the Debtors gives notice of such rejection. In no event and under no circumstances shall cure amounts be paid on account of or arising under any contract or lease between Debtors or between any Debtor and its affiliates or the affiliates of any other Debtors.

C.      **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, Reorganized Debtors, no later than thirty (30) days after the later of (1) the date notice of entry of an order is mailed approving the rejection of such executory contract or unexpired lease, and (2) the date notice of entry of the Confirmation Order is mailed.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and its estate or the Reorganized Debtors and its property.

D.      **Insurance Policies**.  All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as executory contracts under the Plan. Nothing contained herein shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

## ARTICLE VII
## DISTRIBUTIONS UNDER THE PLAN

A.      **Distributions - Generally**.  Reorganized Debtors shall make all distributions required by the Plan.

B.      **Distributions of Cash**.  Any payment of Cash made by Reorganized Debtors pursuant to the Plan may be made at the option of such party either by check drawn on a domestic bank or by wire transfer from a domestic bank.

C.      **Distributions Free and Clear**.  Except as otherwise provided herein, any distributions or transfers by or on behalf of the Debtors under the Plan, including, but not limited to, distributions to any holder of an Allowed Claim, shall be free and clear of any liens, claims, and encumbrances, and no other entity shall have any interest — legal, beneficial, or otherwise — in assets transferred pursuant to the Plan.

D.      **Timing of Distributions**.  Unless otherwise provided herein, any distribution to be made by the Reorganized Debtors shall be made at the time provided in Article IV or Article V of this Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

17469.034/516410.6

E.      **Delivery of Distributions**.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents.  The holder must notify the Reorganized Debtors in writing of a change of address or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules.   The Reorganized Debtors shall not be liable for any distribution sent to the address of record of a holder in the absence of the written change thereof as provided herein.

F.      **Distributions to Holders as of Record Date**.  As of the close of business on the Record Date, the claims registers for the Debtors shall be closed pursuant to the order approving the Disclosure Statement, and there shall be no further changes made to the identity of the record holder of any Claim.   The Reorganized Debtors shall not have any obligation to recognize any transfer of any Claim occurring after the Record Date.  The Reorganized Debtors shall be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the applicable claims register at the close of business on the Record Date.

G.      **Undeliverable and Unclaimed Distributions**.   If any Claim holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the holder notifies the Reorganized Debtors, as appropriate, in writing of such holder's then-current address, at which time all missed distributions shall, subject to the final sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by the Reorganized Debtors in respect of Allowed Claims shall be null and void

if not negotiated within one hundred and sixty (60) days after the date of issuance thereof. After such date, all such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall become unencumbered Cash of the Reorganized Debtors. The holder of any Claim for which undeliverable distribution has been deemed unclaimed property under section 357(b) of the Bankruptcy Code shall not be entitled to any other or further distribution under the Plan on account of such Claim but rather, if in the aggregate such undeliverable or unclaimed distributions total $100,000 or more, the Reorganized Debtors must redistribute those amounts, on a Pro Rata basis, to the holders of Class A6, A7 and B6 Allowed Claims.

H.    **Setoffs**.  To the extent permitted under applicable law, the Reorganized Debtors may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the claims, rights and causes of action of any nature that one of the Debtors has asserted in writing against the holder of such Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code, and in the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from such Debtor, it will be conclusively presumed that the requirements for disallowance of a Claim under section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have been satisfied.  Neither the failure to affect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the a Debtor of any such claims, rights and causes of action that such Debtor may possess against such holder.

17469.034/516410.6

I.    **Application of Distributions**.  Distributions to any holder of an Allowed Claim shall be applied first to the satisfaction of the principal portion (as determined for federal income tax purposes) of any such Claim and thereafter to the remaining portion of such Allowed Claim, if any.

J.    **Withholding and Reporting Requirements.**  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Debtors or any other paying agent, as applicable, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions.  Any party issuing any instrument or making an in-kind (non- Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## ARTICLE VIII
## EFFECTIVE DATE

A.    **Conditions Precedent to the Effective Date**.  The following are conditions precedent to the Effective Date of the Plan:

1.      The Bankruptcy Court shall have entered the Confirmation Order, which shall approve the Plan on substantially the same terms and conditions set forth herein, which shall be in form and substance satisfactory to the Debtors;

2.      No stay of the Confirmation Order shall then be in effect at the time the other conditions set forth herein are satisfied or waived;

3.      All documents, instruments and agreements, in form and substance satisfactory to the Debtors, provided for under or necessary to implement the Plan, including but not limited to the Plan Custodian Agreement and the Unsecured Claims Security Documents, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

4.      All of the payments to be made by the Debtors by or on the Effective Date shall have been made or will be made on the Effective Date;

5.      The Debtors shall have Cash available to make all payments required on the Effective Date;

6.      The Debtors shall have obtained all governmental and other regulatory approvals or rulings that the Debtors believe, in their reasonable discretion, are necessary for consummation of the Plan;

7.      The Debtors' pension plans shall have been terminated or be in the process of termination pursuant to an agreement with the PBGC; and

8.      The Debtors shall have obtained the Post-Confirmation Line of Credit in an amount not less than $6 million.

B.      **Waiver of Conditions**.  The Debtors may waive one or more of the conditions precedent to the Effective Date of the Plan set forth herein.

C.    **Effect of Failure of Conditions**.  In the event that one or more of the conditions specified herein have not occurred and have not been waived on or before the date that is sixty (60) days after the Confirmation Date, (1) the Confirmation Order shall be vacated, (2) no distributions under the Plan shall be made, (3) the Debtors and all holders of Claims shall be restored to the status quo ante as of the date immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (4) the Debtors' obligations with respect to Claims shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Entity or will prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

## ARTICLE IX
## EFFECT OF CONFIRMATION OF PLAN

A.    **Vesting of Assets**.  As of the Effective Date, the property of the Debtors' estates, including all claims and causes of action against third parties that arose prior to or after the Petition Date, shall vest in the Debtors or such other entity as provided in the Plan.  From and after the Effective Date, the Debtors may dispose of their respective assets free of any restrictions of the Bankruptcy Code, but in accordance with the provisions of the Plan.  As of the Effective Date, all assets of the Debtors shall be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

B.    **Binding Effect**.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtors and their successors and assigns, whether or not the Claim

of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

The rights, benefits and obligations of any Entity named or referred to in the Plan whose actions

may be required to effectuate the term of the Plan shall be binding on, and shall inure to the

benefit of, any heir, executor, administrator, successor or assign of such entity (including, but

not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy

Code).

C.      **Discharge**.  Upon the Effective Date and in consideration of the distributions to

be made hereunder, except as otherwise expressly provided herein, each holder (as well as any

trustees and agents on behalf of each holder) of a Claim and any affiliate of such holder shall be

deemed to have forever waived, released, and discharged the Debtors and the Reorganized

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from

any and all Claims, rights, and liabilities that arose prior to the Confirmation Date.  Upon the

Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524

of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against

Debtors or the Reorganized Debtors.

D.      **Exculpation**.  The Exculpation Parties, and any property of or professionals

retained by such parties, or direct or indirect predecessor in interest to any of the foregoing

persons, shall not have or incur any liability to any Entity for any act taken or omission, after

the Petition Date, in connection with or related to the Cases or the operations of the Debtors'

businesses during the Cases, including but not limited to formulating, preparing, disseminating,

implementing, confirming, consummating or administrating the Plan (including soliciting

acceptances or rejections thereof) or any distributions made pursuant to the Plan, except for acts

constituting willful misconduct, gross negligence, or bad faith, and in all respects such parties

shall be entitled to rely in good faith upon the advice of counsel with respect to their duties and responsibilities under the Plan.

       E.    **Releases**.  As of the Effective Date, the Released Parties shall be released by the Debtors and any successors-in-interest of the Debtors from any and all Claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, at law, in equity, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of a Claim or other person or entity would have been legally entitled to assert on behalf of the Debtors or their estates, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place before or on the Effective Date, except for acts constituting willful misconduct, gross negligence, or bad faith occurring during the Cases and, in all respects such parties shall be entitled to rely in good faith upon the advice of counsel with respect to their duties and responsibilities under the Plan.

       F.    **Injunction**.  Subject to the provisions of this Plan, all Entities (other than the Plan Custodian, whose rights are defined by the Plan) who have held, hold, or may hold Claims against one of the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to all Claims against the Debtors from (1) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Released Parties, or their property, (2) enforcing, levying, attaching (including, without limitation, any prejudgment attachment),

collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Released

Parties, or their property, (3) creating, perfecting, or otherwise enforcing in any manner, directly

or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the

Released Parties, or against the property or interests in property of the foregoing, (4) asserting

any right of setoff, directly or indirectly, against any obligation due the Debtors, the

Reorganized Debtors, the Released Parties, or any of their property, except as contemplated or

allowed by the Plan, the Bankruptcy Code, or applicable law, (5) acting or proceeding in any

manner, in any place whatsoever, that does not conform to or comply with the provisions of the

Plan, (6) commencing, continuing or asserting in any manner any action or other proceeding of

any kind with respect to any Claims and causes of action which are extinguished or released

pursuant to the Plan, and (7) taking any actions to interfere with the implementation or

consummation of the Plan.  All Entities are permanently enjoined, on and after the Effective

Date, from asserting any Claim which is released by such Entity under the Plan or for which the

party against whom the Claim is being asserted has received exculpation under the Plan,

including: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any

suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a

judicial, arbitral, administrative or other forum) on account of such Claim, (ii) enforcing,

levying, attaching (including, without limitation, any prejudgment attachment), collecting, or

otherwise recovering by any manner or means, whether directly or indirectly, any judgment,

award, decree, or order on account of such Claim, (iii) creating, perfecting, or otherwise

enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of

such Claim, (iv) asserting any right of setoff, directly or indirectly, against any obligation on

17469.034/516410.6

account of such claim, (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (vi) commencing, continuing or asserting in any manner any action or other proceeding of any kind with respect to any such Claim, and (vii) taking any actions to interfere with the implementation or consummation of the Plan. Nothing herein shall affect the Connecticut Department of Revenue Services' statutory right of setoff.

G.    **Term of Injunctions or Stays**. Unless otherwise herein, all injunctions or stays provided for in this Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of a final order closing this Case.

H.    **Retention of Causes of Action/Reservation of Rights**. Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or choose to assert on behalf of their estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (1) any and all Claims against any Entity, to the extent such Entity asserts a cross-claim, counterclaim, and/or Claim for setoff which seeks affirmative relief against one of the Debtors, its officers, directors, or representatives, (2) any and all claims under chapter 5 of the Bankruptcy Code and (3) the turnover of any property of one of the Debtors' estates. Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which a Debtor had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan. The Debtors and the Reorganized

Debtors shall have, retain, reserve, and be entitled to assert all such Claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Cases had not been commenced, and all of the Debtors' and the Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Case had not been commenced.  The Reorganized Debtors shall, after the Effective Date, retain the rights to bring any causes of action that could have been brought by a Debtor at any time.

I.    **Section 506(c) Reservation**.  The Debtors and the Reorganized Debtors reserve all rights under Bankruptcy Code section 506(c) with respect to any and all Secured Claims.

## ARTICLE X
## DEBTORS' REQUEST PURSUANT TO BANKRUPTCY CODE § 1129(b)

If all of the applicable requirements of Bankruptcy Code section 1129(a), other than section 1129(a)(8) thereof, are met with respect to this Plan, the Debtors request that the Bankruptcy Court, pursuant to Bankruptcy Code section 1129(b), confirm this Plan notwithstanding the requirements of Bankruptcy Code section 1129(a)(8) if this Plan does not discriminate unfairly and is fair and equitable with respect to each class.

## ARTICLE XI
## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings arising from, or relating to, the Cases pursuant to Bankruptcy Code section 1142 and 28 U.S.C. section 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of this Plan are carried out.  Without limiting the generality of the foregoing, the

17469.034/516410.6

Bankruptcy Court shall retain jurisdiction for the following purposes: (1) to hear and determine any and all objections to the allowance, or requests for estimation, of Claims; (2) to consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, one of the Debtors; (3) to determine any and all applications pending on the Confirmation Date for the rejection and disaffirmance, assumption or assignment of executory contracts or leases and the allowance of any Claim resulting therefrom; (4) to enter such orders as may be necessary or appropriate in connection with the recovery of the Debtors' assets or property wherever located; (5) to hear and determine any and all applications for allowance of compensation and reimbursement of expenses; (6) to hear and determine any and all controversies, suits and disputes arising under or in connection with the interpretation, implementation or enforcement of this Plan and any of the documents intended to implement the provisions of this Plan; (7) to hear and determine any and all applications, adversary proceedings, contested matters and other litigated matters pending on the Effective Date or that may be commenced thereafter as provided in this Plan; (8) to hear and determine any applications to modify any provision of this Plan to the full extent permitted by the Bankruptcy Code; (9) to correct any defect, cure any omissions or reconcile any inconsistency in this Plan, or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan; (10) to effectuate distributions under and performance of the provisions of this Plan; (11) to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar and related matters with respect to the Debtors relating to the administration of the Cases, including, without limitation, matters involving federal, state and local taxes in accordance with Bankruptcy Code sections 346, 505 and 1146; (12) to determine such other matters and for such other purposes as may be provided in the Confirmation Order or as may

from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; (13) to enforce all orders, judgments, injunctions, releases and rulings issued or entered in connection with the Cases or this Plan; (14) to enter such orders as may be necessary or appropriate in aid of confirmation and to facilitate implementation of this Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated; (15) to determine any other matter not inconsistent with the Bankruptcy Code; (16) hear any matter regarding the Plan Custodian's rights and duties under the Plan; and (17) to enter an order closing the Cases.

## ARTICLE XII
## MODIFICATION OR WITHDRAWAL OF THIS PLAN

A.     **Modification of this Plan**. This Plan may be altered, amended or modified by the Debtors, before or after the Confirmation Date, as provided in Bankruptcy Code section 1127.

B.     **Withdrawal of this Plan**.  The Debtors reserve the right to revoke and withdraw this Plan at any time before the Confirmation Date.  If the Debtors revoke or withdraws this Plan, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors.

17469.034/516410.6

## ARTICLE XIII
## MISCELLANEOUS

A.      **Governing Law.**  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights, duties and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut.

B.      **Headings.**  The headings of the articles, paragraphs, and sections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

C.      **Severability.**  Should any provision in this Plan be determined to be invalid, void or unenforceable, such determination shall in no way limit, affect, impair or invalidate the enforceability and operative effect of any or all other provisions of this Plan.

D.      **Computations.**  Any calculation of days shall exclude the first date and include the last date of the relevant period.

E.      **Miscellaneous Rules of Construction.**  (1) The words "herein," "hereof," and other words of similar import refer to this Plan as a whole, not to any particular section, subsection or clause, unless the context requires otherwise; (2) whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, or neuter; (3) accounting terms not otherwise defined in this Plan shall have the meanings assigned to them under generally accepted accounting principles currently in effect; and (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order.

17469.034/516410.6

F.      **Confirmation Order and Plan Control.**  To the extent the Confirmation Order and/or this Plan is inconsistent with the Disclosure Statement, this Plan controls the Disclosure Statement, and the Confirmation Order (and any other orders of the Bankruptcy Court) controls this Plan.  In the event the terms or provisions of this Plan are inconsistent with the terms and provisions of the exhibits to this Plan or documents executed in connection with this Plan, the terms of this Plan shall control.

G.      **Successors and Assigns.**  The rights, benefits, and obligations of any person or Entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such person or Entity.

H.      **No Waiver.**  The failure of a Debtor to object to a Claim for purposes of voting on this Plan shall not be deemed a waiver of that Debtor's right to object to or examine such Claim, in whole or in part.

I.      **Notices.**  All notices and requests in connection with this Plan shall be in writing and shall be hand delivered or sent by mail to:

**Johnson Memorial Corporation,**
**Johnson Memorial Hospital, Inc., and**
**The Johnson Evergreen Corporation, Inc.**
c/o Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103
ATTN:  Eric Henzy, Esq.
*Counsel to the Debtors*

17469.034/516410.6

Dated at Stafford and Hartford, Connecticut, this 9th day of August, 2010.

JOHNSON MEMORIAL CORPORATION,
JOHNSON MEMORIAL HOSPITAL, INC.
and THE JOHNSON EVERGREEN
CORPORATION, INC.


By    /s/ Peter J. Betts
    Peter J. Betts, LFACHE
    Interim President & CEO


By    /s/ Eric Henzy
    Eric Henzy
    Federal Bar No. ct12849
    Reid and Riege, P.C.
    One Financial Plaza
    Hartford, CT  06103
    (860) 278-1150
    Fax: (860) 240-1002
    ehenzy@reidandriege.com
    Their Attorneys

17469.034/516410.6